**RALPH W. BAKER, JR**
*Plaintiff*
By: Ralph W. Baker, Jr.

112 South Elliott Place
Brooklyn, NY 11217
ph: 917-697-8168
e: ralphbakerjr@msn.com

RECEIVED
SEP 21 2026
PRO SE OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X Case No. RALPH W. BAKER, JR,

Plaintiff,

**COMPLAINT**
JURY TRIAL
DEMANDED

-against-

Ava DuVernay, Spencer Averick, ARRAY Filmworks, Ms. Oprah Winfrey, Michelle Alexander, Melina Abdullah, United States, Jelani Cobb, Angela Davis, Baz Dreisinger, Henry Louis Gates, Jr., Marie Gottschalk, John Hagan, Michael Harriot, Van Jones, Glenn E. Martin, Marc Mauer, Khalil Gibran Muhammad, Kevin Gannon, Rashad Robinson, Bryan Stevenson, Nicholas Turner, Brennan Center for Justice, Michael Waldman, William J. Clinton, Hillary Rodham Clinton, Cornell William Brooks, Derrick Johnson, Jeremy Travis, Inimai Chettiar, Ta-Nehisi P. Coates, Chris Jackson, Nicole Counts, Victoria Matsui, Alicia Garza, Sherrilyn Ifill, News Corporation, Netflix, Inc., California State University, Los Angeles, Columbia University, University of California, Santa Cruz, John Jay College of Criminal Justice, Harvard University, University of Pennsylvania, Northwestern University, Dream.org, JustLeadershipUSA, Sentencing Project, Colorofchange.org, Equal Justice Initiative, Vera Institute of Justice, Grand View University, New York University, National Association For The Advancement of Colored People, Black Futures Lab, Legal Defense Fund, Incarceration Nations Network, Warner Bros. Discovery, Inc.

Defendants.
------------------------------------------------------------------X

Plaintiff Ralph W. Baker, Jr. as and for his Complaint against defendants Ava DuVernay, and Spencer Averick, and ARRAY Filmworks, and Ms. Oprah Winfrey, and Michelle Alexander, and Melina Abdullah, and United States, and Jelani Cobb, and Angela Davis, and Baz Dreisinger, and Henry Louis Gates, Jr., and Marie Gottschalk, and John Hagan, and Michael Harriot, and Van Jones, and Glenn E. Martin, and Marc Mauer, and Khalil Gibran Muhammad, and Kevin Gannon, and Rashad Robinson, and Bryan Stevenson, and Nicholas Turner, and Brennan Center for Justice, and Michael Waldman, and William J. Clinton, and Hillary Rodham Clinton, and Cornell William Brooks, and Derrick Johnson, and Jeremy Travis, and Inimai Chettiar, and Ta-Nehisi P. Coates, and Chris Jackson, and Nicole Counts, Victoria Matsui, and Alicia Garza, and Sherrilyn Ifill, and New Corporation, and Netflix, Inc. and Brennan Center for Justice, and California State University, Los Angeles, and Columbia University, and University of California, Santa Cruz, and John Jay College of Criminal Justice, and Harvard University, and University of Pennsylvania, and Northwestern University and Dream.org, and JustLeadershipUSA, and Sentencing Project, and Colorofchange.org, and Equal Justice Initiative, and Vera Institute of Justice, and Grandview University, and New York University, and National Association For The Advancement of Colored People, and Black Futures Lab, and Legal Defense Fund, and Incarceration Nations Network, and Warner Bros. Discovery, Inc. alleges as follows:

## PRELIMINARY STATEMENT

Pursuant to 17 U.S. Code § 501 – Infringement of copyright states anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or imports copies into the United States in violation of section 602 is an infringer of copyright or right of the author. Plaintiff also brings this Complaint for direct copyright infringement, vicarious copyright infringement, contributory copyright infringement, unjust enrichment and identity theft, violations of the New York common law, unfair competition laws, the Lanham Act, New York General Business Law§§ 349, 350 and 368-d, and negligence.

1. This is an action for inter alia, the willful copyright infringement in books, documentaries, studies, research, movies, et al., promulgated by Ava DuVernay, New York University, and Michael Harriot. Pursuant to Ava DuVernay, this action involves the willful copyright infringement in the Netflix documentary, *13th*, and the interview, "13th: A Conversation With Oprah Winfrey And Ava DuVernay," ("13th Interview") collectively, the "13th plagiarized works." Pursuant to New York University, this action involves the willful copyright infringement in *Solutions: American Leaders Speak Out on Criminal Justice* ("2015 Study") and *Ending Mass Incarceration: Ideas From Today's Leaders* ("2019 Study"), collectively, the ("NYU plagiarized works"). Pursuant to Michael Harriot, this action involves the willful copyright infringement in *Black AF History: The Un-Whitewashed Story of America* ("Black AF"). Together, the 13th plagiarized works, the NYU plagiarized works and *Black AF* are the "plagiarized works."
2. Without authorization, Ms. DuVernay, New York University and Mr. Harriot copied portions of Ralph W. Baker, Jr.'s *Shock Exchange: How Inner-City Kids From Brooklyn Predicted the Great Recession and the Pain Ahead* ("Shock Exchange").

3. The scale of the scheme promulgated by Ms. DuVernay, New York University and Mr. Harriot is staggering. Ms. DuVernay and several co-conspirators copied Plaintiff's expression of mass incarceration in *13th* and went through pains to mask the piracy. In the "13th Interview," Ms. DuVernay copied Plaintiff's expression of mass incarceration. Ms. Oprah Winfrey promulgated the fantastical notion that Ms. DuVernay was a thought leader on mass incarceration despite Ms. DuVernay's background as a publicist. In effect, Ms. DuVernay is an expert on mass incarceration all on Ms. Oprah Winfrey's "say so." Ms. DuVernay prevaricated throughout the 13th Interview and refused to answer simple questions. Ms. DuVernay displayed no knowledge of mass incarceration. However, she is institutionally backed by Netflix, Inc., which appears to be the sole point of the interview.

4. Here, Nikole Hannah-Jones' *The 1619 Project: A New Origin Story* the ("1619 Book"), 1619 Essays, the podcast series "Listen To '1619,'" ("1619 podcast"), *The 1619 Project: Born on the Water* ("Born on the Water"), *The 1619 Project: A Visual Experience* ("1619 picture book"), and the Hulu docuseries, *The 1619 Project* ("1619 Hulu doc"), are collectively, (the "1619 plagiarized works). Ibram X. Kendi's *Stamped from the Beginning: The Definitive History of Racist Ideas in America* ("Stamped"), *Stamped: Racism, Antiracism, and You: A Remix of the National Book Award-winning Stamped from the Beginning* ("Stamped-Jason Reynolds"), *Stamped (For Kids)*, *STAMPED FROM THE BEGINNING A Graphic History of Racist Ideas in America* ("Stamped picture book"), the documentary *Stamped from the Beginning* ("Stamped Netflix doc"), and *FOUR HUNDRED SOULS A Community of African America, 1619-2019* ("400 Souls"), are collectively, the "Kendi plagiarized works." Ta-Nehisi Coates' *The Water Dancer* ("Water Dancer"), *Between the World and Me*, ("Between"), "The Case For Reparations" ("2014 Essay"), "The Black Family In The Age Of

Mass Incarceration" ("2015 Essay"), *We Were Eight Years In Power* ("Eight Years"), stage plays, T.V. adaptations, derivative works, Captain America comics, Black Panther comics and Black Panther movie are collectively, the "Coates plagiarized works." The plagiarized works, the 1619 plagiarized works, the Kendi plagiarized works and the Coates plagiarized works are collectively, the "global plagiarized works."

5. Plaintiff alleges that over more than a decade, Ms. DuVernay, New York University, Mr. Harriot and their co-conspirators deconstructed *Shock Exchange*. Defendants copied Plaintiff's creative selections, several ideas and Plaintiff's expression of ideas, and copied the structure and pattern of *Shock Exchange* and meticulously tried to hide it. They repackaged *Shock Exchange* and put their names on it.

6. Plaintiff alleges Mr. Harriot also copied Plaintiff language and arrangement of words – "*Shock Exchange* rhythmic prose and tedious talk." Mr. Harriot's alleged actions represent both copyright infringement and identity theft.

7. Publishing endeavors depend on copyright law aner are part of the foundation of the country. According to Article I, Section 8, Clause 8 of the United States Constitution ("Intellectual Property Clause"): "The Congress shall have Power … To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."[1] Plaintiff wrote *Shock Exchange* with such fervor and the understanding that his exclusive right(s) would be upheld in court.

8. These are not one-off events for certain defendants. Ms. Oprah Winfrey, Jelani Cobb, Khalil Gibran Muhammad, Bryan Stevenson and Michelle Alexander contributed to the 13th plagiarized works. Plaintiff previously filed copyright infringement claims against them for

1 https://constitutioncenter.org/the-constitution/articles/article-i#article-section-8

contributing to the 1619 plagiarized works, the Kendi plagiarized works or both. *Baker v. Hannah-Jones*, No. 25-300. Plaintiff previously filed a copyright infringement claim against New York University and Mr. Harriot pursuant to *Baker v. Hannah-Jones*, 25-300 as well. Defendants allegedly made a business decision – steal from an author who is not institutionally-protected and is unknown to courts.

9. *Shock Exchange* was investigated and written by Plaintiff Ralph W. Baker, Jr. Plaintiff understands Ms. DuVernay received her bachelor's degree from the University of California, Los Angeles ("UCLA") in English literature and African-American studies.

10. Plaintiff understands Ms. DuVernay began her career as a journalist and transitioned to public relations for various movie studios and public relations firms, before starting her own PR firm at age 27. Plaintiff understands She made her first film in 2005 and then turned to documentary films and television documentaries. *13th*, produced in 2016, is likely her most-accomplished work. *13th* was nominated for an Academy Award and won a Peabody Award in 2017, and won a Columbia Journalism School duPont Award the next year.

11. Ms. DuVernay is widely-considered one of the top black filmmakers in the country, buoyed by the acclaim she achieved from *13th*, which was allegedly plagiarized.[2]

12. In November 2024 Plaintiff filed copyright infringement claims against Jelani Cobb, Michelle Alexander, Khalil Gibran Muhammad, Angela Davis, Bryan Stevenson, Nikole Hannah-Jones, Ibram X. Kendi, and Netflix, Inc., amongst others. *Baker v. Hannah-Jones*, No. 25-300; certain defendants never appeared in court and never denied copying. This made Plaintiff curious about *13th* – which certain said defendants also contributed to – and how they and Ms. DuVernay "suddenly" knew so much about mass incarceration. Plaintiff began

---

2 https://www.musicbed.com/articles/filmmaking/10-essential-black-filmmakers-to-know/

a painstaking investigation into *13th* over the summer of 2026 and realized certain defendants who were party to *Baker v. Hannah-Jones*, No. 25-300 – Jelani Cobb, Michelle Alexander, Khalil Gibran Muhammad, et al. – had allegedly copied Plaintiff's expression of mass incarceration for the documentary.

13. Plaintiff made similar allegations against Ta-Nehisi Coates for his 2015 Essay that Plaintiff is making against Ms. DuVernay. *Ralph W. Baker Jr. v. Ta-Nehisi P. Coates, et al.*, No. 24-6839. Plaintiff understands Coates has since fled the country for Paris, France. This is an excerpt from Coates' May 2026 commencement speech at the American University of Paris:

> The world is run by people again, who think that they don't need to read books … and they want a frictionless life … **I live here [Paris] now**, and what it means for me to live here [Paris] is that every day you go outside and you get embarrassed because you just want a baguette, man.[3]

14. Plaintiff alleges this represents a "consciousness of guilt" and circumstantial evidence that Coates committed the crimes alleged in *Baker v. Coates*, No. 24-6839. Fed. R. Evid. 404(b).

15. In December 2017 Coates deleted his Twitter account – with over 1 million followers – after a tete-a-tete with Dr. Cornel West. *Baker v. Hannah-Jones*, 25-300, DktEntry: 100-1, Appendix CC. 18 U.S. Code § 1519.

16. Plaintiff alleges that Ms. DuVernay and co-conspirators copied Plaintiff's narrative on mass incarceration – and its conclusions – and added narrative on slavery, Jim Crow, reconstruction, the civil rights movement and former President Richard Nixon's war on drugs to either mask the piracy or create the appearance of dissimilarity with *Shock Exchange*.

17. Plaintiff has alerted Netflix, Inc. general counsel, David Hyman, to this action. Netflix, Inc. has been silent. It continues to profit from *13th* and the fantastical notion that Ms. DuVernay –

[3] "Commencement Ceremony 2026 | Ta-Nehisi Coates Speech," YouTube, June 18, 2026 (Around the 6:30 mark).

a publicist by training – has some special insight on mass incarceration or the vagaries of the U.S. economy.

18. New York University, Coates, Sherrilyn Ifill, the Legal Defense Fund, and New York University professors Pamela Newkirk, Bryan Stevenson, Claudia Rankine, and Terrance Hayes, amongst others, are also party to *Baker v. Hannah-Jones*, No. 25-300. New York University never denied copying, and the other said defendants did not appear in court. This made Plaintiff curious about the 2015 Study and the 2019 Study – which certain said defendants also contributed to – and what made the Brennan Center for Justice and New York University experts on mass incarceration.

19. Plaintiff began a painstaking investigation into the NYU plagiarized works and realized certain defendants who were party to *Baker v. Hannah-Jones*, No. 25-300 – Coates, Ms. Ifill, Bryan Stevenson, New York University, et al. – had allegedly copied Plaintiff's expression of mass incarceration for the NYU plagiarized works.

20. Plaintiff understands the Brennan Center for Justice is a nonprofit law and policy center started in1995 to study mass incarceration, among other things. Plaintiff understands the Brennan Center for Justice's operations are centered at New York University School of Law.

21. Upon information and belief, the Brennan Center for Justice, New York University, the United States and certain politicians, professors and activists used the "Baker Mass Incarceration Index" and Plaintiff's expression of mass incarceration to create bipartisan criminal justice reform like the First Step Act. They did this without attribution to the Plaintiff or *Shock Exchange*.

22. The Brennan Center for Justice and New York University continue to profit from *Shock Exchange* via donations and/or research grants, and New York University's ability to attract

students with its plagiarized material and fake authority on mass incarceration and the plight of black folks. It all begs the question, "Is New York University's mission to seek the truth or seek profits?"

23. In 2022 Plaintiff asked New York University to investigate Ta-Nehisi Coates' alleged plagiarism ring – the "Agency" – to no avail. *Baker v. Hannah-Jones*, No. 25-300, DktEntry: 100-1, Appendix ZZ.

24. Plaintiff understands Michael Harriot is a columnist at theGrio.com where he covers race, politics and culture. Plaintiff understands Harriot was a senior writer for The Root from 2017-2021. Mr. Harriot is also party to *Baker v. Hannah-Jones*, 25-300. Mr. Harriot refused to appear in court and did not deny copying.

25. *Black AF* was published in 2023. Out of "curiosity," Plaintiff purchased in the summer of 2026. Plaintiff alleges Mr. Harriot repackaged *Shock Exchange* and put his name on it. Plaintiff alleges Harriot copied Plaintiff's creative selections and arrangement of words.

26. *Black AF* was published by HarperCollins Publishers, which is owned by News Corporation. News Corporation continues to profit from *Black AF*. Plaintiff informed News Corporation general counsel, David Pitofsky, of this pending action.

## PARTIES

27. Ms. DuVernay ("defendant") is a film maker, producer, writer, marketer and distributor. Plaintiff understands Ms. DuVernay became ensconced with filmmaking in 2005 with the short film, *Saturday Night Life*, loosely based on her mother's life. She followed that up with *This Is Life* (2008), about the hip-hop community in Los Angeles, CA. Ms. DuVernay has since won two Primetime Emmy Awards, NAACP Awards, a BAFTA Film Award, and a

Golden Globe, among other things. After *13th*, she became known as a thought leader on mass incarceration.

28. Spencer Averick ("Averick" or "defendant") is a film editor and producer, who has worked on the critically acclaimed *Middle of Nowhere* (2012), *Selma* (2014) and *13th*. Averick also received writing credits for *13th*.

29. ARRAY Filmworks ("ARRAY" or "defendant") is an independent distribution company launched by Ms. DuVernay in 2011. ARRAY partnered with Netflix, Inc. ("Netflix") in 2016 to distribute its films online. Plaintiff understands ARRAY films have appeared exclusively on Netflix for nearly a decade.

30. Ms. Oprah Winfrey ("Ms. Winfrey" or "defendant") is a talk show host, television producer, actress, author and vaunted Hollywood dealmaker. Ms. Winfrey is also a defendant in *Baker v. Coates*, No. 24-6839 and *Baker v. Hannah-Jones*, No. 25-300.

31. Michelle Alexander ("Alexander" or "defendant") is an author and civil rights activist, and a defendant in *Baker v. Hannah-Jones*, No. 25-300.

32. Melina Abdullah ("Abdullah" or "defendant") is a professor of Pan-African studies at California State University, Los Angeles.

33. United States ("defendant") is the world's largest country and third-largest country based on nominal gross domestic product and by population size, respectively. The actions of certain Congresspeople and senators make the United States party to this action.

34. Jelani Cobb ("Cobb" or "defendant") is the Dean of Journalism at Columbia University. He is also a defendant in *Baker v. Hannah-Jones*, No. 25-300.

35. Angela Davis ("Davis" or "defendant") is a director of feminist studies at the University of Los Angeles, Santa Cruz, and party to *Baker v. Hannah-Jones*, No. 25-300.

36. Baz Dreisinger is professor of English at John Jay College of Criminal Justice.

37. Henry Louis Gates ("Gates" or "defendant") is a professor for African American research at Harvard University. He is also director of the Hutchins Center for African American Research ("Hutchins Center") at Harvard.

38. Marie Gottschalk ("Gottschalk" or "defendant") is a professor of political science at the University of Pennsylvania.

39. John Hagan ("Hagan" or "defendant") is a professor of sociology and law at Northwestern University.

40. Michael Harriot ("Harriot" or "defendant") is a journalist and author.

41. Van Jones ("Jones" or "defendant) is a media personality, lawyer, author and activist. Jones has founded or co-founded non-profit organizations such as the Ella Baker Center for Human Rights, Color of Change, the Dream Machine Innovation Labs, and Dream.org.

42. Glenn E. Martin ("Martin" or "defendant") is president and founder of GEMtrainers.com, a social justice consultancy that assists nonprofits in their fundraising and marketing efforts. He is also the founder and former president of JustLeadershipUSA ("JULSA").

43. Mark Mauer ("Mauer" or "defendant") was the former Executive Director of The Sentencing Project. He currently serves board president.

44. Khalil Gibran Muhammad ("Muhammad" or "defendant") is professor of African American Studies and Public Policy at Princeton University. Prior to 2025 he was professor of History, Race and Public Policy at Harvard University.

45. Kevin Gannon ("Gannon" or "defendant") is Director of the Center for the Advancement of Faculty Excellence and Professor of History at Queens University-Charlotte. He was formerly the Professor of History at Grand View University in Des Moines, IA.

46. Rashad Robinson ("Robinson" or "defendant") is an activist and was the president of Colorofchange.org until 2024.

47. Bryan Stevenson ("Stevenson" or "defendant") is a lawyer, social justice activist, and professor at New York University School of Law. Stevenson is also founder and executive director of Equal Justice Initiative.

48. Nicholas Turner ("Turner" or "defendant") joined the Ford Foundation as executive director in May 2026. Plaintiff understands that from 2013 to 2026 Turner was president and director of Vera Institute of Justice. Turner also served as president and director of Vera Action.

49. Brennan Center For Justice ("Brennan Center" or "defendant") is a nonprofit public law and public policy institute. The center is known for advocating for increasing minimum wage and opposing voter ID laws. Its operations are centered at New York University Law School. It markets itself as a "national leader in ending mass incarceration."

50. Michael Waldman ("Waldman" or "defendant") is a lawyer and president of the Brennan Center. Waldman was previously a speechwriter for President Bill Clinton.

51. William J. Clinton ("Bill Clinton" or "defendant") is the 42nd President of the United States, serving from 1993 to 2001.

52. Hillary Rodham Clinton ("Mrs. Rodham Clinton" or "defendant") is a lawyer and former first lady of the United States as the wife of President Bill Clinton. She was also secretary of state during President Barack Obama's administration from 2009 to 2013 and served as U.S. Senator representing New York from 2001 to 2009.

53. Cornell William Brooks, ("Brooks" or "defendant") is the Professor of the Practice of Public Leadership and Social Justice at Harvard University. He served as president for the National Association for the Advancement of Colored People from 2014 to 2017.

54. Derrick Johnson ("Johnson" or "defendant") is a lawyer and current president of the National Association for the Advancement of Colored People.

55. Jeremy Travis ("Travis" or "defendant") is the former president of John Jay College of Criminal Justice. In 2026 Travis stepped down as president, and in 2017 he joined Arnold Ventures LLC as Senior Vice President of Criminal Justice.

56. Inimai Chettiar ("Chettiar" or "defendant") is a civil rights attorney and justice advocate. She is the current president of a better balance. She was previously Deputy Executive Director of the Justice Action Network, where her leadership helped secure passage of the First Step Act. She also previously served as the Director of the Justice Program at the Brennan Center, where she "established the Center as a national leader in ending mass incarceration, authored groundbreaking reports on crime and incarceration, positioned criminal justice as an issue central to the 2016 and 2020 presidential elections and the national narrative …"[4]

57. Ta-Nehisi P. Coates ("Coates" or "defendant") is a journalist, author and the Sterling Brown Endowed Chair in the Department of English at Howard University.

58. Chris Jackson ("Jackson" or "defendant") is a publisher and editor-in-chief of Random House's One World imprint.

59. Nicole Counts ("Counts" or "defendant") is editorial director of One World, an imprint of Penguin Random House.

60. Victoria Matsui ("Matsui" or "defendant") is a freelance book editor. She was formerly an editor at One World where she worked with Chris Jackson and Nicole Counts.

[4] https://www.abetterbalance.org/bios/inimai-chettiar/

61. Alicia Garza ("Garza" or "defendant") is a civil rights activist, author and co-founder of the Black Lives Matter movement. She also founded Black Futures Lab, which attempts to build political power in black communities.

62. Sherrilyn Ifill is a law professor, the Vernon E. Jordan, Jr., Esq. Endowed Chair in Civil Rights at Howard University, and former president of the NAACP Legal Defense Fund.

63. Netflix, Inc. ("Netflix" or "defendant") is considered one of the leading video on-demand streaming services.

64. News Corporation ("News Corp" or "defendant") is a global mass media company, which owns brands like The Wall Street Journal, HarperCollins, and Dow Jones & Company.

65. California State University, Los Angeles ("Cal State" or "defendant") is a public research university in Los Angeles, CA.

66. Columbia University ("Columbia" or "defendant") is a private Ivy League research university in New York City.

67. University of California, Santa Cruz ("Santa Cruz" or "defendant") is a research institution located in Santa Cruz, CA.

68. John Jay College of Criminal Justice ("John Jay" or "defendant") is a public college founded as a liberal arts institution with a focus on criminal justice and forensics.

69. Harvard University ("Harvard" or "defendant") is a private Ivy League research university located in Cambridge, MA.

70. University of Pennsylvania ("Penn" or "defendant") is a private Ivy League research university located in Philadelphia, PA.

71. Northwestern University ("Northwestern" or "defendant") is a private research university located in Evanston, IL.

72. Dream.org ("Dream.org" or "defendant") was founded in 2007 by activist and entrepreneur Van Jones. The nonprofit focuses on three areas – Green, Justice and Tech — with the goal of combating climate change and mass incarceration and creating economic opportunities in overlooked communities.

73. JustLeadershipUSA ("JULSA" or "defendant") is a non-profit organization started in 2014 by Glenn E. Martin. It works to cut the U.S. correctional population in half and reform the criminal justice system.

74. The Sentencing Project ("Sentencing Project" or "defendant") is a Washington, D.C.-based advocacy center working to cut the correctional population and address racial disparities in the criminal justice system.

75. Colorofchange.org ("Color of Change" or "defendant") was started by James Rucker and Van Jones in 2005 as a response to Hurricane Katrina. It is considered one of the country's largest racial justice organizations.

76. Equal Justice Initiative ("EJI" or "defendant") is a non-profit founded in 1989 by Bryan Stevenson to provide legal representation to prisoners wrongly convicted, poor prisoners and those who have been denied a fair trial.

77. Vera Institute of Justice ("Vera Institute" or "defendant") is a non-profit policy and research institute focused on criminal justice reform.

78. Grand View University ("Grand View" or "defendant") is a private liberal arts university in Des Moines, IA.

79. New York University ("NYU" or "defendant") is a private research university in New York City.

80. National Association for the Advancement of Colored People ("NAACP" or "defendant") is the largest and oldest civil rights group started in 1909.

81. Black Futures Lab ("BFL" or "defendant") was launched in 2018 by Alicia Garza to build independent political power in Black communities.

82. Legal Defense Fund ("LDF" or "defendant") is a legal organization that fights for racial justice.

83. Incarceration Nations Network ("Incarceration Nations" or "defendant") Is a global network that supports prison reform efforts around the world. It was started in 2018 by Ms. Dreisinger.

84. Warner Bros. Discovery, Inc. ("Warner Brothers" or "defendant") is a media company that produces, develops and distributes television, film, gaming and other forms of entertainment in physical and digital formats. It owns such brands as Home Box Office ("HBO"), the Cable News Network ("CNN") and the Oprah Winfrey Network.

85. Mr. Baker resides in Brooklyn, NY. He owns copyright registration TXu001822615 for *Shock Exchange*, registered with the United States Copyright office August 1, 2012.

86. JOHN DOES 1-50, upon information and belief, are individuals and entities, related to the facts, allegations and causes of actions, presently unnamed but who may be named as additional defendants as a result of discovery, investigation, or other legal endeavors directed at, inter alia, the assessment of their respective or joint liabilities.

**JURISDICTION AND VENUE**

87. This action arises under 17 U.S.C. § 101, *et seq.* for defendants' authorship, publication, and sale of the 13th Interview, *13th*, the 2015 Study, the 2019 Study, and *Black AF* in violation and infringement of Plaintiff's copyright in *Shock Exchange*.

88. Injunctive relief, profits and actual damages or statutory damages are sought pursuant to 17 U.S.C. §§ 502-504.

89. In copying Plaintiff's language and arrangement of words, defendants ran afoul of 43(a) of the Lanham Act. New York Common law of unfair competition is analogous to the Lanham Act's unfair competition laws. Defendants have clearly violated the Lanham Act and New York common law. Plaintiff is likely to succeed on the merits of his claim under New York General Business Law §§ 349, 350 and 368-d, which provide a private right of action for persons injured by deceptive acts or false advertising in the conduct of business.

90. Defendants have also created a tort liability in copying Plaintiff's language and stealing his identity.

91. Costs, Plaintiff's time and efforts and attorneys' fees are sought pursuant to 17 U.S.C. § 505.

92. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

93. Venue in this Court is proper pursuant to U.S.C. § 1391 (b).

**FACTUAL BACKGROUND PURSUANT TO THE PLAGIARIZED WORKS**

94. *Water Dancer* was written by Coates and One World editors Chris Jackson, Nicole Counts, and Victoria Matsui. They confessed to (i) stealing Plaintiff's identity and his "special knowledge" (ii) copying Plaintiff's language, word choice, literary writing style, and arrangement of words, (iii) forging documents, and (iv) editing and augmenting documents and (v) being part of an army (the "Agency" or "Secret Agency") of secret agents ("Agents") at war with Plaintiff. – *See Exhibit A*. The Second Circuit ruled rap lyrics may be properly admitted at trial "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." U.S. v. Pierce, 785 F.3d 832, 841(2d Cir. 2015).

95. After Plaintiff sued Coates for copyright infringement in September 2022, Hannah-Jones and Cobb tried attempted to cut Coates loose; in Coates' recent book he described Hannah-Jones as "my homegirl" and confessed to collaborating with her on *The 1619 Project*, and claimed he watched her build the project, and that she sent him "texts with highlighted pages from history books" – *See Exhibit A*.

96. Coates' recent confession serves as a double entendre of sorts. He (i) wanted Plaintiff and the Court to know that *The 1619 Project* was plagiarized and (ii) signaled to Hannah-Jones, Cobb and other Agents – Ms. DuVernay, Harriot, NYU, Netflix, News Corp, et al. – that if Coates went down for the wholesale copying of *Shock Exchange*, he would not go alone.

97. The confession establishes the elements of a crime, and provides "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ..." U.S. v. Stuckey, 253 F. App'x 483 (6th Cir. 2007). U.S. v. Stuckey also held that, "You can certainly not say when somebody writes about killing snitches, that it doesn't make the fact that they may have killed a snitch more probable .... " U.S. v. Stuckey, 253 F. App'x 468 (6th Cir. 2007).

**FACTUAL BACKGROUND TO THIS ACTION PURSUANT TO 13th**

**A. Defendants Actions Represent Unfair Competition**

98. In an October 2019 interview with Kendi, Coates intimated that One World (imprint of Penguin Random House) editors Chris Jackson ("defendant"), Victoria Matsui ("defendant") and Nicole Counts ("defendant") wrote *The Water Dancer* ("Water Dancer").[5] *Baker v. Coates, No. 24-6839*. In *Water Dancer* defendants confessed to (i) stealing Plaintiff's identity and his "special knowledge" (ii) copying Plaintiff's language, arrangement of words, (iii)

[5] Baker v. Coates et al. Case 1:22-cv-07986-JPO-SLC, Dkt. 120.

forging documents, (iv) editing and augmenting documents, and (v) leading a secret army at war with the Plaintiff. – *See Exhibit A*. The Second Circuit ruled rap lyrics may be properly admitted at trial "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." *U.S. v. Pierce*, 785 F.3d 832, 841(2d Cir. 2015). The confession establishes the element of a crime, and proves motive and intent, "You can certainly not say when somebody writes about killing snitches, that it doesn't make the fact that they may have killed a snitch more probable .... " *U.S. v. Stuckey*, 253 F. App'x 468 (6th Cir. 2007).

99. The fact pattern suggests Chris Jackson, other editors, and Coates are using *Shock Exchange* to train authors how to copy Plaintiff's language and arrangement of words. *Baker v. Coates*, No. 24-6839. This has created confusion in the marketplace and represents unfair competition under the Lanham Act and New York Common Law Act. The Lanham Act prohibits activities like trademark infringement, trademark dilution, false advertising, and unfair competition. Unfair competition involves market conduct which gains or seeks to gain an advantage over rivals through misleading, deceptive or fraudulent conduct in trade or commerce. Through the plagiarized works, defendants engaged in misleading, deceptive, and fraudulent conduct. In *King v. Allied*, 807 F. Supp. 300 (S.D.N.Y. 1992), the Southern District granted an injunction to Stephen King and concluded (1) the possessory credit was false and (2) the based upon credit was misleading. This violated section 43(a) of the Lanham Act.

Defendants' plagiarized works violated 43(a) of the Lanham Act. Defendants falsely alleged that they were the originators of the plagiarized works, and misappropriated Plaintiff's literary skills. It will result in irreparable harm. Plaintiff's work has been misattributed to a prominent author; reputational harm has been immeasurable. *Clifford Ross Co. v. Nelvana*,

*Ltd.*, 710 F. Supp. 517 (S.D.N.Y.), aff'd without op., 883 F.2d 1022 (2d Cir.1989); *Wojnarowicz v. Human Family Assn.*, 745 F. Supp. 130 (S.D.N.Y.1990). Plaintiff need not demonstrate lost profits or tangible damage to his reputation to show irreparable harm.

100. New York Common law of unfair competition is analogous to the Lanham Act's unfair competition laws. Defendants have clearly violated the Lanham Act and New York common law. Plaintiff is likely to succeed on the merits of his claim under New York General Business Law §§ 349, 350 and 368-d, which provide a private right of action for persons injured by deceptive acts or false advertising in the conduct of business. These provisions prohibit materially false and misleading advertisements which markedly affect the public. See, e.g., *Construction Technology v. Lockformer Co.*, 704 F. Supp. 1212, 1222-23 (S.D.N.Y.1989).

101. The Ninth Circuit recently adopted Plaintiff's legal argument. Under California's Unfair Competition Law ("UCL"), Plaintiffs argued defendants used copyrighted material to train ChatGPT without plaintiffs' permission. In *PAUL TREMBLAY, et al.*, v. OPENAI, INC., et al., Case Nos. 23-cv-03223-AMO 23-cv-03416-AMO. The U.S. District Court for the Northern District of California cited California's unfair competition law prohibits "not only unlawful business practices but also unfair business practices. The statute is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not forbidden by law." *Tremblay*. In addition, "Assuming the truth of Plaintiff's allegations – the Defendants used Plaintiff's copyrighted works to train their language models for commercial profit – the Court concludes that Defendants' conduct may constitute an unfair practice … this portion of the UCL claim may proceed."

*Tremblay*. For those same reasons, Plaintiff alleges defendants have run afoul of the Lanham Act and New York Common Law Act.

102. Training agents to copy Plaintiff's "special knowledge," passions and beliefs is also unfair competition. Agents confessed to it:

Harder were the man's beliefs and passion, and my ability to convey them with confidence and ease, as though they were my own. I never forgot that lesson. It was essential to what I became, to what I unlocked and saw. – *See Exhibit A*.

103. The PAUL TREMBLAY case has been transferred to the U.S. District Court for the Southern District of New York ("District Court") as part of multi-litigation, MDL No. 3143. The Second Circuit has adopted the PAUL TREMBLAY court's conclusions by de facto.

104. Per *Jefferys*, "The order of each man's words is as singular as his countenance …," or the equivalent of "one's face." *Jefferys v. Boosey*, 4 H.L.C. 869. In copying the order of words in Plaintiff's literary composition, defendants have stolen Plaintiff's face and/identity. The odds that defendants and Plaintiff "composed originally" with the same order of words is "less than that there should be two countenances that could not [be] discriminated." *Jefferys v. Boosey*, 4 H.L.C. 815, 867, Petition for Rehearing at 5, *Baker v. Coates*, No. 24-6839 (U.S. June 11, 2025).

105. Bette Midler sued Ford for running a commercial impersonating her voice. In *Midler v. Ford*, the court asserted that to impersonate Ms. Midler's distinctive voice "is to pirate her identity … We hold only that when a distinctive voice of a professional singer who is widely known is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California." *Midler v. Ford*, 849 F.2d 460 (9th Cir. 1988). Bert Lahr sued Adell Chemical Co. for using a commercial that imitated Lahr's distinctive voice. "The First Circuit held that Lahr had stated a cause of action for unfair competition, that it could be found 'that defendant's conduct saturated plaintiff's audience,

curtailing his market.""" *Midler, Lahr v. Adell Chemical Co.*, 300 F.2d 256, 259 (1st Cir. 2916). Plaintiff and his passions, beliefs, special knowledge and anomalies are well-known to the book industry, corporate media, and arguably every Black professor, journalist, and author. *Steinberg v. Columbia Pictures Industries*, 663 Supp. 706 (S.D.N.Y. 1987). Defendants' books, articles, documentaries, studies and derivative works compete with Plaintiff's book. Defendants' actions represent a tort liability and also represent unfair competition as they have saturated and curtailed the market for Plaintiff's work.

106. Plaintiff understands that "Section 43(a) now expressly prohibits, *inter alia,* the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods or services by another person. Moreover, the legislative history of the 1988 amendments also makes clear that in retaining the statute's original terms 'symbol or device' in the definition of 'trademark,' Congress approved the broad judicial interpretation of these terms to include distinctive sounds and physical appearance." *Tom Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (1992).

107. Plaintiff understands that "symbol or device" also includes one's distinctive attributes. The Ninth Circuit Court of Appeals ("Ninth Circuit") recognized Tom Waits' false endorsement claims under section 43(a). Plaintiff's claims of defendant(s) copying his creative selections should also be recognized. Defendants have not only copied Plaintiff's creative selections, they have stolen Plaintiff's entire identity as reflected in his passions, beliefs, lived experiences, idiosyncrasies and anomalies.

108. A person's passions, beliefs, interests and anomalies are part of his identity. "Anomalies of Shock Exchange" include, but are not limited to, mass incarceration, reconstruction,

massive resistance, school closings, redlining, the housing market, Reagan's policies, Gringrich's policies, et al.

109. In "randomly" exploring mass incarceration and the plight of Blacks, Ms. DuVernay and other agents have copied Plaintiff's passions. Collectively, the plagiarized works have copied Plaintiff's creative selections – and stolen Plaintiff's identity – several times over. Per *Waits*, "Waits' voice misappropriation claim is one for invasion of a personal property right: his right of publicity to control the use of his identity as embodied in his voice." *Waits*, at 1100. *13th* represents an invasion of Plaintiff's right of publicity to control the use of his identity embodied in his passions, anomalies and idiosyncrasies pursuant to mass incarceration and the plight of Blacks in America.

110. Per *Waits*, "…courts have recognized false endorsement claims brought by plaintiffs, including celebrities, for the unauthorized imitation of their distinctive attributes, where those attributes amount to an unregistered trademark." *Waits*, at 1105-1106. Here, Ms. DuVernay and other Agents have copied Plaintiff's distinctive attributes pursuant to his passion about mass incarceration that has highly-impacted African Americans. Ms. DuVernay and these Agents are primarily interested in imitating and mimicking Ralph W. Baker, Jr.

111. Per U.S. Code § 1125 (section 43(a) of the Lanham Act):

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*13th* meets both tests. It engaged in misleading representation that is likely to cause confusion with *Shock Exchange*, and it represented the nature and origin of the narrative on mass incarceration that has damaged Plaintiff's work.

**B. The Selection, Coordination, And Arrangement Of Facts Defendants Copied From *Shock Exchange* Are Original And Creative**

112. The selection, coordination, and arrangement of the facts in *Shock Exchange* are original and creative. Per *Feist*, "The statute identifies three distinct elements, and requires each to be met for a work to qualify as a copyrightable compilation: (1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an 'original' work of authorship." *Feist Publications, Inc. v. Rural Tel. Service Co.*, 499 U.S. 340 (1991).

113. In copying the selection, coordination, and arrangement of the facts in *Shock Exchange*, defendants ran afoul of *Feist*. Agents confessed to copying Plaintiff's "special knowledge." Secondly, Coates confessed that *Shock Exchange* proved the country was looking at mass incarceration in the wrong way and *Shock Exchange* knew how to fix it. – *See Exhibit D.* Plaintiff describes defendants' copying below.

114. Plaintiff's expression of mass incarceration is written from an economic perspective. – *See Exhibit D.* There was nothing like it in the marketplace prior to *Shock Exchange*.

115. Plaintiff triangulates around various metrics – U.S. incarceration rates and their growth over time, U.S. incarceration rate relative to that of the rest of the world, Black male incarceration rate compared to that of white males, and non-violent criminals as a percentage of the U.S. prison population – to determine "mass incarceration" materializes by 2011.

Plaintiff's unique expression – the "Baker Mass Incarceration Index" – (i) proves the U.S. incarceration rate is divorced from violent crime and (ii) determines when "mass incarceration" is triggered and when it is not.

116. Plaintiff's unique expression proves the incarceration rate is divorced from violent crime. In (i) an April 2015 panel discussion at Duke University admitted *Shock Exchange* was unique, and (ii) in a March 2015 discussion at Craig Newmark School of Journalism, Coates claimed he had the fix for mass incarceration in his pending piece for The Atlantic, which Plaintiff alleged was too plagiarized. – *See Exhibit D. Baker v. Coates*, No. 24-6839.

117. Plaintiff asserts the U.S. is the most-incarcerated country in the world, which President Barack Obama ("President Obama"), Van Jones ("Jones"), and Bryan Stevenson ("Stevenson") repeat. Ta-Nehisi Coates ("Coates") repeated this sentiment for "The Black Family In The Age Of Mass Incarceration" ("2015 Essay"). *Baker v. Coates*, No. 24-6839.

118. Here, Van Jones carefully imitates Plaintiff's word choice. Plaintiff references the "free" world, which connotes countries with western-style democracies as opposed to those under communist rule. Van Jones attempts to capture the peculiarity of *Shock Exchange* by referencing the land of the "free," which connotes U.S. with independence from Britain – nothing remotely related to mass incarceration. "Not only are the words chosen by a superior mind peculiar to itself, but in ordinary life no two descriptions of the same fact will be in the same words ..." *Jefferys v. Boosey*, 4 H.L.C. 815, at 869, *Baker v. Coates*, No. 24-6839.

119. Plaintiff asserts incarceration rates exploded from the mid-'90s to the current period. Stevenson asserts incarceration rates exploded from the '70s to the current period, in an attempt to create the appearance of dissimilarity. *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F. 2d 144 (2d Cir. 1956). In his 2015 Essay Coates also attempts to tie mass

incarceration to the 1970s. *Baker v. Coates*, No. 24-6839. This is a pattern. *13th* and Stevenson's analyses lack rigor; they cannot explain what mass incarceration is, why it materializes in the '70s or when it stops. We have to take their word for it.

120. In the 1619 plagiarized works, Stevenson and Hannah-Jones asserted mass incarceration was created by slavery. *Baker v. Hannah-Jones*, Dkt. 5. In *13th* Stevenson said it was created by Nixon's war on drugs. The conflicting statements are evidence of copying. Coates, Cobb, Gibran Muhammad, and Alexader contributed to the 1619 plagiarized works.

121. Plaintiff compares incarceration rates of Black males of 4,797 per 100,000 residents to white males of 708 per 100,000 residents (2011 data). Stevenson and *13th* explain incarceration rates of black males v. white males in percentage terms, and the United States compares black male incarceration to the number of slaves in the 1850s. These are crude attempts to create the appearance of similarity. *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144 (2d Cir. 1956). In the 2015 Essay Coates also explains the incarceration of black males in percentage terms. *Baker v. Coates*, No. 24-6839. This is a pattern.

122. Plaintiff illustrates the disparities in incarceration rates between black men and white men, which former New York Mayor David Dinkins repeats.

123. Cobb asserts these disparities under Reagan quickly exploded into the era of mass incarceration. This contradicts Stevenson and Alexander's narrative that Nixon created mass incarceration. It also contradicts narrative from Stevenson, Hannah Jones and the 1619 plagiarized works – which Cobb contributed to – that slavery created mass incarceration. Cobb's assertion lacks evidence and rigor. Former Tufts professor, Kerri Greenidge, came under fire for unsubstantiated claims made in her recent book. – *See Exhibit D.*

124. Plaintiff asserts treatment and/or education is a better alternative to stopping drug trafficking than locking up drug dealers. Stevenson repeats this sentiment. Plaintiff asserts the war on drugs has resulted in a frequent number of arrests for low-level drug transactions, which Stevenson and the United States repeat. Plaintiff asserts Reagan's war on drugs was a war on blacks and amplified incarceration. Former Congressman Charles Rangel, Mark Mauer and Angela Davis repeat this sentiment. Alexander admits to a war on drugs, but implies it began with Nixon – a crude effort to create the appearance of dissimilarity with Plaintiff *Shock Exchange*, which in itself is evidence of copying. *Joshua* Meier, at 146. Plaintiff accused Coates of attempting to create the appearance of dissimilarity in his 2015 Essay on mass incarceration. *Baker v. Coates*, No. 24-6839. This is a pattern with these Agents.

125. Plaintiff references Reagan's "so-called" war on drugs. Ms. Davis references Reagan's "so-called" war on drugs. Here, Ms. Davis carefully imitates Plaintiff's word choice. *Jefferys v. Boosey*, 4 H.L.C. 815, at 869, *Baker v. Coates*, No. 24-6839.

126. Plaintiff asserts (i) the majority of black males are jailed in federal prison with longer lengths of stay, ravaging the black family and (ii) the increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. New Gingrich ("Gingrich"), Pat Nolen, Grover Norquist, former Congressman Charles Rangel, and former President Bill Clinton repeat the sentiment. Plaintiff asserts mandatory sentences and a higher length of stay are negatively impacting U.S. prison policy. Bill Clinton, Glenn Martin, Stevenson, David Keene, Mark Maurer and Cobb repeat the sentiment.

127. In *Shock Exchange* Plaintiff marvels at how Reagan won Plaintiff's home state of Virginia in a landslide in 1980. *13th* marvels at how effective Reagan's so-called "Southern

strategy" was effective at helping him win the Southern vote in 1980, carefully imitating *Shock Exchange*. Ibram X. Kendi ("Kendi") also imitated *Shock Exchange* in *Stamped*, "Thanks in part to southern support, Reagan easily won the presidency."[6] Plaintiff sued Kendi for allegedly plagiarizing *Shock Exchange* pursuant to *Stamped* and various "Kendi plagiarized works." *Baker v. Hannah-Jones*, 25-300.

128. A chart (Exhibit D) illustrating electoral votes from the 1980 election shows that Reagan did worse in the Southern states than other regions. Reagan won in a landslide – capturing 91% (489 of 538) of total electoral votes. Reagan performed worst in the South; he won 82% of electoral votes in the South versus northeast (97%), Midwest (93%) and west (96%). It is implausible that the main takeaway for Ms. DuVernay, Henry Louis Gates, Stevenson, Cobb and other Agents was how Reagan dominated the South. The only way one can explain the similitude with *Shock Exchange* is through copying. *Steinberg*, 663 F. Supp. at 713.

129. The *actual* interview with Atwater [referenced to by *13th*] included narrative on Reagan cutting social services, "… the interviewer asked a question, '… Reagan does get to … the racist side of the Wallace voter by doing away with legal services, by cutting down on food stamps?'"[7] This narrative imitates *Shock Exchange*, which honed on Reagan's cuts to social programs, "Boxed in by Carter's claims that his tax cuts to the wealthy and increased military spending would come at the expense of social programs, Reagan promised not to reduce entitlement spending."[8] Ms. DuVernay framed the Atwater interview as tax cuts and criminalization of crack dealers in order to (i) frame it as an extension of Nixon's Southern strategy and (ii) create the appearance of dissimilarity with *Shock Exchange*.

---

6 Ibram X. Kendi, *Stamped From The Beginning*, Page 431.
7 "Lee Atwater explains the Southern Strategy, YouTube, @HistoryisAwkward, January 5, 2025.
8 Ralph W. Baker, Jr., Shock Exchange: How Inner-City in Brooklyn Predicted the Great Recession and the Pain Ahead, Page 77.

130. Ms. DuVernay and *13th* purposely misleads the viewer to believe Reagan's threat to lock up crack dealers helped him win the South during his 1980 election. Reagan's war on drugs didn't occur until after he became president. 13th highlights Reagan's address to the nation on his campaign against drug abuse. [Reagan talk, 19:30 mark]; however, that address took place in 1986 during Reagan's second term. *13th* highlights First Lady Nancy Reagan's famous national "Just Say No" to drugs campaign speech, which took place in 1986.[9] Plaintiff understands crack cocaine did not become a national health crisis until the mid-'80s. [Mark Maurer, 22:00 mark]. It's well-known that black politicians and black activists lobbied Reagan to crack down on drugs because (i) they associated crack cocaine and crack use with violence and (ii) they wanted to get violent drug dealers out of black communities. [Grover Norquist, 24:20 mark]. Reagan's Anti-drug Abuse Act of 1986, which established mandatory minimum sentences for crack cocaine, was not signed until his second term. The framing of Reagan winning the South during his 1980 election by promising tax cuts and to lock up crack dealers was cooked up by DuVernay and Agents. This is evidence of copying.

131. *Shock Exchange* describes Reagan's tax cuts for the wealthy, downsizing of the government and cuts to social programs that hurt Blacks. DuVernay carefully imitates it and tries to create the appearance of dissimilarity by describing it as Reagan's "Southern strategy" and characterizing it as an extension of Nixon's "Southern strategy." Per *Shock Exchange*, Reagan and President Obama had the same strategy of "trickle-down" economics, "With QE1, QE2, and the Fed's below-market loan programs, Obama has attached the success of his presidency to the 'trickle-down theory.'"[10] 13th castigates Reagan and his

---

[9] "CNN: 1986: Nancy Reagan's 'Just say no' campaign," YouTube, CNN, February 28, 2011.
[10] Ralph W. Baker, Jr., Shock Exchange: How Inner-City Kids From Brooklyn Predicted the Great Recession and the Pain Ahead, Page 324.

economic policies, carefully imitating *Shock Exchange*. However it praises President Obama throughout, despite the fact that President Obama and Reagan had the same economic policies. The only one can explain the similitude is through copying. *Steinberg v. Columbia Pictures Industries*, 663 Supp. 706 (S.D.N.Y. 1987). Hannah-Jones (1619 plagiarized works) and Kendi (*Stamped*) castigate Reagan and incessantly fawn over President Obama. *Baker v. Hannah-Jones*, Dkt. 5. These works are clearly contrived and designed to promote a staged ideology. The similitude between these alleged plagiarized works and *Shock Exchange* can only be explained through copying. *Steinberg*, at 713.

132. *Shock Exchange* explains the stagflation – high inflation and high unemployment – a holdover from the Reagan administration. 13th carefully imitates this narrative. In that 1981 Reagan address referenced by 13th, Reagan also described stagflation facing the country, (i) mortgage rates of 15.4% or 2 ½ times the 1960 rate of 6%, and (ii) Reagan's fight against rising unemployment and inflation.[11] *Shock Exchange* describes Reagan's cuts to entitlement programs, government jobs, and healthcare, which Ms. Davis carefully imitates. *Shock Exchange* describes Reagan's tax cuts to the wealthy and the business class, which John Hagan repeats. *Shock Exchange* describes Reagan's projected budget deficit in 1982, which triggered budget cuts. 13th displays Reagan's address to the country where he projects savings in 1982 from budget cuts.

**C. Defendants Allegedly Copied Plaintiff's Expression Of Mass Incarceration**

133. Under the Copyright Act, copyright owners have the exclusive rights to copy, distribute, and digitally transmit their copyrighted works. §106. For instance, others generally cannot share a recording of a musician's copyrighted song recording without that musician's

[11] https://www.reaganlibrary.gov/archives/speech/address-nation-economy-february-1981

permission. The Copyright Act provides that "Anyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright." §501(a). A willful infringer faces statutory damages of up to $150,00 per work. §504(c)(2).

134. *13th* is substantially similar to *Shock Exchange*. The facts Plaintiff chooses to describe his material and how he marshals the facts are part of his creativity. Defendants use the same facts and marshal the facts in the same manner, carefully imitating Plaintiff's expression. "What is protected is the manner of expression, the author's analysis and interpretation of events, the way he structures his material and marshals the facts, his choice of words, and the emphasis he gives particular developments. Thus, the essence of infringement lies not in taking a general theme or in coverage of the reports as event, but in appropriating the 'particular expression through similarities of treatment, details, scenes, and characterization.'" *Wainwright v. Wall Street Transcript*, 558 F.2d 91 (2d Cir. 1977).

135. Copyright infringement could "occur by reason of a substantial similarity that involves only a small portion of each work." *Burroughs v. Metro-Goldwyn Mayer, Inc.*, 683 F.2d 610 n. 14 (2d Cir. 1982).

**D. Defendants Alleged Copying Meets Test Of A "True Piracy"**

136. *13th* is not Ms. DuVernay or Averick's original work. It is statistically impossible that they created *13th* independent of *Shock Exchange*. Neither one show any expertise about incarceration, mass incarceration or economics prior to *Shock Exchange*. "The true test of whether there is a piracy or not, is to ascertain whether there is a servile or evasive imitation of the plaintiff's work, or there is a bona fide original compilation, made up of common materials, and common sources, with resemblances which are merely accidental, or result

from the nature of the subject." *Daly v. Palmer et al.*, Case No. 3,552, *Emerson v. Davies et al.*, Case No. 4,436. Defendants confessed to a "gift of mimicry." – *See Exhibit A.*

**E. Defendants Alleged Copying Is Not Fair Use**

137. Pursuant to 17 U.S. Code § 107, factors considered in determining fair use of a work include the purpose and character of the use, the nature of the copyrighted work, amount and substantiality of the portion used, and the effect of the use on upon the potential market or value of the copyrighted work. Defendants' copying meet all four factors. The purpose and of the use is to copy with evasion and supersede *Shock Exchange*. Defendants confessed to a "gift of mimicry." *See Exhibit A*. Defendants have superseded Shock *Exchange*. Ms. DuVernay, Coates, Stevenson, Jones, et al., are considered thought leaders on mass incarceration. They are the ones who get cited or interviewed on the subject. With the help of their corporate backers and universities, defendants have erased *Shock Exchange* and Ralph W. Baker, Jr. from history. *Shock Exchange's* description of mass incarceration is highly creative. The Baker Mass Incarceration Index tells you what mass incarceration is, when it materializes and when it does not. There was nothing like it in the marketplace prior to *Shock Exchange*. Mass incarceration represents about 5% of *Shock Exchange* and 100% of *13th* (100 minutes) and 100% of the 13th Interview (37 minutes). Combined, the 13th plagiarized works, the 2015 Study, the 2019 Study, *Black AF*, the Coates plagiarized works, the 1619 plagiarized work, and the Kendi plagiarized works then Agents have copied *Shock Exchange* several times over.

**F. Defendants Allegedly Copied The Creative Selections Of "A Superior Mind"**

138. Per *Jefferys*, "Not only are the words chosen by a superior mind peculiar to itself, but in ordinary life no two descriptions of the same fact will be in the same words …" *Jefferys v.*

*Boosey*, 4 H.L.C. 815, 867, *Baker v. Coates*, No. 24-6839. A person with no knowledge of the subject matter – Ms. DuVernay, Harriot or other Agents – cannot pick up book or creative work of a "superior mind" and copy his creative selections to get the same result. Plaintiff asserted this in his writ of certiorari ("Writ") to the U.S. Supreme Court pursuant to Coates. Defense attorney, Davis Wright Tremaine LLP ("Davis Wright), Loeb & Loeb LLP ("Loeb & Loeb") and Schulte Roth & Zabell LLP ("Schulte Roth") refused to respond to the Writ – de facto admission that Plaintiff is a "superior mind."

139. *Jefferys* is the foundation of copyright law in the U.K. and parts of it have been adopted by the U.S. Supreme Court in *Holmes v. Hurst*, 174 U.S. 82 (1899). Defendants' mimicry of *Shock Exchange* runs afoul of the very foundation of copyright law and what it was meant to prevent.

**G. Defendants Allegedly Copied The Essence And Structure Of *Shock Exchange***

140. Defendants allegedly copied the essence of structure of Plaintiff's expression of mass incarceration, representing comprehensive non-literal similarity. *Arica Inst., Inc. v. Palmer*, 970 F.2d (2d Cir. 1992). This is consistent with Coates and Jelani Cobb's confession that (i) the best way to write something that stays with people is not to come up with anything original, but (ii) to engage in "applied reading," i.e., take another author's book, deconstruct it and figure out how it's expressed, and copy that author's expression without permission. – *Also see Exhibit J.*

**<u>FACTUAL BACKGROUND TO THIS ACTION PURSUANT TO 13th INTERVIEW</u>**

**H. The 13th Interview Represents Unfair Competition**

141. In the 13th Interview Ms. DuVernay and Ms. Winfrey discuss Plaintiff's idiosyncrasies and passions pursuant to mass incarceration and the plight of Blacks. This represents unfair

competition. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

## I. The Selection, Coordination, And Arrangement Of Facts Defendants Copied From *Shock Exchange* Are Original And Creative

142. *Shock Exchange* describes how Reagan's war on drugs triggered mass incarceration. Ms. Duvernay asserts "They [the public] knew" about the war on drugs. This is contrary to narrative from Coates who confessed (see Exhibit D) that (i) the general thinking was that crime rates mushroomed up after a crime wave in the '60s and (ii) explaining mass incarceration as driven by a war on drugs was a unique way of looking at it. *Feist* at 357. – *See Exhibit E*

143. Plaintiff illustrates the disparity in incarceration between black men and white men (47,97 per 100,000 residents v. 708 per 100,000), which Ms. DuVernay repeats. Defendant feigned as if she was already aware that black men are incarcerated at seven times the rate of white men.

144. Plaintiff describes how black men experience much longer stays in prison vis-à-vis their white counterparts. Ms. DuVernay claims the documentary "informs you in a different way." Actually, the documentary carefully imitates *Shock Exchange*.

145. Again, Ms. DuVernay describes the different treatment for those who could afford to buy powder cocaine and those who could only afford crack cocaine. She simply repeats the disparity in sentencing. Ms. DuVernay describes the need to drill on the disparity in sentencing, carefully imitating one of *Shock Exchange*'s conclusions that length in stay is driving mass incarceration more so than the number of crimes committed.

146. *Shock Exchange* explains how the war on drugs was a war on African Americans, and it threatened to eradicate the black family as we know it. Former Congressman New Gingrich divulges how the disparity in sentences devastated the black community, carefully imitating Plaintiff. *Shock Exchange* was a clarion call, and Ms. DuVernay, and the Agency heard it; they want the public to believe that clarion call is coming from her and Mr. Gingrich.

147. It was actually Newt Gingrich who pushed policymakers to get tough on crime in the early '90s. Ms. DuVernay struggled to explain why she thought it made sense to include Gingrich in the documentary.

148. Plaintiff asserts it would be better to offer drug users treatment or education than locking up drug dealers. Drug abuse is a medical problem, not a crime. Ms. DuVernay mimics the sentiment by implying drug use is not a crime.

**J. Defendants Copied Plaintiff's Expression Of Mass Incarceration**

149. Under the Copyright Act, copyright owners have the exclusive rights to copy, distribute, and digitally transmit their copyrighted works. §106. The 13th Interview is practically devoid of content. Ms. DuVernay prevaricated throughout. When she did speak, Ms. DuVernay simply copied Plaintiff's principal arguments that (i) the war on drugs created mass incarceration, (ii) the disparity in sentencing needed to be deeply understood, (iii) mass incarceration ravaged the black family and (iv) drug users should receive treatment over imprisonment. *Wainwright*, 558 F.2d at 96.

150. Copyright infringement could "occur by reason of a substantial similarity that involves only a small portion of each work." *Burroughs v. Metro-Goldwyn Mayer, Inc.*, 683 F.2d 610 n. 14 (2d Cir. 1982).

**K. Defendants Copying Meets Test Of A "True Piracy"**

151. The 13th Interview is nothing more than a servile imitation of *Shock Exchange*. No matter what the question, Ms. DuVernay gives the same responses as *Shock Exchange*. *Daly v. Palmer et al.*, Case No. 3,552, *Emerson v. Davies et al.*, Case No. 4,436. Defendants confessed to copying Plaintiff's "special knowledge" and confessed to a "gift of mimicry." – *See Exhibit A*. The similarities with *Shock Exchange* are intentional.

152. Ms. DuVernay could not answer similar questions about 13th, like why she structured the documentary in that matter or why she cared about "those people" incarcerated. Ms.

**L. Defendants Alleged Copying Is Not Fair Use**

153. The interview is not fair use. The parts of *Shock Exchange* defendant copied were highly creative. The only purpose was to supersede *Shock Exchange*. Ms. DuVernay and other Agents have destroyed *Shock Exchange*, and any market for the book and any marketability for it. 17 U.S. Code § 107.

154. Ms. DuVernay could not answer simple questions about 13th, like why she structured the documentary in that manner or why should anyone care about "those people" incarcerated? It is clear that defendant produced 13th only to compete with *Shock Exchange* and supersede it.

155. The following chart illustrates how 13th and the 13th Interview are a combined 137 minutes long, of which about 124 minutes (91%) discuss mass incarceration. About 100 percent of the 13th plagiarized works reflect Plaintiff's creative selections. They also copy how *Shock Exchange* is expressed, which represent 100 percent of the book.

Anomalies Of Shock Exchange

| | 13th Interview | Total Minutes | % Of Total Minutes | 13th Doc | Total Minutes | % Of Total Minutes | Combined | Total Minutes | % Of Total Minutes |
|---|---|---|---|---|---|---|---|---|---|
| Criminal Justice | 36 | 37 | 97% | 88 | 100 | 88% | 124 | 137 | 91% |
| Reconstruction | 1 | 37 | 3% | 2 | 100 | 2% | 3 | 137 | 2% |
| Du Bois | - | 37 | - | - | 100 | 0% | - | 137 | 0% |
| Black Church | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Redlining | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Housing / Wealth / Land / Housing Wealth | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Revolt, riots, resistance, violence, uprisings, unrest | - | 37 | 0% | 4 | 100 | 4% | 4 | 137 | 3% |
| Reparations | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Glass-Steagall, MBS, CDO | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Panic / Financial Crisis | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Plaintiff's Personal Story | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Reagan Policies | - | 37 | 0% | 12 | 100 | 12% | 12 | 137 | 9% |
| Massive Resistance | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| John Randolph | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Black Music | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Infrastructure | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Gingrich Revolution / Republicans combat democratic policies | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Blanche K. Bruce | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Rodney King | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Tobacco | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Dexter Avenue Baptist Church | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Blacks Denied Public School | - | 37 | 0% | 1 | 100 | 1% | 1 | 137 | 1% |
| Angst Over Interracial Sex | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Large % Of Blacks | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Tax Dollars For White Interests | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Brown v. Board | - | 37 | 0% | - | 100 | 0% | - | 137 | 0% |
| Civil Rights Movement | - | 37 | 0% | 1 | 100 | 1% | 1 | 137 | 1% |
| Sum | 37 | 37 | 100% | 100 | 100 | 100% | 137 | 137 | 100% |

Source: Ralph W. Baker, Jr.

156. Pursuant to the Coates plagiarized works, Plaintiff accused Coates of copying Plaintiff's arrangement of words – Shock Exchange rhythmic prose and tedious talk – for three stage plays related to Between, and for the Black Panther movie. The stage plays are about 270 minutes combined (90 minutes per play) and the Black Panther movie is about 134 minutes. The Coates plagiarized works allegedly copied 404 minutes in total. The Coates plagiarized works and the 13th plagiarized works are a combined 541 minutes, of which 100 percent of the works are allegedly copied.

## FACTUAL BACKGROUND TO THIS ACTION PURSUANT TO THE 2015 STUDY

**M. The 2015 Study Represents Unfair Competition**

157. The 2015 Study discusses Plaintiff's idiosyncrasies and passions pursuant to mass incarceration and the plight of Blacks, the disparity in sentencing between blacks and white, the need for treatment instead of incarceration for drug addicts, the black tax – high incarceration and high unemployment – amongst other things. This represents unfair competition. Per U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

**N. The Selection, Coordination, And Arrangement Of Facts Defendants Allegedly Copied From *Shock Exchange* Are Original And Creative**

158. *Shock Exchange* asserts the US is the most-incarcerated country in the world, which Bill Clinton, Mrs. Hillary Rodham Clinton, United States, Bryan Stevenson and repeat. The 2015 Study repeats this narrative at least seven times. – *See Exhibit F.*

159. *Shock Exchange* asserts the growth in the U.S. incarceration rate is untenable, which defendants repeat at least six times. Plaintiff's review period goes from the mid-'90s to the 2011 data – consistently with Plaintiff's argument that mass incarceration is driven by the war on drugs. Mark A.R. Kleinman implies that we need to reduce the prisoner headcount to "historical levels" or "civilized levels," which are likely at levels implicit in the Baker Mass Incarceration Index.

160. Mark A.R. Kleinman also implies we need to reduce the prisoner headcount by 80 percent, yet he obfuscates why, after such a reduction, mass incarceration would no longer exist. His analysis lacks rigor. Kamala Harris, in her capacity as California Attorney General, Marc Levin and Jeremy Travis' review period began in the '70s, implying mass incarceration existed in the '70s or began in the '70s. The study nor defendants cannot clearly explain what

mass incarceration is or when it began. Former Tufts professor, Kerri Greenidge, came under fire for unsubstantiated claims made in her recent book. – *See Exhibit D.*

161. *Shock Exchange* asserts there is a disparity in incarceration rates between black men and whites. Defendants repeat this narrative at least four times. Plaintiff uses data, such as, how many people are incarcerated per 100,000 residents. On three occasions describe the number of black men incarcerated in percentage terms – a crude effort to create the appearance of dissimilarity which in itself is evidence of copying. *Joshua Meier*, at 146. Plaintiff accused Coates of describing incarceration rates in percentage terms to create dissimilarity with *Shock Exchange* pursuant to his 2015 Essay. *Baker v. Coates*, No. 24-6839. This is a consistent pattern with these Agents.

162. *Shock Exchange* asserts treatment – rather than incarceration – would be a better solution to stopping the drug trade and/or crime, which defendants repeat at least 10 times. *Shock Exchange* asserts locking up drug dealers does not stop drug dealing. One could release non-violent criminals and it would not cause violent crime to rise or cause a greater threat to society. Bill Clinton asks how to reduce prisoners while keeping crime down? This carefully imitates the major question *Shock Exchange* answers. The 2015 Study asserts locking up people does not stop crime – a clear attempt to avoid verbatim copying. Coates repeated the same narrative in the 2015 Essay – a consistent pattern from these Agents. *Baker v. Coates*, No. 24-6839.

163. Certain defendants imply their narrative was inspired by the "Texas model," where Texas apparently released non-violent criminals and reduced incarceration without any increased risk to the public. First of all, defendants meticulously describe the racial make up of prisoners; however, there is no mention of the racial make up of low-level criminals released

in Texas or what they were arrested for. Mimicking *Shock Exchange* and crediting a so-called "Texas model" is again, a crude effort to create the appearance of dissimilarity, and thus evidence of copying. *Joshua Meier*, at 146. Again, Agents carefully imitate *Shock Exchange* and then credit someone who is institutionally backed. This a consistent pattern.

164. *Shock Exchange* explains the "black tax" – high unemployment rates and high incarceration rates. *Shock Exchange* explains the two are linked, which defendants repeat. Defendants describe how incarceration ultimately leads to unemployment.

**O. Defendants Allegedly Copied Plaintiff's Expression Of Mass Incarceration**

165. Under the Copyright Act, copyright owners have the exclusive rights to copy, distribute, and digitally transmit their copyrighted works. §106. The Copyright Act provides that "Anyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright." §501(a). Defendants carefully imitated the components of the Baker Mass Incarceration Index. They copied the same facts and marshaled the facts in the same manner as the Plaintiff. Defendants mimicked Plaintiff's analysis and interpretation of events. *Wainwright*, 558 F.2d at 96. Copyright infringement could "occur by reason of a substantial similarity that involves only a small portion of each work." *Burroughs v. Metro-Golden Mayer, Inc.* 683 F.2d at 624.

**P. Defendants Alleged Copying Is Not Fair Use**

166. The 2015 Study is not fair use. The parts of *Shock Exchange* defendant copied were highly creative. The only purpose was to supersede *Shock Exchange*. Defendants copied a over 100% of the book, and defendants and other Agents have destroyed *Shock Exchange*, and any market for the book and any marketability for it. 17 U.S. Code § 107. Defendants

like Ms. DuVernay, Stevenson or the United States are considered thought leaders on mass incarceration, and have erased the Plaintiff from history.

167. The following chart shows that mass incarceration – one of Plaintiff's creative selections – represents over 90% of both the 2015 Study and 2019 study.

| | Anomalies Of Shock Exchange | | | | | | NYU Studies Combined | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2015 Study | Total Pages | % of Total Pages | 2019 Study | Total Pages | % of Total Pages | Combined Studies | Total Pages | % of Total Pages |
| Criminal Justice | 112 | 120 | 93% | 61 | 71 | 86% | 173 | 191 | 91% |
| Reconstruction | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Du Bois | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Black Church | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Redlining | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Housing / Wealth / Land | - | 120 | 0% | 3 | 71 | 4% | 3 | 191 | 2% |
| Revolt, riots, violence, uprisings, unrest | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Reparations | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Glass-Steagall, MBS, CDO | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Panic Financial Crisis | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Plaintiff's Personal Story | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Reagan Policies | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Massive Resistance | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| John Randolph | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Black Music | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Gingrich / Republicans | | | | | | | | | |
| Combat Democrats | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Blanche K. Bruce | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Rodney King | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Tobacco | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Dexter Avenue | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Blacks Denied School | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Interracial Sex | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Large % Of Blacks | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Tax Dollars For Whites | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Brown v. Board | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Civi Rights | - | 120 | 0% | - | 71 | 0% | - | 191 | 0% |
| Sum | 112 | 120 | 93% | 64 | 71 | 90% | 176 | 191 | 92% |

Source: Ralph W. Baker, Jr.
Note 1: 2015 Study and 2019 Study include "Foreward" and excludes blank pages.
Note 2: Based on the number of pages these themes are referred to.

Plaintiff's creative selections represent over 92% of *Black AF*.

## Anomalies Of Shock Exchange

| | Black AF | Pages | Total Pages | Shock Exchange | Total Pages | % of Total Pages |
|---|---|---|---|---|---|---|
| Criminal Justice | 10 | 383 | 3% | 5 | 330 | 2% |
| Reconstruction | 40 | 383 | 10% | 1 | 330 | 0% |
| Du Bois | 40 | 383 | 10% | 3 | 330 | 1% |
| Black Church | 4 | 383 | 1% | 4 | 330 | 1% |
| Redlining | 4 | 383 | 1% | 1 | 330 | 0% |
| Housing / Wealth / Land | - | 383 | 0% | 40 | 330 | 12% |
| Revolt, riots, violence, uprisings, unrest | 162 | 383 | 42% | 10 | 330 | 3% |
| Reparations | 15 | 383 | 4% | 1 | 330 | 0% |
| Glass-Steagall, MBS, CDO | - | 383 | 0% | 4 | 330 | 1% |
| Panic Financial Crisis | - | 383 | 0% | 41 | 330 | 12% |
| Plaintiff's Personal Story | 2 | 383 | 1% | 17 | 330 | 5% |
| Reagan Policies | 6 | 383 | 2% | 12 | 330 | 4% |
| Massive Resistance | - | 383 | 0% | 5 | 330 | 2% |
| John Randolph | - | 383 | 0% | 1 | 330 | 0% |
| Black Music | 26 | 383 | 7% | 2 | 330 | 1% |
| Gingrich / Republicans | | | | | | |
| Combat Democrats | 1 | 383 | 0% | 2 | 330 | 1% |
| Blanche K. Bruce | - | 383 | 0% | 1 | 330 | 0% |
| Rodney King | - | 383 | 0% | 2 | 330 | 1% |
| Tobacco | - | 383 | 0% | 2 | 330 | 1% |
| Dexter Avenue | - | 383 | 0% | 1 | 330 | 0% |
| Blacks Denied School | - | 383 | 0% | 6 | 330 | 2% |
| Interracial Sex | 2 | 383 | 1% | 1 | 330 | 0% |
| Large % Of Blacks | 2 | 383 | 1% | 2 | 330 | 1% |
| Tax Dollars For Whites | 3 | 383 | 1% | 1 | 330 | 0% |
| Brown v. Board | - | 383 | 0% | 3 | 330 | 1% |
| Civi Rights | 35 | 383 | 9% | 1 | 330 | 0% |
| Sum | 352 | 383 | 92% | 171 | 330 | 51% |

Source: Ralph W. Baker, Jr.

Note 1: Based on the number of pages these themes are referred to.

**Percentage Of Shock Exchange Copied - Plagiarized Works (Includes Arrangement of Words)**

| | 2015 Study | Total Pages | % Of Total Pages | 2019 Study | Total Pages | % Of Total Pages |
|---|---|---|---|---|---|---|
| Content | 112 | 120 | 93% | 64 | 71 | 90% |
| Arrangement of Words | - | 120 | 0% | - | 71 | 0% |
| Expression | 120 | 120 | 100% | 71 | 71 | 100% |
| Total Pages Copied | 120 | 120 | 100% | 71 | 71 | 100% |

| | Black AF | Total Pages | % Of Total Pages |
|---|---|---|---|
| Content | 352 | 383 | 92% |
| Arrangement of Words | 383 | 383 | 100% |
| Expression | 383 | 383 | 100% |
| Total Pages Copied | 383 | 383 | 100% |

| Total Pages Copied - Content, Expression Arrangement of Words | | Total Pages Unfair Use | Total Pages - Shock Exchange | % Of Total Pages |
|---|---|---|---|---|
| 2015 Study / 2019 Study | (1) | 191 | 330 | 58% |
| Black AF | (2) | 383 | 330 | 116% |
| Combined | | 574 | 330 | 174% |

Source: Ralph W. Baker Jr.
(1) 191 pages derived from (1120 pages for 2015 Study) + (71 pages for 2019 Study)

168. The plagiarized works have allegedly copied a combined 574 pages or 174% of *Shock Exchange*. The 1619 plagiarized works and the Kendi plagiarized works allegedly copied a combined 374% of *Shock Exchange*. *Baker v. Hannah-Jones*, No. 25-300, DktEntry: 152-1. The Coates plagiarized works allegedly copied a combined 1,063 pages – 2014 Essay (64), Water Dancer (403), 2015 Essay (77), Between (152) and Eight Years (367). *Baker v. Hannah-Jones*, No. 25-300, DktEntry: 100-1, Appendix GG. The Coates plagiarized works have allegedly copied 322% of Shock Exchange and the global plagiarized works have allegedly copied 870% of *Shock Exchange* (174% + 374% + 322%). In effect, Agents have allegedly **copied *Shock Exchange* nearly nine times over**, and openly bragged about it.

## Q. Defendants Copied The Creative Selections Of A "Superior Mind"

169. For the 2015 Essay defendants simply repackaged *Shock Exchange* under NYU's umbrella. A person is not allowed to pick up a book written by a superior mind, copy that person's creative selections and attempt to get the same results as the original author. *Jefferys v. Boosey*, 4 H.L.C. 815, 867, *Baker v. Coates*, No. 24-6839.

**R. Defendants Allegedly Copied The Essence And Structure Of *Shock Exchange***

170. Defendants allegedly copied the essence of structure of Plaintiff's expression of mass incarceration, representing comprehensive non-literal similarity. *Arica*, 970 F.2d at 1073. This is consistent with Coates and Jelani Cobb's confession that (i) the best way to write something that stays with people is not to come up with anything original, but (ii) to engage in "applied reading," i.e., take another author's book, deconstruct it and figure out how it's expressed, and copy that author's expression without permission. – *Also see Exhibit J.*

**FACTUAL BACKGROUND TO THIS ACTION PURSUANT TO THE 2019 STUDY**

**S. The 2019 Study Represents Unfair Competition**

171. The 2015 Study discusses Plaintiff's idiosyncrasies and passions pursuant to mass incarceration and the plight of Blacks, the disparity in sentencing between blacks and white, the need for treatment instead of incarceration for drug addicts, the black tax – high incarceration and high unemployment – amongst other things. This represents unfair competition. Per U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

**T. The Selection, Coordination, And Arrangement Of Facts Defendants Allegedly Copied From *Shock Exchange* Are Original And Creative**

172. *Shock Exchange* asserts the US is the most-incarcerated country in the world, which defendants and the 2019 Study repeats at least four times. – *See Exhibit G.*

173. *Shock Exchange* asserts the growth in the U.S. incarceration rate is untenable, which defendants and the 2019 Study repeats at least five times.

174. *Shock Exchange* asserts there is a disparity in incarceration rates between black men and whites, which defendants repeat over 15 times. Plaintiff understands the First Step Act was designed to remove some of the disparities in drug sentencing between the races. Plaintiff understands lawmakers presented this act to President Trump, and it was signed into law in 2018. The fact pattern suggests lawmakers used Plaintiff's expression of mass incarceration to craft the First Step Act and feigned no knowledge of Ralph W. Baker, Jr. or *Shock Exchange*. Defendants referenced the First Step Act ad nauseum.

175. *Shock Exchange* asserts treatment – rather than incarceration – would be a better solution to stopping the drug trade and/or crime, which defendants repeat.

176. *Shock Exchange* asserts (i) the majority of black males are jailed in federal prison with longer stays, which has ravaged the black family, (ii) mandatory minimum sentences are driving up the length of stay, and (iii) about half of the U.S. prison population is non-violent offenders, implying we are giving non-violent offenders a "length of stay" as if they are violent offenders. Defenders repeat this narrative. Defendants also estimate a large number of non-violent criminals could be released without any additional threat to the public – a major conclusion of *Shock Exchange*. In particular, Inimai Chettiar of New York University cites a figure from a 2019 study created by Wendy Sawyer and Peter Wagner of the Prison Policy Initiative. Again, Agents allegedly carefully imitate *Shock Exchange* and then credit someone who is institutionally-backed. **This is a clear sign of a citation club.**

177. *Shock Exchange* asserts how the growth in the prison population is driven by "length of stay" more so than the number of crimes committed. Defendants repeat this narrative and

reference the 1994 Crime Bill – which set mandatory minimums and increased length of stay – at least three times.

178. *Shock Exchange* asserts Reagan's war on drugs has resulted in frequent arrests of non-violent offenders without reducing violent crime. Defendants repeat this narrative. *Shock Exchange* explains the "black tax" – unemployment and incarceration – the cost of being black in America. Defendants repeat this narrative at least five times. Van Jones' narrative is practically verbatim from *Shock Exchange*.

**U. Defendants Allegedly Copied Plaintiff's Expression Of Mass Incarceration**

179. Under the Copyright Act, copyright owners have the exclusive rights to copy, distribute, and digitally transmit their copyrighted works. §106. The Copyright Act provides that "Anyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright." §501(a). Defendants carefully imitated the components of the Baker Mass Incarceration Index. They copied the same facts and marshaled the facts in the same manner as the Plaintiff. Defendants mimicked Plaintiff's analysis and interpretation of events. *Wainwright*, 558 F.2d at 96.

180. Copyright infringement could "occur by reason of a substantial similarity that involves only a small portion of each work." *Burroughs v. Metro-Goldwyn Mayer, Inc.*, 683 F.2d at 624.

**V. Defendants Alleged Copying Is Not Fair Use**

181. The 2015 Study is not fair use. The parts of *Shock Exchange* defendant copied were highly creative. The only purpose was to supersede *Shock Exchange*. Defendants copied over 100% of the book, and defendants and other Agents have destroyed *Shock Exchange*, and any market for the book and any marketability for it. 17 U.S. Code § 107. Defendants

like Ms. DuVernay, Stevenson or the United States are considered thought leaders on mass incarceration, and have erased the Plaintiff and *Shock Exchange* from history.

**W. Defendants Copied The Essence And Structure Of *Shock Exchange***

182. Defendants allegedly copied the essence of structure of Plaintiff's expression of mass incarceration, representing comprehensive non-literal similarity. *Arica*, 970 F.2d at 1073. This is consistent with Coates and Jelani Cobb's confession that (i) the best way to write something that stays with people is not to come up with anything original, but (ii) to engage in "applied reading," i.e., take another author's book, deconstruct it and figure out how it's expressed, and copy that author's expression without permission. – *Also see Exhibit J.*

**<u>FACTUAL BACKGROUND TO THIS ACTION PURSUANT TO BLACK AF</u>**

**X. *Black AF* Represents Unfair Competition**

183. *Black AF* discusses Plaintiff's idiosyncrasies and passions pursuant to mass incarceration and the plight of Blacks, the disparity in sentencing between blacks and white, the need for treatment instead of incarceration for drug addicts, the black tax – high incarceration and high unemployment – amongst other things. This represents unfair competition. Per U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

**Y. *Black AF* Allegedly Copied Plaintiff's Express Of Mass Incarceration, Reconstruction and Civil Rights**

184. Under the Copyright Act, copyright owners have the exclusive rights to copy, distribute, and digitally transmit their copyrighted works. §106. The Copyright Act provides that "Anyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright." §501(a). *Black AF* allegedly copied Plaintiff's expression of Ronald Reagan's

1980 presidential election night, mass incarceration, and reconstruction and the civil rights movement. *See Exhibit I.*

**Z. Michael Harriot Allegedly Copied Plaintiff's Arrangement Of Words**

185. Plaintiff alleges that Harriot copied Plaintiff's language and arrangement of words – *Shock Exchange* rhythmic prose and tedious talk. Per *Holmes v. Hurst*, an author's arrangement of words is protectable: "The right thus secured by the copyright act is not a right to the use of certain words … But the right is to that arrangement of words which the author has selected to express his ideas … The nature of this property is perhaps best defined by Mr. Justice Erle in *Jefferys*, 4 H.L.C. 815, 867: 'The subject of property is the order of words in the author's composition.'" *Holmes* 174 U.S., at 86. Below is a summary of a comparison of the arrangement of words vis-à-vis *BAF* and *Shock Exchange*. *See Exhibit H* for a comprehensive analysis of the arrangement of words.

**Analytical Dissection - Shock Exchange v. Black AF**

| Plagiarized Work | Arrangement / Scene | Shock Exchange Arrangement / Scene | Total Occurrence - BAF % Of Shock Exchange: Top 5 Repeated Words | Total Occurrence - BAF % Of Shock Exchange: Next 4 Repeated Words |
|---|---|---|---|---|
| BAF1 | Mass Incarceration | Mass Incarceration | 85% | 87% |
| BAF2 | Mass Incarceration | Mass Incarceration | 121% | 121% |
| BAF3 | Mass Incarceration | Mass Incarceration | 96% | 97% |
| BAF4 | Mass Incarceration | Mass Incarceration | 123% | 126% |
| BAF5 | Mass Incarceration | Mass Incarceration | 104% | 111% |
| BAF6 | Mass Incarceration | Mass Incarceration | 102% | 111% |
| Mean - Entire Dissection | | | 105% | 109% |
| Median - Entire Dissection | | | 103% | 111% |

Source: Ralph W. Baker, Jr.

186. Defendant(s) copied a substantial portion of Plaintiff's literary composition, which was illegal, "The defendant here could not copy any substantial part of the arrangement or

expression of Hartfield's combination and, because we think there is good reason to believe that he did, we agree with the conclusion of the court below." *Hartfield v. Peterson* 91 F.2d 998 (2d Cir. 1937). The threshold for "substantial part" in Hartfield was 21 per cent. *Hartfield*, 91 F.2d at 1000-1001. Defendants only have to copy the arrangement of words to run afoul of copyright infringement. Per *White-Smith Music*, "'This court has substantially decided that the subject of property in a copyrighted musical composition is the order of the notes in the author's composition, by adopting in *Holmes v. Hurst*, 174 U.S. 86, Mr. Justice Erle's definition of the subject of property in a book or literary composition as being 'the order of the words in the author's composition.' And the same thing must also be true as to the notes of a musical composition. The only thing that has to be copied to constitute a copy of the copyright property is the order in which the notes were set down." *White-Smith Music Co. v. Apollo Co.*, 209 U.S. 1 (1908).

187. There was a substantial similarity between the top 5 repeated words, and the next four most-repeated words in Plaintiff's arrangement(s) and defendants' arrangements. The above chart illustrates the similarities were multiples of the threshold in *Hartfield*.

188. Certain of the passages show defendant copied nearly an exact amount (100 per cent) of Plaintiff's expression ("total occurrence"). In certain instances, defendant's language was even more dense than Plaintiff's. Pursuant to 17 U.S. Code § 102(a), copyright protection subsists for original literary works fixed in a tangible medium of expression that can perceived, reproduced or communicated. For the avoidance of doubt, this is actual copying. It also proves Plaintiff's language and arrangement of words – Shock Exchange rhythmic prose and tedious talk – is a protectible expression.

## AA. Harriot's Actions Represent Unfair Competition

189. In an October 2019 interview with Kendi, Coates intimated that One World (imprint of Penguin Random House) editors Chris Jackson ("defendant"), Victoria Matsui ("defendant") and Nicole Counts ("defendant") wrote *The Water Dancer* ("Water Dancer").[12] *Baker v. Coates, No. 24-6839*. In *Water Dancer* defendants confessed to (i) stealing Plaintiff's identity and his "special knowledge" (ii) copying Plaintiff's language, arrangement of words, (iii) forging documents, (iv) editing and augmenting documents, and (v) leading a secret army at war with the Plaintiff. – *See Exhibit A*. The Second Circuit ruled rap lyrics may be properly admitted at trial "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." *U.S. v. Pierce*, 785 F.3d 832, 841(2d Cir. 2015). The confession establishes the element of a crime, and proves motive and intent, "You can certainly not say when somebody writes about killing snitches, that it doesn't make the fact that they may have killed a snitch more probable .... " *U.S. v. Stuckey*, 253 F. App'x 468 (6th Cir. 2007).

190. The fact pattern suggests Chris Jackson, other editors, and Coates are using *Shock Exchange* to train authors how to copy Plaintiff's language and arrangement of words. *Baker v. Coates*, No. 24-6839. This has created confusion in the marketplace and represents unfair competition under the Lanham Act and New York Common Law Act. The Lanham Act prohibits activities like trademark infringement, trademark dilution, false advertising, and unfair competition. Unfair competition involves market conduct which gains or seeks to gain an advantage over rivals through misleading, deceptive or fraudulent conduct in trade or commerce. Through the plagiarized works, defendants engaged in misleading, deceptive, and fraudulent conduct. In *King v. Allied*, 807 F. Supp. 300 (S.D.N.Y. 1992), the Southern District

[12] Baker v. Coates et al. Case 1:22-cv-07986-JPO-SLC, Dkt. 120.

granted an injunction to Stephen King and concluded (1) the possessory credit was false and (2) the based upon credit was misleading. This violated section 43(a) of the Lanham Act.

Defendants' plagiarized works violated 43(a) of the Lanham Act. Defendants falsely alleged that they were the originators of the plagiarized works, and misappropriated from Plaintiff's literary skills. It will result in irreparable harm. Plaintiff's work has been misattributed to a prominent author; reputational harm has been immeasurable. *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517 (S.D.N.Y.), aff'd without op., 883 F.2d 1022 (2d Cir.1989); *Wojnarowicz v. Human Family Assn.*, 745 F. Supp. 130 (S.D.N.Y.1990). Plaintiff need not demonstrate lost profits or tangible damage to his reputation to show irreparable harm.

191. New York Common law of unfair competition is analogous to the Lanham Act's unfair competition laws. Defendants have clearly violated the Lanham Act and New York common law. Plaintiff is likely to succeed on the merits of his claim under New York General Business Law §§ 349, 350 and 368-d, which provide a private right of action for persons injured by deceptive acts or false advertising in the conduct of business. These provisions prohibit materially false and misleading advertisements which markedly affect the public. See, e.g., *Construction Technology v. Lockformer Co.*, 704 F. Supp. 1212, 1222-23 (S.D.N.Y.1989).

192. The Ninth Circuit recently adopted Plaintiff's legal argument. Under California's Unfair Competition Law ("UCL"), Plaintiffs argued defendants used copyrighted material to train ChatGPT without plaintiffs' permission. In *PAUL TREMBLAY, et al.*, v. OPENAI, INC., et al., Case Nos. 23-cv-03223-AMO 23-cv-03416-AMO. The U.S. District Court for the Northern District of California cited California's unfair competition law prohibits "not only

unlawful business practices but also unfair business practices. The statute is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not forbidden by law." *Tremblay*. In addition, "Assuming the truth of Plaintiff's allegations – the Defendants used Plaintiff's copyrighted works to train their language models for commercial profit – the Court concludes that Defendants' conduct may constitute an unfair practice … this portion of the UCL claim may proceed." *Tremblay*. For those same reasons, Plaintiff alleges defendants have run afoul of the Lanham Act and New York Common Law Act.

193. The PAUL TREMBLAY case has been transferred to the U.S. District Court for the Southern District of New York ("District Court") as part of multi-litigation, MDL No. 3143. The Second Circuit has adopted the PAUL TREMBLAY court's conclusions by de facto.

194. Per *Jefferys*, "The order of each man's words is as singular as his countenance …," or the equivalent of "one's face." *Jefferys v. Boosey*, 4 H.L.C. 869. In copying the order of words in Plaintiff's literary composition, defendants have stolen Plaintiff's face and/identity. The odds that defendants and Plaintiff "composed originally" with the same order of words is "less than that there should be two countenances that could not [be] discriminated." *Jefferys v. Boosey*, 4 H.L.C. 815, 867, Petition for Rehearing at 5, *Baker v. Coates*, No. 24-6839 (U.S. June 11, 2025).

195. Bette Midler sued Ford for running a commercial impersonating her voice. In *Midler v. Ford*, the court asserted that to impersonate Ms. Midler's distinctive voice "is to pirate her identity … We hold only that when a distinctive voice of a professional singer is widely known and is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California." *Midler* 849 F.2d, at 463. Bert

Lahr sued Adell Chemical Co. for using a commercial that imitated Lahr's distinctive voice. "The First Circuit held that Lahr had stated a cause of action for unfair competition, that it could be found 'that defendant's conduct saturated plaintiff's audience, curtailing his market.'" *Midler*, 849 F.2d at 462-463, *Lahr*, 300 F.2d at 259. Plaintiff and his distinctive voice are well-known to the book industry, corporate media, and arguably every Black professor, journalist, and author. Defendants' books, articles and derivative works compete with Plaintiff's book. Defendants' actions represent a tort liability and also represent unfair competition as they have saturated and curtailed the market for Plaintiff's work.

196. Plaintiff understands that "Section 43(a) now expressly prohibits, *inter alia,* the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods or services by another person. Moreover, the legislative history of the 1988 amendments also makes clear that in retaining the statute's original terms 'symbol or device' in the definition of 'trademark,' Congress approved the broad judicial interpretation of these terms to include distinctive sounds and physical appearance." *Waits*, 978 F.2d at 1107.

197. Plaintiff understands that "symbol or device" also includes one's arrangement of words. The Ninth Circuit Court of Appeals ("Ninth Circuit") recognized Tom Waits' false endorsement claims under section 43(a). Plaintiff claims of defendant(s) copying his arrangement of words should also be endorsed. Defendants have not only copied Plaintiff's language and arrangement of words, they have stolen Plaintiff's entire identity.

198. *Black AF* also discusses Plaintiff's idiosyncrasies, passions or "special knowledge") pursuant to mass incarceration and the plight of Blacks, the disparity in sentencing between blacks and white, reconstruction, Du Bois, social unrest, civil rights, et al. This represents

unfair competition. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

**BB. The Selection, Coordination, And Arrangement Of Facts Defendants Allegedly Copied From *Shock Exchange* Were Original And Creative.**

199. The selection, coordination, and arrangement of facts in *Shock Exchange* are original and creative. There was nothing like *Shock Exchange* in the marketplace when it was published in 2012. Plaintiff's narrative on reconstruction, mass incarceration, redlining, massive resistance, the housing market, et al. was and remains groundbreaking. *Shock Exchange* was so well-written and informative the Harriot, News Corp, New York University, Ms. DuVernay, Netflix and hundreds of members of the Agency decided *Shock Exchange* was too important for the Plaintiff to have all by himself. *Feist* at 357.

**CC. Defendants Allegedly Copied The Essence And Structure Of *Shock Exchange***

200. Defendants allegedly copied the essence and structure of Plaintiff's expression of mass incarceration, reconstruction, civil rights, et al., representing comprehensive non-literal similarity. *Arica*, 970 F.2d at 1073. This is consistent with Coates and Jelani Cobb's confession that (i) the best way to write something that stays with people is not to come up with anything original, but (ii) to engage in "applied reading," i.e., take another author's book, deconstruct it and figure out how it's expressed, and copy that author's expression without permission. – *Also see Exhibit J.*

**FOR THE CAUSE OF ACTION AGAINST DIRECT AGENTS**

201. Certain "Agents" per the Complaint are "Direct Agents" who engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 13th plagiarized work, the NYU plagiarized works, *Black AF* or the plagiarized

works; they include, but are not limited to Ava DuVernay, Spencer Averick, Michelle Alexander, Melina Abdullah, United States, Jelani Cobb, Angela Davis, Baz Dreisinger, Henry Louis Gates, Jr., Marie Gottschalk, John Hagan, Van Jones, Glenn E. Martin, Marc Maurer, Khalil Gibran Muhammad, Rashad Robinson, Kevin Gannon, Bryan Stevenson, Nicholas Turner, Michael Waldman, William J. Clinton, Hillary Rodham Clinton, Cornell William Brooks, Derrick Johnson, Inimai Chettiar, Ta-Nehisi P. Coates, Chris Jackson, Nicole Counts, Victoria Matsui, Alicia Garza, Sherrilyn Ifill, and Michael Harriot.

**FOR THE CAUSE OF ACTION AGAINST SECONDARY AGENTS**

202. Agents other than Direct Agents are "Secondary Agents" who engaged in vicarious infringement, contributory infringement or both. Here, "College Agents" include, but are not limited to, NYU, Harvard, Columbia, UC Santa Cruz, California State, John Jay, Penn, Northwestern, and Grand View.

203. Certain Agents engaged in vicarious infringement. Per *Grokster*, "… a vicarious liability theory, which allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, n. 9.

204. Certain Agents, including College Agents, engaged in contributory infringement. Per *Cox Communications, Inc. et al. v. Sony Music Entertainment et al.*, No. 24-171, "The provider of a service is contributorily liable for the user's infringement only if it intended that the service be used for infringement. The intent required for contributory infringement can be shown only if the party induced the infringement or the provided service is tailored to that

infringement." *Grokster*, 545 U.S., at 930. "A provider induces infringement if it actively encourages infringement through specific acts. *Grokster*, 545 U.S., at 942.

**FOR THE CAUSE OF ACTION AGAINST AVA DUVERNAY**

**(Copyright Infringement And Unfair Competition)**

205. Plaintiff repeats and realleges all of the foregoing allegations as if fully set forth herein.

206. Plaintiff owns a registered copyright in *Shock Exchange*.

207. Plaintiff owns the exclusive rights to *Shock Exchange*, and has not transferred any such rights to any individual or entity.

208. Defendant stole a substantial portion of *Shock Exchange*. She stole the most unique aspects of *Shock Exchange*.

209. Defendant's theft was obvious, despite attempts to mask the piracy.

210. In all instances of defendant's copyright infringement, she was stealing from the heart of *Shock Exchange*.

211. Taken collectively, defendant's copying constitutes a gross and willful violation of Plaintiff's copyright.

212. Defendant, through *13th* and the 13th Interview, has engaged in unfair competition with Plaintiff and *Shock Exchange*.

213. The fact pattern suggests Ms. DuVernay and other editors and writers copied Plaintiff's creative selections – mass incarceration, the components of the Baker Mass Incarceration Index, and Plaintiff's counsel on addressing mass incarceration – and instructed Direct Agents what to say.

214. Plaintiff has been damaged financially and emotionally. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in amount to be determined at trial. In

addition to actual damages and profits or statutory damages, Plaintiff is entitled to recover the costs of attorneys' fees incurred in this action.

215. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries, sound recordings and music owned or related to defendant, including *13th*, the 13th Interview, *A Wrinkle In Time*, *When They See Us*, and *Origin*.

216. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately. This includes, but is not limited to, *13th* and the 13th Interview, *A Wrinkle In Time*, When They See *Us*, and *Origin*. Plaintiff demands the copyright and 100 percent of all revenue associated with Ms. DuVernay – since 2016 – be transferred to him into perpetuity.

217. Defendant, through her movies and documentaries, and broadcasts copied from *Shock Exchange*, has engaged in unfair competition with Plaintiff and *Shock Exchange*. Defendant, Netflix and Ms. Oprah Winfrey have brandished the defendant as a thought leader on mass incarceration, amongst others. Defendant and Netflix and other distributors and marketers have caused public confusion resulting in the wrongful belief that defendant, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of these themes, expression and analyses. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

218. Plaintiff is forced to sue defendant, Netflix, Ms. Oprah Winfrey, Spencer Averick, et al., lest the confusion in the marketplace will continue and defendant, her employers and business partners will argue Plaintiff is copying them.

**FOR THE CAUSE OF ACTION AGAINST SPENCER AVERICK**

219. Defendant took writing credit for work he did not write. The fact pattern suggests defendant copied Plaintiff's creative selections pursuant to mass incarceration and instructed Direct Agents what to say.

220. Averick engaged in unfair competition. He caused public confusion resulting in the wrongful belief that he, and not Ralph W. Baker, Jr. or *Shock Exchange*, was the source of the narrative, ideas and expression of ideas relayed in *13th*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

221. As a direct and proximate result of Averick's conduct, Plaintiff has been damaged in amount to be determined at trial. In addition to actual damages and profits or statutory damages, Plaintiff is entitled to recover the costs and reasonable attorneys' fees incurred in this action.

222. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

223. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately. This includes, but is not limited to, *13th* and the 13th Interview, *A Wrinkle In Time*, When They See *Us*, and *Origin*. Plaintiff demands the copyright and 100 percent of all revenue associated with Averick – since 2016 – be transferred to him into perpetuity.

**FOR THE CAUSE OF ACTION AGAINST MICHELLE ALEXANDER**

224. Alexander engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

225. Defendant engaged in unfair competition. She caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

226. The fact pattern suggests this action represents a pattern from Ms. Alexander. Plaintiff also accused Ms. Alexander of infringement pursuant to *Baker v. Hannah-Jones*, No. 25-300.

227. As a direct and proximate result of Alexander's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

228. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST MELINA ABDULLAH**

229. Ms. Abdullah engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

230. Defendant engaged in unfair competition. She caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

231. As a direct and proximate result of Ms. Abdullah's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

232. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST BAZ DREISINGER**

233. Ms. Dreisinger engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

234. Defendant engaged in unfair competition. She caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

235. As a direct and proximate result of Ms. Dreisinger's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

236. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

237. Plaintiff demands that Dreisinger and John Jay match all grant money, funding and research dollars tenfold garnered by Incarceration Nations Network since 2016 and awarded to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST TA-NEHISI P. COATES**

238. Plaintiff alleges that Coates copied Plaintiff's express of mass incarceration for the 2019 Study with no attribution to the Plaintiff. Coates engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 2019 Study.

239. Coates engaged in vicarious infringement pursuant to *Black AF. Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, by promoting Michael Harriot and *Black AF* at [at] The Intersection, the Apollo's inaugural festival of arts and ideas in October 2023.[13] In helping Harriot and *Black AF* compete with Plaintiff and destroy *Shock Exchange*, Coates was able to sate his anger and jealousy of Plaintiff. – *See Exhibit A*. In keeping *Shock Exchange* hidden, it allowed defendant and Agents to continue their plagiarism scheme.

240. Plaintiff alleges Coates trained Harriot and other Agents how to copy Plaintiff's language and arrangement of words and/or Plaintiff's "special knowledge" and creative selections, making Coates guilty of contributory infringement and guilty of inducing direct infringement. *Grokster*, 545 U.S., at 942. Defendant confessed to infringement; he intended for his services to be used for infringement. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). In confessing to infringement, defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

[13] https://www.apollotheater.org/posts/at-the-intersection-weekend-lineup

241. Coates has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 2019 Study.

242. Coates engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the 2019 Study independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

243. As a direct and proximate result of Coates' conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

244. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to Coates from 2019 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST JELANI COBB**

245. Cobb has engaged in direct infringement with Coates who has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the *13th*.

246. Plaintiff previously filed a complaint against Cobb for infringement, and accused him of allegedly deleting messages off X and/or hiding evidence previously on social media relevant to the case. *Baker v. Hannah-Jones, et al.*, Complaint. In a May 2025 interview with Boston Public Radio, Cobb intimated Columbia's legal counsel's advice is to delete information on

social media to reduce your risk, "Interviewer: 'Jelani Cobb you made a comment … for which you took a little bit of blowback. You said, "Nobody can protect you. These are dangerous times." Who were you speaking to and what were you trying to say?' Cobb: 'That quote has become the bane of my existence. I was speaking to a group of students who were at a town hall … I was trying to convey that we have protocols around safety and around caution … Our legal counsel gave the advice that legal counsel would give. When you deal with a lawyer what they generally tell you to do is reduce your risk … If you have something on social media, you might want to consider deleting it.'"[14] The interview could be considered corroborating evidence of evidence tampering. 18 U.S. Code § 1519.

247. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created *13th* independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

248. As a direct and proximate result of Cobbs' conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

249. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST ANGELA DAVIS**

---

[14] "Columbia journalism dean addresses response to Trump and challenges to press freedom," *GBH*, May 1, 2025. (Around the 10:31 mark)

250. Ms. Davis engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

251. Defendant engaged in unfair competition. She caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

252. The fact pattern suggests this action represents a pattern from Ms. Davis. Plaintiff also accused Ms. Alexander of infringement pursuant to *Baker v. Hannah-Jones*, No. 25-300.

253. As a direct and proximate result of Ms. Davis' conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

254. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST MICHAEL HARRIOT**

255. Harriot has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *Black AF*.

256. Plaintiff alleges Harriot copied Plaintiff's language and arrangement of words, representing identity theft. Harriot's actions represent unfair competition, as they have created confusion in the marketplace pursuant to whose language, ideas and expression of ideas were presented in *Black AF*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

257. As a direct and proximate result of Harriot's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

258. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2023 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST BRYAN STEVENSON**

259. Stevenson has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*, the 2015 Study and/or the plagiarized works.

260. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th*, the 2015 Study and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

261. As a direct and proximate result of Stevenson's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

262. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound

recordings, and music owned or related to defendant from 2015 be transferred to him immediately.

263. Plaintiff demands that Stevenson and/or New York University match all grant money, funding, and research dollars garnered by the Equal Justice Initiative since 2016 to inception, and awarded to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST HENRY LOUIS GATES**

264. Gates has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the plagiarized works.

265. Gates is well aware of *Shock Exchange*. Plaintiff sent the book to Gates at Harvard University circa 2013/2014.

266. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

267. As a direct and proximate result of Gates' conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

268. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

269. Plaintiff demands that Gates and/or Harvard match all grant money, funding, and research dollars garnered by the Hutchins Center since 2016 and awarded to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST UNITED STATES**

270. United States has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*, the 2015 Study, the 2019 Study and the NYU plagiarized works. The fact pattern suggests that for over a decade the United States has been mining *Shock Exchange* for policy ideas and recommendations, copying content from *Shock Exchange*, and crediting institutions or those institutionally-backed to curry favor with voters.

271. United States engaged in unfair competition. United States caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th*, the 2015 Study, the 2019 Study or the NYU plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

272. This action represents a distinct pattern from the United States. Plaintiff accused the United States of copying Plaintiff's expression of infrastructure investing to spur the U.S. economy in 2008 – Plaintiff was "loud" about it:

> On November 23, 2008 the cover of the New York Times caught my eye … The caption read, "Obama Plays FDR in 2.5M Jobs Plan; Pledges Building Blitz to Jump Start Economy." The key plan involved investing in infrastructure … I chuckled at the article. Mr. Obama was trying to convince the world that he infrastructure idea had come to him in a séance with FDR … Secondly, in giving credit to his grand plan to FDR, an icon who the country revered, it still struck me as an attempt to curry favor with white voters. "President Obama conveniently failed to mention the true source of his idea to invest in roads and bridges to spur the economy," I surmised.[15]

[15] Ralph W. Baker, Jr., *Shock Exchange: How Inner-City Kids From Brooklyn Predicted the Great Recession and the Pain Ahead*, Pages 176-177.

United States has had over a decade to deny these plagiarism allegations, yet has remained silent. The fact pattern suggests that when the United States needs a policy to address mass incarceration or the vagaries of the U.S. economy it mines content from the Plaintiff – books, articles, blog posts – and feigns no knowledge of Ralph W. Baker, Jr. or *Shock Exchange*.

273. As a direct and proximate result of United States' conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to the plagiarized works.

274. Plaintiff demands that United States compensates Plaintiff for his original work and publicly-acknowledges that *13th*, the NYU plagiarized works and/or the plagiarized works were copied from the Plaintiff and *Shock Exchange* without attribution.

**FOR THE CAUSE OF ACTION AGAINST MARIE GOTTSCHALK**

275. Ms. Gottschalk engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

276. Defendant engaged in unfair competition. She caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

277. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

278. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST JOE HAGAN**

279. Hagan has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the *13th*.

280. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

281. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

282. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST VAN JONES**

283. Jones has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the plagiarized works.

284. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th*, the 2019 Study, and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

285. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

286. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

287. Plaintiff demands that Jones and Warner Bros. Discovery, Inc. to match all grant money, funding and research dollars garnered by (i) Color of Change, the Dream Machine Innovation Labs, and Dream.org. and (ii) $100 million award from Jeff Bezos tenfold, and return them to Plaintiff immediately.[16]

**FOR THE CAUSE OF ACTION AGAINST GLENN E. MARTIN**

288. Martin has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

---

[16] Oliver Darcy, "Bezos donates $100 million each to CNN contributor Van Jones and chef Jose Andres," www.cnn.com, July 21, 2021.

289. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

290. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

291. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

292. Plaintiff demands that Martin match all grant money, funding and research dollars garnered by JULSA since 2016 and return them to the Plaintiff immediately.[17]

**FOR THE CAUSE OF ACTION AGAINST MARC MAUER**

293. Mauer has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the plagiarized works.

294. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

[17] Oliver Darcy, "Bezos donates $100 million each to CNN contributor Van Jones and chef Jose Andres," www.cnn.com, July 21, 2021.

295. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

296. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant since 2016 be transferred to him immediately.

297. Plaintiff demands that Mauer match all grant money, funding and research dollars garnered by Sentencing Project since 2016 and return them to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST KHALIL GIBRAN MUHAMMAD**

298. Gibran Muhammad has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the plagiarized works.

299. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

300. This action represents a distinct pattern by Gibran Muhammad. Plaintiff made similar infringement claims against defendant pursuant to *Baker v. Hannah-Jones*, 25-300.

301. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

302. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST KEVIN GANNON**

303. Gannon has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the plagiarized works.

304. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

305. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

306. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST RASHAD ROBINSON**

307. Robinson has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th* and the 2019 Essay.

308. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th*, the 2019 Essay and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

309. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

310. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

311. Plaintiff demands that Robinson match all grant money, funding and research dollars garnered by ColorofChange.org since 2016 tenfold, and return them to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST NICHOLAS TURNER**

312. Turner has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying *13th*.

313. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the *13th* and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

314. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale,

marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

315. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

316. Plaintiff demands that Turner matches all grant money, funding and research dollars garnered by Vera Institute of Justice since 2016 and return them to Plaintiff immediately. Plaintiff demands that Turner match all grant money, funding and research dollars he has garnered related to criminal justice – including funds garnered by Vera Action – and return them to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST INIMAI CHETTIAR**

317. Chettiar has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the plagiarized works.

318. Defendant engaged in unfair competition. Defendant caused public confusion resulting in the wrongful belief that defendants wrote or created the 2015 Study, 2019 Study, or the NYU plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

319. As a direct and proximate result of Chettiar's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

320. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2015 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST MICHAEL WALDMAN**

321. Waldman has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 2015 Study. It is statistically impossible that Waldman – President Bill Clinton's speech writer – has the same knowledge of mass incarceration as the Plaintiff, or that he crafted the 2015 Study or the 2019 Study independent of *Shock Exchange*.

322. Waldman engaged in vicarious infringement pursuant to the 2019 Study. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 at 930, n 9. As President and CEO of the Brennan Center for Justice, defendant profited directly from the infringement; he profited financially and/or gained prestige and influence from having published the study or having been part of the management team that brought the 2019 Study to market.

323. As an Agent, defendant intended for his services to be used for infringement. – *See Exhibit A*. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. During the week of September 13, 2026 Plaintiff demanded defendant cease-and-desist from marketing and promoting, producing and reproducing the NYU plagiarized works. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. "If a computer system operator learns of specific infringement material on his system and fails to

purge such material from the system, the operator knows and contributes to direct infringement." *Disney v. Hotfile*, at 34.

324. Defendant engaged in unfair competition. Defendant caused public confusion resulting in the wrongful belief that defendants wrote or created the 2015 Study, 2019 Study, or the NYU plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

325. As a direct and proximate result of Waldman's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

326. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2015 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST WILLIAM J. CLINTON**

327. William J. Clinton has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 2015 Study.

328. The fact pattern suggests Mr. Clinton was completely aware the 2015 Study was plagiarized from *Shock Exchange*. In the 2015 Study Mr. Clinton admitted fear of crime had been used as a political weapon, "After decades in which fear of crime was wielded as a political weapon, so many now understand the need to think hard and offer real reforms …" That fact pattern suggests Mr. Clinton was aware the 2015 Study was plagiarized from *Shock Exchange*, and Mr. Clinton used weaponized *Shock Exchange* and its expression and findings

on mass incarceration to help his wife, Hillary Rodham Clinton vie for the 2016 presidency. Plaintiff understands Hillary Rodham Clinton announced her plans to run for president April 12, 2015.[18] That same month Mr. Clinton issued a mea culpa – making a formal call to end mass incarceration.[19]

329. Like other agents, Mr. Clinton likely thought he had found the cheat code to mass incarceration and the 2016 presidency. Mr. Clinton engaged in unfair competition. Defendant caused public confusion resulting in the wrongful belief that defendants wrote or created the 2015 Study independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

330. As a direct and proximate result of Mr. Clinton's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

331. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2015 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST HILLARY RODHAM CLINTON**

332. Hillary Rodham Clinton has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 2015 Study.

---

[18] "Getting Started| Hillary Clinton," YouTube, April 12, 2015, https://en.wikipedia.org/wiki/Hillary_Clinton_2016_presidential_campaign#cite_note-5

[19] Ed Pilkington, "Bill Clinton: mass incarceration on my watch 'put too many people in prison,' *The Guardian*, April 28, 2015.

333. Mrs. Clinton made "ending mass incarceration" a key campaign issue during her candidacy to become U.S. president in 2016. Plaintiff alleges that in copying *Shock Exchange*'s expression of mass incarceration and the ways to address it, Mrs. Clinton weaponized mass infringement to potentially help her become the country's 45th president. Mrs. Clinton Clinton announced her plans to run for president April 12, 2015.[20] In a speech at Columbia University later that month, Mrs. Clinton vowed to "end mass incarceration" and called for treatment over incarceration for drug addicts.[21]

334. Mrs. Clinton engaged in unfair competition. Defendant caused public confusion resulting in the wrongful belief that defendants wrote or created the 2015 Study independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

335. As a direct and proximate result of Mrs. Clinton's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

336. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2015 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST CORNEL WILLIAM BROOKS**

[20] "Getting Started| Hillary Clinton," YouTube, April 12, 2015, https://en.wikipedia.org/wiki/Hillary_Clinton_2016_presidential_campaign#cite_note-5

[21] https://www.nbcnews.com/storyline/baltimore-unrest/hillary-clinton-call-body-cameras-all-police-n350261 , April 29, 2015.

337. Brooks has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying 2015 Study.

338. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the 2015 Study and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

339. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

340. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2015 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST DERRICK JOHNSON**

341. Johnson has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying 2019 Study.

342. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the 2019 Study and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

343. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale,

marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

344. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2019 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST JEREMY TRAVIS**

345. Travis has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying 2019 Study.

346. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the 2019 Study and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

347. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

348. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2019 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST ALICIA GARZA**

349. Garza has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying 2019 Study.

350. Defendant engaged in unfair competition. He caused public confusion resulting in the wrongful belief that defendants wrote or created the 2019 Study and/or the plagiarized works independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

351. This action represents a distinct pattern by Ms. Garza. Plaintiff made similar infringement claims against defendant pursuant to *Baker v. Hannah-Jones*, 25-300.

352. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

353. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2019 be transferred to him immediately.

354. Plaintiff demands that Garza match all grant money, funding and research dollars garnered by Black Futures Lab tenfold since 2016 and return them to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST SHERRILYN IFILL**

355. Ms. Ifill has engaged in direct infringement by writing, promoting, marketing, producing, distributing, directing, or publicly displaying the 2019 Study.

356. Defendant engaged in unfair competition. She caused public confusion resulting in the wrongful belief that defendants wrote or created the 2019 Study and/or the plagiarized works

independent of *Shock Exchange*. U.S. Code § 1125 (section 43(a) of the Lanham Act), *Waits*, at 1100 and 1105-1106.

357. This action represents a distinct pattern by Ms. Ifill. Plaintiff made copyright infringement claims against defendant pursuant to *Baker v. Hannah-Jones*, 25-300, where Ms. Ifill allegedly promoted herself as an expert on school closings in Plaintiff's home area of Prince Edward County, VA.

358. Plaintiff filed the complaint against Ms. Ifill and others in the Southern District of New York ("District Court") on November 16, 2024. *Baker v. Hannah-Jones* et al., 24-CV-8760. Plaintiff understands that within a matter of weeks of the filing, Ms. Ifill deleted her entire X account. Plaintiff alleges this is evidence tampering and obstruction of justice. 18 U.S. Code § 1519. This is a distinct pattern from these Agents. Plaintiff accused Cobbs and Coates of evidence tampering. *Baker v. Hannah-Jones* et al., Cmplt., *Baker v. Hannah-Jones*, 25-300, DktEntry: 100-1, Appendix CC.

359. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant. Plaintiff demands that defendant is banned from owning a copyright in perpetuity.

360. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2019 be transferred to him immediately.

**FOR THE CAUSE OF ACTION AGAINST SECONDARY INFRINGERS**

**(Vicarious Infringement And/Or Contributory Infringement)**

361. Certain Agents per the Company are "Vicarious Agents," "College Agents" and "Contributory Agents." College Agents include, but are not limited to, Cal State, Columbia, UC Santa Cruz, John Jay, Harvard, Penn, Northwestern and Grand View. One infringes contributorily by intentionally inducing or encouraging direct infringement, see *Gershwin Pub. Corp.* v. *Columbia Artists Management, Inc.*, 443 F. 2d 1159, 1162 (CA2 1971), and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it, *Shapiro, Bernstein & Co.* v. *H. L. Green Co.*, 316 F. 2d 304, 307 (CA2 1963). *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 at 930. Per *Grokster*, "… a vicarious liability theory, which allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, n. 9.

The U.S. Supreme Court recently gave more clarification on contributory infringement:

> The provider of a service is contributorily liable for the user's infringement only if it intended that the provided service be used for infringement. The intent required for contributory liability can be shown only if the party induced the infringement or the provided service is tailored to that infringement. Grokster, 545 U. S., at 930; Sony, 464 U. S., at 440–441.
>
> A provider induces infringement if it actively encourages infringement through specific acts. Grokster, 545 U. S., at 942 … For example, in Grokster, we held that a jury could find two file-sharing software companies liable for inducement. Id., at 941 (majority opinion). The companies promoted and marketed their software as a tool to infringe copyrights. Id., at 926. The "principal object" of their business models "was use of their software to download copyrighted works." Ibid. Other decisions have held providers liable for similar conduct. See Kalem Co. v. Harper Brothers, 222 U. S. 55, 62–63 (1911) (finding liability where "[t]he defendant not only expected but invoked by advertisement the use of its films" for infringement of an author's copyright); Henry v. A. B. Dick Co., 224 U. S. 1, 49 (1912) (finding liability because the sale was made "with the purpose and intent" that the object be used for patent infringement), overruled on other grounds, Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 518 (1917). A

service is tailored to infringement if it is "not capable of 'substantial' or 'commercially significant' noninfringing uses." Grokster, 545 U. S., at 942 (Ginsburg, J., concurring) (quoting Sony, 464 U. S., at 442). *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7, ¶¶ 2 - 4 (2026).

**FOR THE CAUSE OF ACTION AGAINST ARRAY**

362. ARRAY marketed, promoted and distributed 13th even though it knew the documentary was plagiarized. ARRAY(i) profited from direct infringement promulgated by Ms. DuVernay and Averick and (ii) had the right and ability to supervise the direct infringer.

363. As a direct result of ARRAY's conduct, Plaintiff is damaged in an amount to be determined at trial. In addition to actual damages and profits for statutory damages, Plaintiff is entitled to recover the costs and reasonable attorneys' fees incurred in this action.

364. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. ARRAY profited financially, profited from the prestige of having produced an award-winning documentary, and likely won future production rights on the strength of *13th*.

365. ARRAY engaged in contributory infringement. ARRAY and other Agents openly bragged about stealing Plaintiff's "special knowledge" and stealing Plaintiff's identity. – *See Exhibit A*. ARRY intended for its services provided to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). In confessing to infringement, defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

366. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320

(S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent ARRAY a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

367. ARRAY has engaged in unfair competition. ARRAY helped promulgate the narrative that the ideas and expression of ideas in 13th were created by Ms. DuVernay and other Agents. By promoting *13th* from Ms. DuVernay and others, which Plaintiff alleges is plagiarized, ARRAY increased publicity for the 13th and the value of its financial interest. Through its movies, interviews and documentaries, ARRAY has engaged in unfair competition with Plaintiff and *Shock Exchange*. ARRAY and its co-conspirators have caused public confusion resulting in the wrongful belief that defendant, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas in 13th.

368. ARRAY has shown a brazen disregard for U.S. copyright law. Plaintiff demands an injunction against ARRAY from the sale, marketing and promotion of books, articles,

movies, documentaries, sound recordings and music related to defendant, including *13th* and the 13th Interview.

369. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately. This includes, but is not limited to, *13th* and the 13th Interview. Plaintiff demands the copyright and 100 percent of all revenue associated with ARRAY be transferred to him into perpetuity.

**FOR THE CAUSE OF ACTION AGAINST NETFLIX**

370. Netflix marketed, promoted and distributed 13th and (i) profited from direct infringement promulgated by Direct Agents, and (ii) had the right and ability to supervise the direct infringer. Netflix has promoted and financed several projects from Ms. DuVernay. (*13th*, *When They See Us*, *Colin in Black & White*), and expects to launch the documentary, *14th*, later this year.[22]

371. Upon information and belief, Netflix content costs have skyrocketed over the years as certain of its partners removed content off Netflix's service and created their own streaming services. The cost to produce a documentary like 13th is likely 15-to-20 times cheaper to produce than an original movie or a multi-part show, and the outcome from the original project could be highly-uncertain. Upon information and belief, this could explain content from *Shock Exchange* – in documentary form – is alleged to be so prevalent on Netflix service.

[22] "Ava DuVernay's '14th' Documentary Sets Netflix Release Date, Jazz Tangcay, Variety, August 20, 2026.

372. As a direct and proximate result of Netflix's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

373. Netflix has engaged in unfair competition. Netflix has helped promulgate the narrative that the ideas and expression of ideas in 13th were created by Ms. DuVernay and other Agents. Plaintiff alleges that in promoting *13th*, Netflix increased publicity for 13th and the value of its financial interest.

374. Through its movies, interviews and documentaries, Netflix has engaged in unfair competition with Plaintiff and *Shock Exchange*. Netflix and its co-conspirators have caused public confusion resulting in the wrongful belief that defendant, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas in 13th.

375. Netflix has shown a brazen disregard for U.S. copyright law. Plaintiff demands an injunction against Netflix from the sale, marketing and promotion of books, articles, movies, documentaries, sound recordings and music related to defendant, including *13th* and the 13th Interview.

376. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to Ms. DuVernay from 2016 be transferred to him immediately. This includes, but is not limited to, *13th* and the 13th Interview.

377. Plaintiff demands an injunction from Netflix marketing, promoting or distributing books, articles, movies, documentaries, sound recordings or music that mentions for relate to creative selections from *Shock Exchange* as presented here, and presented to the Second Circuit Court of Appeals pursuant to *Baker v. Hannah-Jones*, 25-300, DktEntry: 152-1.

378. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, profited from the prestige of having produced an award-winning documentary, amplified engagement and attracted new subscribers to its streaming service, and likely attracted additional content creators and infringers to its streaming service on the strength of *13th*.

379. Netflix engaged in contributory infringement. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

380. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct

infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

381. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

382. Defendant showed unlawful intent. Netflix gave DuVernay creative control to make whatever documentary she wanted, "Netflix reached out to me with an offer that I'd never heard before. Come and make what you'd like to make."[23] However, Netflix did not take meaningful steps to prevent infringement. "… defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425. The massive scale of infringement shows intent by Netflix. Plaintiff also alleged the Stamped Netflix doc infringed on Plaintiff's copyright. *Baker v. Hannah-Jones*, 25-300. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. Netflix's business model is tailored for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F.

[23] Ramen Setoodeh, "Ava DuVernay on Why Netflix Understands Artists and Diversity," Variety, August 15, 2017.

Supp. 2D at 659. Netflix is seeking cheaper content to lower its content costs. Plaintiff understands *13th* had a production budget only $1 million.[24] Plaintiff alleges the content costs were so low because Ms. DuVernay allegedly copied the content from *Shock Exchange*. Netflix ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

**FOR THE CAUSE OF ACTION AGAINST MS. OPRAH WINFREY**

383. Ms. Winfrey engaged in vicarious infringement. *Grokster*, 545 U.S. 913, 930, n. 9. Defendant profited from the infringing acts of Ms. DuVernay. Ms. Winfrey knew or should have known the *13th* Interview was plagiarized. Plaintiff has filed copyright infringement charges against Ms. Winfrey pursuant for aiding and helping certain defendants fence property stolen from Plaintiff. *Baker v. Coates*, No. 24-6839, *Baker v. Hannah-Jones*, No. 25-300. Ms. Winfrey has gained notoriety and prestige from being part of another creative project allegedly stolen from the Plaintiff. The *13th* Interview allowed Ms. Winfrey has brandished her image as "queenmaker" and an ability to deliver high-quality content to Hollywood.

384. Defendant engaged in contributory infringement. Defendant contributed her "star power" to the 13th Interview – the same "star power" that helped the 1619 Hulu doc win an Emmy.[25] "…a defendant was liable as a contributory infringer when it had knowledge of direct infringement and materially contributed to the infringement." *Grokster*, at 927-928. Defendants and Agents openly bragged about infringement. – *See Exhibit A*. Defendant

---

[24] https://en.wikipedia.org/wiki/13th_(film)

[25] Matthew Carey, "The '1619 Project', attacked by conservatives, Earns Emmy Win For Oprah, Nikole Hannah-Jones, Roger Ross-Williams & More," *Deadline*, January 7, 2024.

intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. During the week of September 13, 2026 Plaintiff sent Ms. Winfrey a cease-and-desist letter. *ReDigi*, at 658. Defendant ignored infringement. *Disney v. Hotfile*, at 34.

385. The massive scale of infringement shows intent by defendant. Plaintiff filed copyright infringement claims against Ms. Winfrey pursuant to *Baker v. Coates*, No. 24-6839, and *Baker v. Hannah-Jones*, 25-300. *Arista v. Lime*, 784 F.Supp.2d at 427.

386. As a result of Ms. Winfrey's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands a permanent injunction on the sale, marketing and promotion of books, articles, movies, documentaries and sound recordings related to defendant.

387. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2016 be transferred to him immediately.

388. Ms. Winfrey and Netflix marketed promoted and distributed *13th* and (i) profited from direct infringement promulgated by Direct Agents, and (ii) had the right and ability to supervise the direct infringer. Netflix has promoted and financed several projects from Ms. DuVernay. (*13th*, *When They See Us*, *Colin in Black & White*), and expects to launch the documentary, *14th*, later this year.[26]

[26] "Ava DuVernay's '14th' Documentary Sets Netflix Release Date, Jazz Tangcay, Variety, August 20, 2026.

389. Ms. Winfrey engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in 13th were created by Ms. DuVernay and other Agents. Defendant has caused public confusion resulting in the wrongful belief that defendant, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas in 13th.

390. Plaintiff demands an injunction from Ms. Winfrey marketing, promoting or distributing books, articles, movies, documentaries, sound recordings or music related to defendant, including 13th or the 13th Interview.

**FOR THE CAUSE OF ACTION AGAINST NEWS CORP**

391. News Corp has engaged in vicarious infringement. Defendant marketed, promoted and distributed *Black AF* and (i) profited from direct infringement promulgated by Harriot, and (ii) had the right and ability to supervise the direct infringer. *Grokster,* 545 U.S. 913, 930, n. 9.

392. News Corp engaged in contributory infringement and materially contributed to direct infringement. Defendant provided it marketing muscle and distribution prowess to market and promote *Black AF*. *Grokster*, at 927-928. Defendant knew about infringement. During the week of September 6, 2026 Plaintiff sent a cease-and-desist letter to News Corp. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement and contributed to direct infringement. “If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to infringement.” *Disney v. Hotfile*, at 34. Defendant distributed a “device” or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. “Even though an entity merely

distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

393. Damningly, defendant did not take meaningful steps to prevent infringement. "... defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425.

394. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

395. As a direct and proximate result of News Corp's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

396. News Corp has engaged in unfair competition and identity theft, and created a tort liability. News Corp has helped promulgate the notion that the ideas and expression of ideas, and the language and arrangement of words in *Black AF* were Harriot's original work. Plaintiff alleges that in promoting Harriot and *Black AF*, News Corp increased publicity for the book and the value of its financial interest.

397. Through *Black AF*, News Corp has engaged in unfair competition with Plaintiff and *Shock Exchange*. News Corp has caused public confusion resulting in the wrongful belief that Harriot, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas, and the language included in *Black AF*.

398. News Corp has shown a brazen disregard for U.S. copyright law. Plaintiff demands an injunction against News Corp from the sale, marketing and promotion of book, articles, movies, documentaries, sound recordings and music related to Harriot, including *Black AF*.

399. Plaintiff demands the copyright for *Black AF* and 100 percent of all revenue related to the book from inception and into perpetuity.

**FOR THE CAUSE OF ACTION AGAINST CHRIS JACKSON**

400. Jackson allegedly helped train Harriot and other Agents copy Plaintiff's language and arrangement of words. Defendant allegedly helped Harriot and other Agents copy Plaintiff's "special knowledge" and steal Plaintiff's identity. – *See Exhibit A*. Defendant engaged in vicarious infringement pursuant to *Black AF*. *Grokster*, 545 U.S. 913, 930, n. 9. In helping Harriot, *Black AF* and Agents compete with Plaintiff and destroy *Shock Exchange*, defendant was able to sate his anger and jealousy of Plaintiff. – *See Exhibit A*. In keeping *Shock Exchange* hidden, it allowed defendant and Agents to continue their plagiarism scheme.

401. Defendant engaged in contributory infringement. Plaintiff alleges Jackson trained Harriot and other Agents how to copy Plaintiff's language and arrangement of words and/or Plaintiff's "special knowledge" and creative selections, making defendant guilty of contributory infringement and guilty of inducing direct infringement. *Grokster*, 545 U.S., at 942. Defendant confessed to infringement; he intended for his services to be used for infringement. – *See Exhibit A*. Defendant intended for his services to be used for

infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). In confessing to infringement, defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

402. Defendant engaged in unfair competition resulting in the wrongful belief that Harriot wrote *Black AF* and the ideas and expression of ideas included in *Black AF*.

403. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to actual damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

404. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2023 be transferred to him immediately.

405. Plaintiff demands an injunction against defendant from the sale, marketing and promotion of book, articles, movies, documentaries, sound recordings and music.

**FOR THE CAUSE OF ACTION AGAINST NICOLE COUNTS**

406. Ms. Counts allegedly helped train Harriot and other Agents copy Plaintiff's language and arrangement of words. Defendant allegedly helped Harriot and other Agents copy Plaintiff's "special knowledge" and steal Plaintiff's identity. – *See Exhibit A*. Defendant engaged in vicarious infringement pursuant to *Black AF*. *Grokster,* 545 U.S. 913, 930, n. 9. In helping

Harriot, *Black AF* and Agents compete with Plaintiff and destroy *Shock Exchange*, defendant was able to sate her anger and jealousy of Plaintiff. – *See Exhibit A*. In keeping *Shock Exchange* hidden, it allowed defendant and Agents to continue their plagiarism scheme.

407. Plaintiff alleges defendant trained Harriot and other Agents how to copy Plaintiff's language and arrangement of words and/or Plaintiff's "special knowledge" and creative selections, making defendant guilty of contributory infringement and guilty of inducing direct infringement. *Grokster*, 545 U.S., at 942. Defendant confessed to infringement; she intended for her services to be used for infringement. – *See Exhibit A. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). In confessing to infringement, defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

408. Defendant engaged in unfair competition resulting in the wrongful belief that Harriot wrote *Black AF* and the ideas and expression of ideas included in *Black AF*.

409. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to actual damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

410. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2023 be transferred to him immediately.

411. Plaintiff demands an injunction against defendant from the sale, marketing and promotion of book, articles, movies, documentaries, sound recordings and music.

**FOR THE CAUSE OF ACTION AGAINST VICTORIA MATSUI**

412. Ms. Matsui allegedly helped train Harriot and other Agents copy Plaintiff's language and arrangement of words. Defendant allegedly helped Harriot and other Agents copy Plaintiff's "special knowledge" and steal Plaintiff's identity. – *See Exhibit A*. Defendant engaged in vicarious infringement pursuant to *Black AF*. *Grokster,* 545 U.S. 913, 930, n. 9. In helping Harriot, *Black AF* and Agents compete with Plaintiff and destroy *Shock Exchange*, defendant was able to sate her anger and jealousy of Plaintiff. – *See Exhibit A*. In keeping *Shock Exchange* hidden, it allowed defendant and Agents to continue their plagiarism scheme.

413. Plaintiff alleges defendant trained Harriot and other Agents how to copy Plaintiff's language and arrangement of words and/or Plaintiff's "special knowledge" and creative selections, making defendant guilty of contributory infringement and guilty of inducing direct infringement. *Grokster*, 545 U.S., at 942. Defendant confessed to infringement; she intended for her services to be used for infringement. – *See Exhibit A*. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). In confessing to infringement, defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

414. Defendant engaged in unfair competition resulting in the wrongful belief that Harriot wrote *Black AF* and the ideas and expression of ideas included in *Black AF*.

415. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to actual damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

416. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to defendant from 2023 be transferred to him immediately.

417. Plaintiff demands an injunction against defendant from the sale, marketing and promotion of book, articles, movies, documentaries, sound recordings and music.

**FOR THE CAUSE OF ACTION AGAINST CAL STATE**

418. Ms. Abdullah contributed to *13th*, which attaches Cal State to the infringing act. As a direct and proximate result of Cal State's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

419. Cal State has engaged in unfair competition. Cal State has helped promulgate the narrative that the ideas and expression of ideas in *13th* were created by Ms. DuVernay, Ms. Abdullah and other Agents. Cal State has caused public confusion resulting in the wrongful belief that Ms. Abdullah and other Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, are the source of the ideas and expression of ideas in *13th*.

420. Plaintiff demands an injunction against Cal State from the sale, marketing and promotion of books, articles, movies, documentaries, studies, policy recommendations, sound recordings and music related to Ms. Abdullah, including *13th*.

421. Plaintiff demands the copyright and 100 percent of all revenue generated since 2016, and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to Cal State's Pan-African Studies department and any other department that promoted or benefited from *13th*.

422. Cal State engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. Cal State benefited from the prestige of the direct infringer promoting herself as a thought leader on Plaintiff's "special knowledge." This likely drove funding, donations, grants and research dollars, and attracted students to Cal State.

423. Cal State engaged in contributory infringement. Ms. Abdullah's participation in *13th* helped drive publicity for Cal State, and likely attracted students, donations and research dollars. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

424. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement.

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

425. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

426. Cal State's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

427. Cal State materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Defendant ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

428. Plaintiff demands that Cal State's department of Pan-African Studies loses it accreditation and that Cal State loses its tax-exempt status retroactive to 2016.

**FOR THE CAUSE OF ACTION AGAINST COLUMBIA**

429. Cobb contributed to *13th*, which attaches Columbia to the infringing act. As a direct and proximate result of Columbia's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

430. Columbia has engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in *13th* were created by Ms. DuVernay, Cobb and other Agents. Columbia has caused public confusion resulting in the wrongful belief that certain Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, are the source of the ideas and expression of ideas in *13th*.

431. Plaintiff demands an injunction against Columbia from the sale, marketing and marketing promoting or distributing of books, articles, movies, documentaries, sound recordings or music related to Cobb, including *13th*.

432. Plaintiff demands the copyright and 100 percent of all revenue generated since 2016, and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to Columbia's Journalism department and any other department that promoted or benefited from *13th*.

433. Columbia engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. Columbia benefited from the prestige of the direct infringer promoting

himself as a thought leader on Plaintiff's "special knowledge." This likely increased funding, donations, grants and research dollars, and attracted students to Columbia.

434. Columbia engaged in contributory infringement. Columbia professor Cobb contributed to *13th*, which helped drive publicity for Columbia, and likely attracted students, donations and research dollars. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

435. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to

cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

436. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

437. Columbia's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

438. Defendant materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Defendant ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

439. Plaintiff demands that Columbia's Journalism department – and any department that promoted 13th – loses its accreditation and Columbia loses its tax-exempt status retroactive to 2016.

**FOR THE CAUSE OF ACTION AGAINST UC SANTA CRUZ**

440. Ms. Davis contributed to 13th, which attaches UC Santa Cruz to the infringing act. As a direct and proximate result of UC Santa Cruz's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

441. UC Santa Cruz has engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in *13th* were created by Ms. DuVernay, Ms. Davis and certain other Agents. Defendant has caused public confusion resulting in the wrongful belief that Ms. Duvernay, Ms. Davis and certain Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas in *13th*.

442. Plaintiff demands an injunction against UC Santa Cruz from the sale, marketing and promoting or distributing of books, articles, movies, documentaries, sound recording or music related to Ms. Davis, including *13th*.

443. Plaintiff demands the copyright and 100 percent of all revenue generated – since 2016 – and the copyright for all books, articles, movies, documentaries, studies, policy resound recordings, and music owned or related to the department of history, feminist studies or any other department that promoted *13th*.

444. UC Santa Cruz engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. UC Santa Cruz benefited from the prestige of the direct infringer promoting himself/herself as a thought leader on Plaintiff's "special knowledge." This likely helped defendant increase funding, donations, grants and research dollars, and attract new students.

445. Defendant engaged in contributory infringement. UC Santa Cruz professor Davis contributed to *13th*, which helped drive publicity for UC Santa Cruz, and likely attracted

students, donations and research dollars. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

446. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

447. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

448. UC Santa Cruz materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Defendant ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

449. Plaintiff demands that the department of history, the department of feminist studies – and any other department that promoted 13th – lose their accreditation, and UC Santa Cruz loses its tax-exempt status retroactive to 2015.

**FOR THE CAUSE OF ACTION AGAINST JOHN JAY**

450. Ms. Dreisinger contributed to *13th* and Travis contributed to the 2015 Study and/or the NYU plagiarized works. This attaches John Jay to the infringing acts. As a direct and proximate result of John Jay's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

451. John Jay has engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in *13th* were created by Ms. DuVernay and other Agents, and the 2015 Study and/or NYU plagiarized works were created by Waldman and other Agents. John Jay has caused public confusion resulting in the wrongful belief that

certain Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, are the sources of the ideas and expression of ideas in *13th* and the 2015 Study.

452. Plaintiff demands an injunction against John Jay from the sale, marketing and promotion of books, articles, movies, documentaries, sound recordings or music related to Travis, and Dreisinger, including *13th*, the 2015 Study or any of the plagiarized works.

453. Plaintiff demands the copyright and 100 percent of all revenue generated since 2015, and the copyright for all books, articles, movies, documentaries, sound recordings, and music owned or related to John Jay.

454. John Jay engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringers and had the right and ability to supervise the direct infringers. John Jay benefited from the prestige of the direct infringers promoting themselves as thought leaders on Plaintiff's "special knowledge." This likely helped defendant increase funding, donations, grants and research dollars, and attract new students.

455. John Jay engaged in contributory infringement. John Jay professor Dreisinger and former president Travis contributed to *13th*, the 2015 Study and the plagiarized works; this helped drive publicity for John Jay, and likely attracted students, donations and research dollars. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or

instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

456. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

457. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

458. John Jay's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their

students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

459. Defendant materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Defendant ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

460. Plaintiff demands that John Jay loses its accreditation and loses its tax-exempt status retroactive to 2015.

**FOR THE CAUSE OF ACTION AGAINST HARVARD**

461. Gates contributed to *13th*, attaching Harvard to his infringing act. As a direct and proximate result of NYU's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

462. Harvard has engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in *13th* were created by Ms. DuVernay, Cobb, Gates and other Agents.

463. Plaintiff demands an injunction against Harvard from the sale, marketing and promotion of books, articles, movies, documentaries, studies, policy recommendations, sound recordings and music related to Gates, including the *13th*.

464. Plaintiff demands the copyright and 100 percent of all revenue generated – since 2016 – and the copyright for all books, articles, movies, documentaries, studies, policy resound

recordings, and music owned or related to the Hutchins Center for African and African American Research, the department of African American studies or any other department that promoted *13th*.

465. Harvard engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. Harvard benefited from the prestige of the direct infringer promoting himself as a thought leader on Plaintiff's "special knowledge." This likely helped defendant increase funding, donations, grants and research dollars, and attract new students.

466. Harvard engaged in contributory infringement. Harvard professor Gates contributed to *13th*, helped drive publicity for Harvard, and likely attracted students, donations and research dollars to Harvard. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A.* Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

467. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week

of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

468. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

469. Defendant showed unlawful intent. Harvard never made any meaningful steps to prevent infringement. The fact pattern suggests Harvard and other College Agents are using Plaintiff and the Court as their internal controls. "… defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425. The massive scale of infringement shows intent by defendant. Harvard and Harvard professors Tiya Miles and Imani Perry are party to Plaintiff's copyright infringement claim pursuant to *Baker v. Hannah-Jones*, 25-300. Plaintiff understands that Ms. Ifill and Kendi have served as adjunct professors at Harvard. Upon information and belief, Harriot has developed a college course, "Race: An Economic Construct," may have been adopted by Harvard. In 2025 Harvard

awarded Harriot the Nyhan Prize for Public Policy Journalism, which honors journalists who bring hidden truths to the forefront of public policy journalism. In announcing the award, Harvard referenced *Black AF*.[27] "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. Harvard's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

470. Harvard materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Harvard ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

471. Plaintiff demands that Harvard's Kennedy School, the Hutchins Center for African and African American Research, and the department of African American studies lose their accreditation. Plaintiff also demands that Harvard's tax-exempt status is revoked retroactive to 2016. Plaintiff demands that Harvard matches all grant money, funding, donations, and research dollars garnered by Harvard since 2016 and transfer it to Plaintiff immediately.

**FOR THE CAUSE OF ACTION AGAINST PENN**

---

[27] "Michael Harriot and Rose Conlan Named 2024 – 25 Nyhan Prize Honorees," Harvard Kennedy Center | Shorenstein School on Media, Politics and Public Policy, May 1, 2025.

472. Ms. Gottschalk contributed to *13th*, which attaches Penn to the infringing act. As a direct and proximate result of Penn's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

473. Penn has engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in 13th by Ms. DuVernay, Ms. Gottschalk and other Agents. Defendant and its co-conspirators have caused public confusion resulting in the wrongful belief that Ms. DuVernay, Ms. Gottschalk, and other Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, are the sources of the ideas and expression of ideas in *13th*.

474. Plaintiff demands an injunction against Penn from the sale, marketing and promotion of books, articles, movies, documentaries, studies, policy recommendations, sound recordings and music related to Ms. Gottschalk, *13th*.

475. Plaintiff demands the copyright and 100 percent of all revenue generated – since 2016 – and the copyright for all books, articles, movies, documentaries, studies, sound recordings, and music owned or related to Penn's department of Political Science, and any other department that promoted *13th*, transferred to Plaintiff immediately.

476. Penn engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. Penn benefited from the prestige of the direct infringer promoting herself as a thought leader on Plaintiff's "special knowledge." This likely helped defendant increase funding, donations, grants and research dollars, and attract new students.

477. Penn engaged in contributory infringement. Penn professor Gottschalk contributed to *13th*, which helped drive publicity for Penn, and likely attracted students, donations and

research dollars to Penn. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

478. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

479. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

480. Defendant showed unlawful intent. Penn never made any meaningful steps to prevent infringement. The fact pattern suggests Penn and other College Agents are using Plaintiff and the Court as their internal controls. "… defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425. The massive scale of infringement shows intent by Penn. Penn and Penn professor Dorothy Roberts are party to Plaintiff's copyright infringement claim pursuant to *Baker v. Hannah-Jones*, 25-300. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. Penn's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges – including NYU – do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J*. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

481. Penn materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Defendant ignored infringement. "If a computer operator learns of specific infringing material on his system and

fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

482. Plaintiff demands that Penn's department of Political Science loses accreditation and Penn loses its tax-exempt status retroactive to 2016. Plaintiff also demands that Penns matches all grand money, funding, donations and research dollars garnered since 2016 for its department of Political Science.

**FOR THE CAUSE OF ACTION AGAINST NORTHWESTERN**

483. Hagan contributed to 13th, which attaches Northwestern to the infringing act. As a direct and proximate result of Northwestern's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

484. Northwestern has engaged in unfair competition. Defendant has helped promulgate the narrative that the ideas and expression of ideas in the *13th* were created by Ms. DuVernay, Hagan and other Agents. Northwestern and its co-conspirators have caused public confusion resulting in the wrongful belief that Ms. DuVernay, Hagan and other Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, are the source of the ideas and expression of ideas in *13th*.

485. Plaintiff demands an injunction against Northwestern from the sale, marketing and promotion of books, articles, movies, documentaries, studies, policy recommendations, sound recordings and music related to Hagan, including *13th*.

486. Plaintiff demands the copyright and 100 percent of all revenue generated – since 2016 – and the copyright for all books, articles, movies, documentaries, studies, sound recordings, and music owned or related to Northwestern's department of Sociology, and any other department that promoted *13th*, and transferred to Plaintiff immediately.

487. Northwestern engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. Defendant benefited from the prestige of the direct infringer promoting himself/herself as a thought leader on Plaintiff's "special knowledge." This likely helped defendant increase funding, donations, grants and research dollars, and attract new students.

488. Northwestern engaged in contributory infringement. Northwestern professor Hagan contributed to *13th*, and helped drive publicity for Northwestern, and likely attracted students, donations and research dollars to Northwestern. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

489. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to

purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

490. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

491. Defendant showed unlawful intent. Northwestern never made any meaningful steps to prevent infringement. The fact pattern suggests defendant and other College Agents are using Plaintiff and the Court as their internal controls. "… defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425. The massive scale of infringement shows intent by Northwestern. Plaintiff alleged one of Northwestern's professors contributed to the 1619 plagiarized works. *Baker v. Hannah-Jones*, 25-300, DktEntry:152-1. Upon information and belief, a Northwestern professor (1) fact-checked the 1619 Essays and (ii) co-taught a class with Nikole Hannah-Jones at Howard University where they discussed and promoted the 1619 plagiarized works. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. NYU's business model is tailored for infringement. Per Coates, (i) he teaches students

how to plagiarize and steal from other authors and (ii) all colleges do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

492. Northwestern materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Northwestern ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

493. Plaintiff demands that Northwestern's department of Sociology loses its accreditation and Northwestern have its tax-exempt status revoke, retroactive to 2016.

**FOR THE CAUSE OF ACTION AGAINST DREAM.ORG**

494. Dream.org is attached to the actions of Van Jones. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of 13th and the 2019 Study. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

495. Dream.org engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing 13th and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. *Disney v. Hotfile*, at 34.

496. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

497. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Dream.org's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST JULSA**

498. JULSA is attached to the actions of Glenn E. Martin. Defendant engaged in vicarious infringement. *Grokster*, 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of *13th*. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

499. JULSA engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing *13th*. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. *Disney v. Hotfile*, at 34.

500. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

501. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that JULSA's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST SENTENCING PROJECT**

502. Sentencing Project is attached to the actions of Marc Mauer. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of *13th*. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

503. Sentencing Project engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing *13th*. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. *Disney v. Hotfile*, at 34.

504. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

505. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Sentencing Project's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST COLOROFCHANGE.ORG**

506. Colorofchange.org is attached to the actions of Rashad Robinson. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of 13th and the 2019 Study. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

507. Defendant engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing *13th* and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. *Disney v. Hotfile*, at 34.

508. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

509. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Colorofchange.org's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST EQUAL JUSTICE INITIATIVE**

510. EJI is attached to the actions of Bryan Stevenson. Defendant engaged in vicarious infringement. *Grokster*, 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of *13th* and the 2015 Study. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

511. EJI engaged in contributory infringement. In using its capital, brand and distribution muscle to promote 13th and the 2015 Study, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing 13th and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. *Disney v. Hotfile*, at 34.

512. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

513. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that EJI's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST VERA INSTITUTE**

514. Vera Institute is attached to the actions of Nicholas Turner. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of *13th*. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

515. Vera Institute engaged in contributory infringement. In using its capital, brand and distribution muscle to promote *13th*, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing 13th and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. *Disney v. Hotfile*, at 34.

516. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

517. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Vera Institute's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST GRAND VIEW**

518. Gannon contributed to *13th*, which attaches Grand View to the infringing act. As a direct and proximate result of Grand View's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

519. Defendant has engaged in unfair competition. Grand View has helped promulgate the narrative that the ideas and expression of ideas in *13th* were created by Ms. DuVernay, Gannon and other Agents. Grand View and its co-conspirators have caused public confusion resulting in the wrongful belief that Ms. DuVernay, Gannon and other Agents, and not Ralph W. Baker, Jr. and *Shock Exchange*, are the sources of the ideas and expression of ideas in *13th*.

520. Plaintiff demands an injunction against Grand View from the sale, marketing and promotion of books, articles, movies, documentaries, sound recordings, and music related to Gannon, including *13th*.

521. Plaintiff demands the copyright and 100 percent of all revenue generated – since 2016 – and the copyright for all books, articles, movies, documentaries, studies, policy resound recordings, and music owned or related to Grand View's department of history transferred to Plaintiff immediately.

522. Grand View engaged in vicarious infringement. Defendant profited from direct infringement promulgated by the direct infringer and had the right and ability to supervise the direct infringer. Defendant benefited from the prestige of the direct infringer promoting

herself as a thought leader on Plaintiff's "special knowledge." This likely helped defendant increase funding, donations, grants and research dollars, and attract new students.

523. Grand View engaged in contributory infringement. Grand View professor Kevin Gannon contributed to *13th*, and helped drive publicity for defendant and likely attracted students, donations and research dollars to Grand View. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

524. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. *Disney v. Hotfile*, at 34.

525. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

526. Grand View's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

527. Grand View materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. Grand View ignored infringement. *Disney v. Hotfile*, at 34.

528. Plaintiff demands that Grand View's department of History loses its accreditation, and Grand View's tax-exempt status revoked retroactive to 2016. Plaintiff also demands that Grand View match all grant money, funding, donations and research dollars garnered by its department of History since 2016.

**FOR THE CAUSE OF ACTION AGAINST THE BRENNAN CENTER**

529. Brennan Center marketed, promoted and distributed the 2015 Study, the 2019 Study and the NYU plagiarized works and (i) profited from direct infringement promulgated by Direct Agents, and (ii) had the right and ability to supervise the direct infringer.

530. As a direct and proximate result of Brennan Center's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

531. Brennan Center has engaged in unfair competition. Brennan Center has helped promulgate the narrative that the ideas and expression of ideas in the 2015 Study, the 2019 Study and the NYU plagiarized works were created by Ms. Chettiar, Waldman and other Direct Agents. Plaintiff alleges that in promoting the 2015 Study, the 2019 Study and the NYU plagiarized works, Brennan Center increased publicity for those works, allowed the Brennan Center to help set policy pursuant to mass incarceration, and help Brennan Center raise funding and/or garner research grants for defendant.

532. Through the 2015 Study and the 2019 Study and other studies on mass incarceration, Brennan Center has engaged in unfair competition with Plaintiff and *Shock Exchange*. Brennan Center and its co-conspirators have caused public confusion resulting in the wrongful belief that defendant, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas in the 2015 Study, 2019 Study and NYU plagiarized works.

533. Brennan Center has shown a brazen disregard for U.S. copyright law. Plaintiff demands an injunction against Brennan Center from the sale, marketing and promotion of books, articles, movies, documentaries, sound recordings and music related to defendant, including the 2015 Study, the 2019 Study and the NYU plagiarized works.

534. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, studies articles, movies, documentaries, sound recordings, and music owned or related to Brennan Center from 2015 be transferred to him immediately. This includes, but is not limited to, the 2015 Study the 2019 Study and the NYU plagiarized works.

535. Plaintiff demands Brennan match all donations, funding, grant money, and research dollars it received since 2015. Defendant demands that the Brennan Center's tax exempt status be revoked, retroactive to 2015. Defendant demands that the Brennan Center and the entirety of its operations be shut down in perpetuity.

536. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, profited from the prestige of having produced the 2015 Study, the 2019 Study, and the NYU plagiarized works. This allowed the Brennan Center to attract more funding and research grants, and take credit for shaping policy pursuant to mass incarceration.

537. Brennan Center engaged in contributory infringement. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

538. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week

of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing the 2015 Study, the 2019 Study and the NYU plagiarized works. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

539. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

540. Defendant showed unlawful intent. Brennan Center did not take meaningful steps to prevent infringement. "… defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425. The massive scale of infringement shows intent by Brennan Center. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. Brennan Center ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge

such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

541. Ms. Chettiar, and the representatives of the NAACP contributed to the 2015 Study and the 2019 Study. Waldman contributed to the 2015 Study, and oversaw the 2019 Study. Ms. Chettiar, the NAACP and Waldman are repeat infringers, and Brennan Center is a conduit for infringing activity, "A substantial number of blatant repeat offenders made the system a conduit for infringing activity." *Hotfile*, at 23.

**FOR THE CAUSE OF ACTION AGAINST NYU**

542. NYU marketed, promoted and distributed the 2015 Study, the 2019 Study and the NYU plagiarized works, and (i) profited from direct infringement promulgated by Direct Agents, and (ii) had the right and ability to supervise the direct infringer. Plaintiff understands that NYU has substantial influence of the Brennan Center. The Brennan Center chose to house it operations at NYU Law School, which gives Brennan Center access to NYU's resources and students. Plaintiff understands that about 32% of Brennan Center's board members (9 of 28) are affiliated with NYU Law.

543. Plaintiff understands Brennan Center and NYU Law are practically integrated:

> NYU Law students often serve as legal interns and work on projects with Brennan Center staff through the Law School's Brennan Center Public Policy Advocacy Clinic, a semester-long fieldwork course taught by Brennan Center attorneys. NYU Law faculty comprise one-third of the Brennan Center's board of directors, and many professors have collaborated with the center in various capacities. The Brennan Center also hosts numerous symposia, panel discussions, and book talks at the law school each year."[28]

[28] https://www.brennancenter.org/about/brennan-center-nyu-school-law

544. As a direct and proximate result of NYU's conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to damages and profits or statutory damages, Plaintiff is entitled to recover costs and reasonable attorneys' fees incurred in this action.

545. NYU has engaged in unfair competition. NYU has helped promulgate the narrative that the ideas and expression of ideas in the 2015 Study, the 2019 Study and the NYU plagiarized works were created by Ms. Chettiar, Waldman, Stevenson, Coates and other Agents.

546. Through its studies on mass incarceration, NYU has engaged in unfair competition with Plaintiff and *Shock Exchange*. NYU and its co-conspirators have caused public confusion resulting in the wrongful belief that defendant, and not Ralph W. Baker, Jr. and *Shock Exchange*, is the source of the ideas and expression of ideas in the 2015 Study, the 2019 Study and the NYU plagiarized works.

547. NYU has shown a brazen disregard for U.S. copyright law. Plaintiff demands an injunction against NYU from the sale, marketing and promotion of books, articles, movies, documentaries, studies, policy recommendations, sound recordings and music related to defendant, including the 2015 Study, the 2019 Study and the NYU plagiarized works.

548. Plaintiff demands the copyright and 100 percent of all revenue generated – since inception – and the copyright for all books, articles, movies, documentaries, studies, policy resound recordings, and music owned or related to Brennan Center from 2015 be transferred to him immediately. This includes, but is not limited to, the 2015 Study, the 2019 Study and the NYU plagiarized works.

549. Plaintiff demands an injunction from NYU – and its professors and Agents – marketing promoting or distributing books, articles, movies, documentaries, sound recordings or music that mentions or relate to creative selections from *Shock Exchange* as presented here, and

presented to the Second Circuit Court of Appeals pursuant to *Baker v. Hannah-Jones*, 25-300, DktEntry: 152-1.

550. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, profited from the prestige of having produced the 2015 Study the 2019 Study and the NYU plagiarized works, and the prestige of having Stevenson, Coates and others considered thought leaders on Plaintiff's "special knowledge." This prestige likely increased funding, donations, grant and research dollars, and attracted students to NYU.

551. NYU engaged in contributory infringement. NYU professor Bryan Stevenson contributed to *13th*, and then NYU professor Ta-Nehisi Coates contributed to the 2019 Study. Their participation in these plagiarized works helped drive publicity for NYU, and likely attracted students, donations and research dollars to NYU. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

552. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement.

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

553. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

554. Defendant showed unlawful intent. NYU never made any meaningful steps to prevent infringement. The fact pattern suggests NYU and other College Agents are using Plaintiff and the Court as their internal controls. "… defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-92, *Arista v. Lime*, 784 F.Supp.2d at 425. The massive scale of infringement shows intent by NYU. Defendant and certain of its professors are party to Plaintiff's copyright infringement claim pursuant to *Baker v. Hannah-Jones*, 25-300. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*,

784 F.Supp.2d at 427. NYU's business model is tailored for infringement. Per Coates, (i) he teaches students how to plagiarize and steal from other authors and (ii) all colleges – including NYU – do it. Per Coates and Cobb, they mimic other authors' expression through "applied reading" and encourage their students to do it also. *See Exhibit J. Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 2, ¶5 (2026), *Capitol Records, LLC v. ReDIGI, Inc.*: 934 F. Supp. 2D at 659.

555. NYU materially contributed to infringement. It – and other College Agents – require professors to publish books and articles, and be considered thought leaders in their disciplines to get tenure and maintain it. *Grokster*, at 927-928. NYU ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

556. Plaintiff demands that NYU and NYU Law School lose their accreditation retroactive to 2015. Plaintiff also demands that NYU and NYU Law School match all grant money, funding, donations and research dollars garnered since 2015.

**FOR THE CAUSE OF ACTION AGAINST NAACP**

557. NAACP is attached to the actions of NAACP president Derrick Johnson, who contributed to the 2019 Study, and former NAACP president, Cornell William Brooks, who contributed to the 2015 Study. Defendant engaged in vicarious infringement. *Grokster*, 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of of the 2015 Study, the 2019 Study and the NYU plagiarized works. This likely allowed the NAACP to attract additional funding, attract members and be viewed as a credible advocate of policies meant to address mass incarceration.

558. NAACP engaged in contributory infringement. In using its capital, brand and distribution muscle to promote the NYU plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing the 2015 Study and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34.

559. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

560. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that NAACP tax exempt status is revoked, retroactive to 2015.

**FOR THE CAUSE OF ACTION AGAINST BLACK FUTURES LAB**

561. Black Futures Lab is attached to the actions of Alicia Garza. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of the 2019 Study. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

562. Black Futures Lab Corps engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026

Plaintiff sent a letter to cease and desist from marketing 13th and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34.

563. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

564. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Black Futures Lab's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST LEGAL DEFENSE FUND**

565. Legal Defense Fund is attached to the actions of former president Sherrilyn Ifill. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of the 2019 Study. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

566. Legal Defense Fund engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. "'If a computer

system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34.

567. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

568. The massive scale of infringement shows intent by Legal Defense Fund. Plaintiff accused Ms. Ifill of copying narrative on school closings in Prince Edward County, VA pursuant to *Baker v. Hannah-Jones*, 25-300. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. The fact pattern suggests Ms. Ifill and Legal Defense are using ideas and expressions of ideas from *Shock Exchange* to transition themselves as event promoters, content creators and thought leaders.

569. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Legal Defense Fund's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST INCARCERATION NATIONS**

570. Incarceration Nations is attached to the actions of Ms. Dreisinger. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, and profited from the prestige of having been associated with the production, distribution and marketing of *13th*. This likely allowed defendant to attract funding and/or research grants, and be viewed as a credible advocate for certain public policies.

571. Incarceration Nations engaged in contributory infringement. In using its capital, brand and distribution muscle to promote certain plagiarized works, defendant materially contributed to infringement. *Grokster*, at 927-928. During the week of September 13, 2026 Plaintiff sent a letter to cease and desist from marketing 13th and the 2019 Study. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34.

572. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

573. As a direct and proximate result of defendant's conduct, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff demands that Incarceration Nation's tax exempt status is revoked, retroactive to 2016, and that its operations are shut down in perpetuity.

**FOR THE CAUSE OF ACTION AGAINST WARNER BROTHERS**

574. Warner Brothers heavily promoted *13th* and profited from the prestige that one of its commentators – Van Jones – was an apparent expert on mass incarceration.

575. Warner Brothers has engaged in unfair competition. Netflix has helped promulgate the narrative that (i) the ideas and expression of ideas in *13th* were created by Ms. DuVernay, Jones and other Agents (ii) Jones has some special insight into mass incarceration independent of *Shock Exchange*.

576. Plaintiff demands the copyright and 100 percent of all revenue generated – since 2016 – and the copyright for all television broadcasts, books, articles, movies, documentaries, sound recordings, and music owned or related to Ms. DuVernay and Jones from 2016 be transferred to him immediately.

577. Plaintiff demands a blackout period for CNN from 6pm to 2am, Thursday through Sunday for the next 10 years.

578. Defendant engaged in vicarious infringement. *Grokster,* 545 U.S. 913, 930, n. 9. Defendant profited financially, profited from promoting *13th* and promulgating a narrative that Ms. DuVernay, Jones and other Agents created *13th* and were experts on mass incarceration. These institutionally-backed Agents likely cross-promoted CNN and/or other entertainment entities under the umbrella of Warner Bros. The prestige of having one of Warner Brother's on air personalities associated with *13th* and viewed as a thought leader on mass incarceration likely amplified viewership for CNN and Warner Brothers, and increased advertising dollars and demand for additional content and live events from Jones and Warner Brothers.

579. Warner Bros. engaged in contributory infringement. Defendants and other Agents openly bragged about stealing Plaintiff's "special knowledge," stealing Plaintiff's identity and destroying Plaintiff. – *See Exhibit A*. Defendant intended for its services to be used for infringement. *Cox Commc'ns, Inc. v. Sony Music Entm't*, 607 U.S. ___, slip op. at 7 ¶2 (2026). The confession proves defendant established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425. Defendant encouraged inducement through acts "such as advertising an infringing use or

instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 919, *Disney v. Hotfile*, F.Supp.2d, at 30.

580. Courts have also looked to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). During the week of September 13, 2026 Plaintiff sent defendant a letter to cease-and-desist from marketing and promoting, producing and reproducing *13th*. Defendant ignored infringement. "'If a computer system operator learns of specific infringement material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.'" *Disney v. Hotfile*, at 34. Defendant distributed a "device" or used a platform – communication channels (podcasts, social media), streaming service, website, et al. – to cause infringement. "Even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has the 'object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps to foster infringement.'" *Disney v. Hotfile*, at 30, *Grokster*, 545 U.S. at 919.

581. Defendants confessed to infringement. – *See Exhibit A*. In confession established a "clear expression" of such intent. *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764, *Arista v. Lime*, 784 F.Supp.2d at 425.

582. Defendant showed unlawful intent. Warner Bros. did not take meaningful steps to prevent infringement. "... defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster." Grokster Remand, 454 F. Supp.2d at 984-

92, *Arista v. Lime*, 784 F.Supp.2d at 425. Ms. DuVernay has a background in public relations, and Jones' expertise appear to be ingratiating himself with those in power, and raising capital to complete with Plaintiff. Prior to 2016 neither Jones nor Ms. DuVernay showed any special knowledge pursuant to mass incarceration or the vagaries of the economy. The massive scale of infringement shows intent by Warner Bros. Plaintiff alleges Jones infringed on Plaintiff's copyright for 13th and the 2019 Study. "The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." *Arista v. Lime*, 784 F.Supp.2d at 427. Warner Bros. ignored infringement. "If a computer operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Disney v. Hotfile*, at 34.

583. Jones is a repeat infringer, which could prompt Warner Bros. to act. "Service providers granting access to those users should be given 'strong incentives … to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1178, *Disney v. Hotfile*, at 20.

## <u>CLAIMS FOR RELIEF</u>

### FIRST CAUSE OF ACTION
### Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)

584. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

585. *Shock Exchange* is original, creative, and copyrightable subject matter under the laws of the United States.

586. The copyright in *Shock Exchange* is registered, and the Copyright Office has issued valid Certificates of Registration for *Shock Exchange*.

587. By their actions, alleged above, defendants have infringed and will infringe Plaintiff's copyrights in and to *Shock Exchange* by, inter alia, reproducing, distributing, publicly displaying, publicly performing, and making derivative works of *Shock Exchange* without any authorization or permission from Plaintiff.

588. Each infringement of the rights of Plaintiff in *Shock Exchange* constitutes a separate infringement and distinct act of infringement.

589. Defendants' infringement of Plaintiff's copyrights, including *Shock Exchange*, is willful.

590. Upon information and belief, as a direct and proximate result of its wrongful conduct, defendants have and will obtain benefits, including, but not limited to, profits to which Plaintiff is entitled.

591. As a direct and proximate result of defendants' wrongful conduct, Plaintiff has been and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, defendants will cause further irreparable injury to Plaintiff.

592. As a direct and proximate result of defendants' infringement, Plaintiff is entitled to recover statutory damages, pursuant to 17 U.S.C. § 504(c), with respect to each work infringed. Alternatively, at the election of Plaintiff, pursuant to 17 U.S.C. § 504(b), Plaintiffs are further entitled to recover from defendants damages they have sustained and will sustain, as well as any gain, profits and advantages obtained by defendants as a result of its acts of infringement alleged above. At present, the amount of damages, gains, profits and advantages cannot be fully ascertained by Plaintiff.

593. Plaintiff is allowed to recover his attorneys fees and costs.

**SECOND CAUSE OF ACTION**
**Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)**

594. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

595. Plaintiff brings claims of secondary liability, in the alternative, to the extent defendants attempt to evade responsibility by blaming the conduct on others.

596. Defendants are secondarily liable under theories of contributory liability, inducement liability, and vicarious liability for the underlying reproduction, distribution, public display, and public performance of *Shock Exchange*, as well as the making of infringing derivatives of *Shock Exchange*.

597. Defendants are contributorily liable as they know, or have reason to know, that *Shock Exchange* is infringed each time *Shock Exchange* is copied or publicly displayed, and they have caused or materially contributed to those infringements.

598. Defendants are secondarily liable under the theory of inducement. Defendants are responsible at every level for copying and/or repackaging copyrighted books, including *Shock Exchange*. Defendants could take simple measures to prevent further infringement. First, they could start by promoting *Shock Exchange*. Instead, they would rather copy *Shock Exchange* and compete with Plaintiff out of jealously and envy for Plaintiff, and in certain instances, infringement is key to defendants' business models.

599. Defendants are vicariously liable for copyright infringement because they have the right and ability to supervise the infringement of its users and possesses a financial interest in the infringement.

600. Defendants possess an obvious direct financial interest in the infringement. Having users copy the ideas and expression of ideas, repackage *Shock Exchange* as their own, or copy Plaintiff's arrangement of words, give the impression that users are thought leaders on

Plaintiff's "special knowledge." This drives growth in advertising dollars, funding, grants, subscribers, students et al., for defendants.

601. Each infringement of the rights of Plaintiff in *Shock Exchange* constitutes a separate and distinct act of infringement.

602. Defendants' infringement of Plaintiffs' copyright, including *Shock Exchange*, is willful

603. Upon information and belief, as a direct and proximate result of its wrongful conduct, defendants have and will obtain benefits, including but not limited to, profits to which defendants are not entitled.

604. As a direct and proximate result of defendants' wrongful conduct, Plaintiff has been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, defendants will cause further irreparable injury to Plaintiff. As a direct and proximate result of defendants' infringement, Plaintiff is entitled to recover statutory damages pursuant to 17 U.S.C. § 504(c) with respect to each work infringed. Pursuant to 17 U.S.C. § 504(b), Plaintiff is further entitled to recover from defendants the damages he has sustained and will sustain, as well as any gains, and advantages by defendants as a results of their acts of infringement alleged above. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Plaintiff.

605. Plaintiff is entitled to recover his attorney's fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request judgment against defendants as follows:

A. Declaring that the practices of defendants constitute willful copyright infringement;

B. Issuing a preliminary and permanent injunction enjoining defendants and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in active concert or participation with it, from directly or indirectly reproducing, distributing, publicly displaying, creating derivative works, otherwise infringing, or causing, enable, facilitating, encouraging, or inducing the reproduction, distribution, public display, creation of derivative works, or other infringement of, any of the respective copyrights owned or exclusively controlled, in whole or in part, by Plaintiff, whether now in existence or hereafter created, and ordering that all unlawful copies be destroyed;

C. Entering judgment for Plaintiff against defendants for statutory damages in an amount based upon defendants' willful acts of infringement of *Shock Exchange*, as alleged above, pursuant to Copyright Act, 17 U.S.C. §§ 101, *et seq.*;

D. Alternatively, ordering defendants to render a full and complete accounting to Plaintiff of defendants' profits, gains, advantages, or the value of business opportunities received from the foregoing acts of infringement of *Shock Exchange*, entering judgment for Plaintiff against defendants for all damages suffered by Plaintiff and for any profits or gain by defendants attributable to the infringements alleged above of Plaintiff's copyright in amounts to be determined at trial;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505;

F. Awarding Plaintiff pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

G. Granting such other further and different relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable in this action.

**Dated**: September 19, 2026

**RALPH W. BAKER, JR. – PLAINTIFF**

9/19/26

Name:

Date:

# EXHIBIT A

*Water Dancer* was written by Coates, Chris Jackson, Nicole Counts and Victoria Matsui. They confessed to being part of an army of secret agents at war with the Plaintiff.

| ***The Water Dancer*** |
|---|
| **(I)** "… It is a blessing to be here, **to be at war with them**. We are an outpost in that army that you now know as the Underground. Everyone living here is part of that army, though we can give no tell of such things … **They're all agents**, though they work in different ways. Some of them work the house. They are read, as you are, and have put that skill to use. Paper is important in this – freedom papers, wills and testaments … The house agents always got an ear to the ground. They study. They know the gossip. They know the journals. They know of influence in their region, but no one in the region really knows them. **And then there are others**."<br><br>P.161 |
| **(II)** "But there are others who cannot be remanded to the house, for they feel the walls pushing in. They are the ones who remember the first time they ran, and it was so glorious to them, to be in defiance against everything they had ever been told … That is the field agent. The **field agents** are different. They go into plantations and lead the Task up off of them. The field agents are daring … And we need each other. We work together. Same army …"<br><br>P.162 |
| **(III)** So I trained to be an agent, trained in the Mountains at Bryceton, Corrine's family stead, along with other agents recruited for the Underground. You will **forgive me for not saying much about my fellow agents** … We are not yet past a time when scores are settled and vengeances sought, do many of us must, even in this time, remain Underground.<br><br>P.163 |

Coates, Chris Jackson, Nicole Counts, and Victoria Matsui confessed to (i) forging documents, (ii) stealing Plaintiff's identity, (iii) learning Plaintiff's language, (iv) copying Plaintiff's arrangement of words, and word choice, (vi) stealing Plaintiff's "special knowledge" and masking the piracy.

| ***The Water Dancer*** |
|---|
| **(IV)** "But I have not let them dictate to me, Hiram," she said, holding the envelope. "And I have not simply read, my boy. I have learned their language and custom – even those that should be beyond my station, especially those that should be beyond my station, and that has been the seed of my liberty."<br><br>She walked over and placed the package before me. |

"Open it," she said.

This I did and found inside of it a life of a man. There were letters to family. There were authorizations. There were certificates of sale.

"This is yours for the week," she said. We can't hold on to this man's effects forever. What we have here is a selection, random enough so that its absence should not alarm him."

"And what am I to do?" I asked.

"Learn him, of course," she said. "This is a lesson in their customs. A way of comprehending all of those things beyond your station. He is a gentleman, of some education and schooling, as are many of the great slave-holders in this country."

I must have looked confused because Corrine now said, "What do you think you've been studying down here?"

I said nothing. She continued on, "What we do is not idle exercise, nor Christian improvement. First you learn what they know, in the general. And then you learn them in the specific – their words and their hand. Own the man's special knowledge and you shall own the measure of the man. Then you might fashion the costume, Hiram, and make it yours to fit."

I began to study the very next day. Quickly I ascertained that all the documents were drawn up by the same hand. Studying them, a portrait began to emerge. From the artifacts of the author's life – the balance of his ledgers, his communications with his wife, his journal entries upon certain deaths, the accounting off consecutive harvests – the man, in all his traits and foibles, was summoned before me. I saw his daily habits, his routines, his particular philosophy, and by the final hour, having never know him, I could render nearly all his features.

Corrine met me again, a week later, in the library. I provided her with all I had ascertained, and under her rigorous interrogation, I provided even more. What was his wife's favorite flower? How regular were their departures? Did this man love his father? Had he yet turned gray? Where did he stand in society? And how ancient was his fortune? Was he given to the infliction of random cruelties? I responded to every query – I had, with my gift of memory, inhaled all the facts of the man's life. But Corrine pushed on to questions that went beyond the facts that might be committed to memory to matters of interpretation. Was he a good man? What did he covet in life? Was he the sort to revel in perceived wrongs? The next night she picked up this line of inquiry and pushed me to construct the man down to the last loose thread of his waistcoat. On the following night of interrogation, I found that the more speculative questions came easier, and then by the last night they were so easy that I felt them to matters of my own life. And that was the point of it all.

"Now," she said. "You have read well enough to know this man to be in possession of a particular property of which he is most fond."

"The jockey, yes." I replied. "Levity Williams."

"The same," she said. "This man will need a day-pass for the road, a letter of introduction for the further portion, and finally free papers signed by his master. You will provide these."

She pulled from the case a tin and handed it to me. Opening it, I saw a fine pen, and by handling, it, I knew it was the same weight as the one often employed by the object of my study.

"Hiram, the costume must fit," she said. "The day-pass must be done with the same hurried disregard, the letters must have all that official flourish, and the freedom papers the same arrogance that is surely the right of these vile people."

There was still the practical fact of copying his signature and penmanship. But here my memory and gift of mimicry triumphed. It was no different than what I'd done all those years ago, when Mr. Fields showed me the image of the bridge. Harder were the man's beliefs and passions, and my ability to convey them with confidence and ease, as though they were my own. I never forgot that lesson. It was essential to what I became, to what I unlocked and saw.

I don't know if those documents ever loosed Levity Williams. Everything we did was done under so much secrecy. But still, in forging these documents I felt something new arising in me and the new thing was power. The power extended out from my right arm, projected itself through the pen, and shot out through the wilderness, right at the heart of those who condemned us.

Soon this became a regular labor. Every few weeks, Corrine presented me with a new package. And each week I fitted myself to the costume, so that when I finished, I was sometimes unsure of where I ended and the Taskmaster began … I nearly loved them. My work demanded no less: I must reach beyond all my particular hatred and pain, see them in their fullness, and then, with my pen, strike out and destroy them . . .

And we did much more than that. We returned the documents edited and augmented. Our forgeries encouraged feuds. We altered inquests. We lent proof of fornication. My anger was now free and ranged beyond Maynard and my father, aimed now at all Virginia, an anger I sated each night, under the lanterns, at the long library table.

Pages 166-169

Coleman Hughes of *The Free Press* explains how Coates collaborated with fellow agents, Ms. Hannah-Jones (and others) on *The 1619 Project*:

| Coleman Hughes, *The Fantasy World of Ta-Nehisi Coates*, The Free Press, October 2, 2024 |
|---|
| **(4)** Mythmaking, rather than history, dominates the book's third essay, "Bearing the Flaming Cross," where we learn that Coates had an intimate view of *The 1619 Project* as it was being created by Nikole Hannah-Jones … As Coates tells it, the backlash to The 1619 Project practically fell out of the sky … resulted from a characteristically American unwillingness to face our past.<br><br>"Nikole is my homegirl," Coates writes. And he "had the great fortune of watching her build 'The 1619 Project,' of being on the receiving end of texts with highlighted pages from history books," and more. "Seeing the seriousness of effort, her passion for it, the platform she commanded, and the response it garnered," Coates realized that "a backlash was certain to come."<br><br>P.8 |

# EXHIBIT D

Plaintiff's description of mass incarceration from *Shock Exchange* in comparison to *13th*.

Before quantifying the black tax – unemployment and incarceration – I would expect to see a sharp rise in unemployment starting in the late 1970s and early 1980s as the U.S. manufacturing base began to erode. Black men worked their way into middle class status by traveling to northern cities and California where manufacturing jobs were in abundance. The decline in U.S. manufacturing has hurt the economy overall, but African Americans especially. The inverse of this conclusion is that black men, for whatever reason, have been less successful in transitioning from the manufacturing sectors to the service sectors of the economy.

The above chart illustrates the employment-to-population ratio by sex and race, and measures the proportion of the population employed. This may be a better proxy for the true employment picture. The employment-to-population ratio for African-American men in 2010 was 53.1%, as compared to 65.1%, 67.5% and 68.0% for white, Asian and Hispanic men, respectively. Prior to seeing the data I would have expected a sharp decline in the ratio for black males starting in the mid-80s as the country's manufacturing base began to erode. However, the figures were relatively unchanged in 1980 (60.4%) and in 2000 (60.2%), yet fell precipitously by 2010. It reiterates the adage that "when America catches cold, black America catches pneumonia."

There was no noticeable difference in the employment-population ratio amongst women from different racial groups. Overall, the employment-to-population ratio for all women has increased since the early 1970s as more women have entered the workplace. Yet the differential in the ratio between black women and black men is the smallest vis-à-vis other ethnic groups. For instance, in 2010 the differential in the ratio between black men and black women (1.6%) was much less than that of whites (11.1%), Asians (14.5%) and Hispanics (10.4%). The differential may be symptomatic of a U.S. service economy more comfortable with black women in the workplace.

The rate of incarceration also reflects the additional costs of being black in America. One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration. The abnormally high rate for African Americans is a known truth in the black community. After doing some research, I found that the U.S. has the highest incarceration rate of any country in the "free world."

The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. The incarceration rate is a function of admissions, times length of stay. Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S.

prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. Critics have also blamed the so-called "war on drugs" for the abnormally high incarceration rate of African-American males (4,797 per 100,000 U.S. residents) as compared to that of white males (708 per 100,000 U.S. residents). Even more damning is the fact that a high percentage of white males are incarcerated in local jails with shorter stays, causing less of a disruption for their families. In contrast, the majority of black males are jailed in federal prison with longer stays – a phenomenon that has practically ravaged the black family. Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for low-level drug transactions and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking.

Senior year, Dr. Hendley presented us with a case involving a town with an exploding population of dogs. The town manager had a dilemma – to control the population by either spaying male dogs or female dogs. The logical answer would be to spay the male dogs, since they were the "obvious" culprits. However, if the ratio was 10 female dogs per 10 male dogs and he spaded as many as six male dogs, the remaining four could still service 10 female dogs. Instead, the town manager spaded the female dogs and the dog population decreased proportionately. To that point, attempting to "spay" drug dealers does not have the same impact on the drug trade as spaying the user through incarceration, treatment, or education. In no way am I attempting to dissect the criminal justice system, but simply presenting data that supports what Grandma always knew – if you are black in America, odds are you are going to the pen.

P.52 - P.54

Below is a summary of the two analyses side-by-side.

| ***13th*** | ***Shock Exchange*** |
|---|---|
| **(I)** The U.S. is home to 5% of the world's population but 25% of the world's prisoners. [President Barack Obama, 0:00 mark]<br><br>A little country with 5% of the world's prison population having 25% of the world's prisoners … One out of four human beings with their hands on bars, shackled, in the world is locked up here, in the land of the **free**. [Van Jones, 0:00 mark)<br><br>We had a prison population of 300,000 in 1972. Today, we have a prison population of 2.3 million. The United States now has the | U.S. has higher incarceration rate of any country in the **free** world.<br><br>*Shock Exchange* included a chart of the U.S. at 743 per 100,000 residents and its closest-to-scale competitors, Rwanda (595), Russia (568), Georgia (547) and U.S. Virgin Isles (549). |

| | |
|---|---|
| highest rate of incarceration in the world. [Bryan Stevenson, 0:30 mark] | |
| **(II)** We had a prison population of 300,000 in 1972. Today, we have a prison population of 2.3 million. [Bryan Stevenson, 0:30 mark] | The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. |
| **(III)** Lifetime likelihood of imprisonment for white males: 1 in 17. [*13th*, 1:23:00 mark]<br><br>The Bureau of Justice reported that one in three young, black males is expected to go to jail or prison during his lifetime, which is an unbelievably shocking statistic. [Bryan Stevenson, 1:23:00 mark]<br><br>Black men account for 6.5% of the U.S. population. They make up 40.% of the U.S. population. [*13th*, 123:30 mark]<br><br>We now have more African Americans under criminal supervision than all the slaves in the 1850s. [Senator Cory Booker, 1:23:30 mark]<br><br>[Reporter: Police here are cracking down on crack dealers.] Usually black or Hispanic, Latino, they were getting long sentences for possession of crack. [David Dinkins, 23:00 mark]<br><br>These sorts of disparities under Reagan quickly exploded into the era of mass incarceration. [Jelani Cobb, 23:30 mark] | Critics have also blamed the so-called "war on drugs" for the abnormally high incarceration rate of African-American males (4,797 per 100,000 U.S. residents) as compared to that of white males (708 per 100,000 U.S. residents). |
| **(IV)** "A war on drugs." And that utterance [from President Nixon] gave birth to this era where we decided to deal with drug addiction and drug dependency as a crime issue rather than a health issue. Hundreds of thousands of people were being sent to jails and prisons for simple possession of marijuana, for **low-level offenses**. [Bryan Stevenson, 16:30 mark]<br><br>We've got an opportunity to make a difference at a time when overall violent crime rates have been dropping at the same time as incarcerations last year for the first | Nor will it (criminalization) ever reduce drug trafficking … Attempting to "spay" drug dealers does not have the same impact on the drug trade as spaying the user through incarceration, treatment, or education.<br><br>Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for **low-level drug transactions** and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking. |

| | |
|---|---|
| time in 40 years.[1] [President Barack Obama, comments from El Reno Federal Correctional Institution in El Reno, Oklahoma, on July 16, 2015, 1:18:30 mark] | |
| **(V)** President Richard Nixon was the first to coin the term 'a war on drugs,' but President Ronald Reagan turned that rhetorical war into a literal one … The modern war on drugs was declared by Ronald Reagan in 1982. [Michelle Alexander, 19:30 mark]<br><br>And some people say, "Well how can you join the person declaring the war on drugs with someone like Ronald Reagan?" I joined with Nancy Reagan because she said, "Just say no …" we're not talking about locking up people … We're talking about prevention. [Charlie Rangel, 20:30 mark]<br><br>In the mid-1980s we were already starting to embark on a war on drugs … along comes this drug, crack cocaine … This was just going to just take over communities, in particularly, African American communities … Congress in virtually record time established mandatory sentencing penalties for crack that were far harsher than those for powder cocaine … [Mark Maurer, 22:00 mark].<br><br>Cocaine was more sophisticated. It was just a powder … [Charlie Rangel, 23:00 mark]<br><br>In many ways, the **so-called** war on drugs was a war on communities of color … [Angela Davis, 25:00 mark] | Reagan's **so-called** war on drugs turned out to be nothing more than a war on African Americans. The increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world.<br>The policy has eradicated entire families and has threatened to eliminate the African American race as we know it. In September 2011, the Wall Street Journal was "so alarmed" that it even had a forum where experts advised African-American women to seek out white males for marriage partners. P. 80. |
| **(VI)** Newt Gingrinch: Crack was largely an inner-city issue and cocaine was largely a suburban issue … We absolutely should have treated crack and cocaine as exactly the same thing … it also fundamentally violated a sense of core fairness. [Newt Gingrich, 22:30 mark] | Majority of black males jailed in federal prison with longer stays – a phenomenon that has ravaged the black family.<br><br>The increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. The policy has eradicated |

[1] https://www.presidency.ucsb.edu/documents/remarks-following-visit-federal-correctional-institution-el-reno-and-exchange-with

| | |
|---|---|
| A scythe went through our black communities, literally cutting off men from their families … huge chunks just disappearing into our prisons, and for really long times. [Pat Nolen, 23:30 mark]<br><br>When crack cocaine hit in the early '80s there were a lot of mayors and so on who felt very strongly that this is a real threat and they wanted to crack down on it and Rangel was one of the guys pushing for stronger sentencing … Then years later there was an effort to re-write history that there was a racial disparity put in by mean white people. That's not where it came from. [Grover Norquist, 24:20 mark].<br><br>Rangel: It may have seemed like a good idea at the time, but it sure didn't work out as being effective. [Charlie Rangel, 24:40 mark]<br><br>But I want to say a few things about it [mass incarceration] because I signed a bill that made the problem worse. And I want to admit it. There were longer sentences. And most of these people are in prison under state law, but the federal law set a trend. And that was overdone. We were wrong about that. [Bill Clinton at 2015 NAACP national convention, 40:30 mark]. | entire families and threatened to eliminate the African American race as we know it. P. 80. |
| **(VII)** When you commit a third violent crime you will be put away and put away for good. Three strikes and you are out. [Bill Clinton speech, 36:30 mark]<br><br>A person's convicted of their third felony, essentially that person is mandated to prison for the rest of their lives. [Glenn Martin, 37:00 mark]<br><br>"Mandatory sentencing." We said we would no longer going to let judges consider the circumstances around a crime. We're just going to impose a mandatory sentence. [Bryan Stevenson, 37:00 mark] | Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. |

| | |
|---|---|
| Serious, violent criminals serve at least 85% of their sentence. [Bill Clinton speech, 38:00 mark]<br><br>We passed Truth in Sentencing Law which kept people imprisoned for 85% of their sentence … We had parole in the country as a mechanism for getting people out of jails and prisons when it was clear that they were no longer a threat to public safety. [Bryan Stenson, 38:00 mark]<br><br>We've done away with parole. So, in the federal system, when you get 20 to 30 years, that's what you got. [David Keene, 38:00 mark]<br><br>Sharanda has spent the last 16 years in prison and she will die there because she was sentenced to life without parole. Her only crime? Transporting cocaine … I mean only crime. She had no other arrests … The judge was required to send Sharanda away for life. [*The Nightly Show With Larry Wilmore*, November 2015, 38:30 mark ]<br><br>And then comes to Congress with a proposal for a $30 billion federal crime bill of 1994 that was heavily loaded towards enforcement incarceration. [Mark Maurer, 38:30 mark]<br><br>Again we see this kind of notching up of the number of people who were arrested at every level and this kind of exploding prison population. [Jelani Cobb, 40:00 mark] | |
| **(VIII)** Nixon's Southern strategy was implemented right after the civil rights movement. He played on fear of crime and law and order to win the election easily. Reagan promised tax cuts to the rich, and to throw all the crack users in jail, both of which devastated communities of color but were **effective in getting the Southern vote.** In 1981 just before Reagan assumed the presidency, his campaign strategist, Lee | Reagan was defeating Jimmy Carter by a landslide. **But there was still hope.** Virginia was up next. When the screen showed **Reagan had taken Virginia by a huge margin** and it was clear that he was going to be the next president, Suzie exclaimed "Black folks are going to catch hell now!" P. 75 |

| | |
|---|---|
| Atwater, was caught on tape explaining the Southern strategy. | |
| **(IX)** In 1981 just before Reagan assumed the presidency, his campaign strategist, Lee Atwater, was caught on tape explaining the Southern strategy. "…You're getting so abstract now. You're talking about **cutting taxes** … totally economic things and the by-product of them is blacks get hurt worse than whites. | Reagan had become a disciple of "supply-side economics" whereby (i) you provided **tax cuts** to businesses and the wealthy and (ii) additional spending and investing provided by the tax cuts would pay for themselves … Reagan's budget director, David Stockman, admitted the theory was pure folly … P. 77 |
| **(X)** There was a crisis in the U.S. economy at that time. [James Kilgore, 21:00 mark]<br><br>"I regret to say that we are in the worst economic mess since the Great Depression." [President Reagan, 21:00 mark … This is an excerpt from 1981 address to the nation where Reagan describes the stagflation – rising costs and rising unemployment – faced by the country.] | I tried to understand the uncertainty and pain the American public was experiencing. The stagflation of 1991-1992 would ultimately cost President George W. Bush his job … All signs of the "perfect storm" kept pointing back to one man – Ronald Reagan. P. 75 |
| There is a frontal assault on institutions designed to assist human beings, on the education system, welfare, on jobs, healthcare. [Angela Davis, 21:00 mark] | Reagan proposed budget cuts of $16 billion, which included, but were not limited to (i) $7 billion in "discretionary" funding appropriated annually for government programs … (ii) $5 billion by delaying cost-of-living increases in entitlement programs, (iii) $1.5 billion reductions in Medicare, Medicaid and aid to low-income families with dependent children, and (iv) $300 million by reducing the federal workforce. Pages 77 – 78 |
| The idea of expanding the freedom of American business and the entrepreneurial class. [John Hagan, 21:30 mark] | Reagan introduced a tax bill that included (i) across-the-board cut in personal income taxes of 25%, (ii) accelerated depreciation of business [expenses] which lowered … taxes payable to the government. P. 77 |
| We will save $1.8 billion in fiscal year **1982**. [Reagan address] | That tax cuts and economic growth that were below Reagan's original budget projections had some economists predicting a budget deficit of up to $70 billion in **1982** … Reagan proposed budget cuts of $16 billion … Pages 77-78 |

Plaintiff's conclusion on mass incarceration from *Shock Exchange* is inspired by a case study from Dr. Bill Hendley's advanced economics class at Hampden-Sydney College in 1989.

Plaintiff's expression of mass incarceration is written from an economic perspective. By simply cutting the drug supply – removing drugs off the street or locking up drug dealers – authorities will not reduce the flow of drugs. Regulators must address the demand side. There was nothing like it in the marketplace when Plaintiff published *Shock Exchange*.

Plaintiff triangulates around various metrics – U.S. incarceration rates and their growth over time, U.S. incarceration rate relative to that of the rest of the world, Black male incarceration rate compared to that of white males, and non-violent criminals as a percentage of the U.S. prison population – to determine "mass incarceration" materializes by 2011. Plaintiff's unique expression – the "Baker Mass Incarceration Index" – (i) proves the U.S. incarceration rate is divorced from violent crime and (ii) determines when "mass incarceration" is triggered and when it is not. Plaintiff's unique expression proves the incarceration rate is divorced from violent crime. The index is part science and art, and Ralph W. Baker, Jr. is the best person to interpret it.

Ta-Nehisi Coates admitted *Shock Exchange's* expression of mass incarceration and its suggested remedy were unique, and described how he plagiarized it for *The Black Family In The Age Of Mass Incarceration* ("2015 Essay"). *Baker v. Hannah-Jones*, No. 25-300, DktEntry: 100-1, Appendix: GGG. In an April 2015 panel discussion at Duke University, Coates describes how the popular narrative on mass incarceration is that it started in 1970:

> The mass incarceration life story is that in 1970, we went a little crazy and started jailing a bunch of people. We responded to real crime trends. We just kind of went overboard. Suddenly, we looked up and we had more incarcerated people than any nation on Earth. 800,000 more people than are incarcerated in China, a country with nearly a million more people. Don't know what happened. (Around the 39:30 mark).[2]

In a March 2015 discussion at Craig Newmark School of Journalism, Coates was ecstatic about his piece for mass incarceration:

> I'm working on this thing about mass incarceration … The Atlantic likes to put its foot down on certain issues and say 'Okay. We're going to try and do something big about this. We're going to try to make some sort of statement …' You have to, you know do something different. One of the things I'm working on I'm working on this thing about mass incarceration. That's like the creative sort of challenge. 'Everybody's talking about mass incarceration. What do you have to say that's different?
>
> Oh god, I can't tell you what's different. I'm sorry … At that moment when you realize that, 'Ohh this is being talked about in every place in the world and every outlet and here is the thing … Here is the thing that folks are missing …' Here is the thing that everyone is underestimating. And frankly, here is the reason why it probably won't get fixed.[3]

According to the 2011 data the U.S. is the most-incarcerated country in the world – even among countries without the rule of a law. This is non-sensical. The incarceration rate grew from 200

---

[2] "Reparation: A Roundtable Discussion with Ta-Nehisi Coates," Scholars and Publics, YouTube, April 13, 2015.

[3] "Ta-Nehisi Coates in Conversation with A.O. Scott and Anna Holmes," Craig Newmark Graduate School of Journalism, YouTube, March 20, 2015. (Around the 45:00 to 47:00 mark).

per 100,000 residents in the mid-90s to 743 by 2010 – a compound annual growth rate of about 8%. This also in non-sensical. Crime is not growing at a rate to justify this rapid growth in incarceration. Black males are incarcerated at about 7x the rate of white males (4,797 per 100,000 U.S. residents v. 708 per 100,000 U.S. residents), which is out of balance. The large percentage of non-violent criminals implies the U.S. is locking up non-violent criminals and giving them lengthy sentences as if they are violent criminals. The incarceration rate is thus, divorced from violent crime.

Ms. DuVernay and other Agents mimic Plaintiff's expression of mass incarceration and the Baker Mass Incarceration Index with the goal of superseding it. Plaintiff asserts the U.S. is the most-incarcerated country in the world, which President Barack Obama ("President Obama"), Van Jones ("Jones"), and Bryan Stevenson ("Stevenson") repeat like they just discovered fire. Ta-Nehisi Coates ("Coates") repeated this sentiment for "The Black Family In The Age Of Mass Incarceration" ("2015 Essay"). *Ralph W. Baker Jr. v. Ta-Nehisi P. Coates, et al.*, No. 24-6839, *Baker v. Coates, et al.*, 22-CV-7986 (JPO), Dkt. 150. Stevenson repeats this sentiment for *The 1619 Project: A New Origin Story* ("1619 Book"). *Baker v. Hannah-Jones, et al.*, 25-300, *Baker v. Hannah-Jones, et al.*, 24-CV-8760, Dkt. 5. It there was nothing unique about it, and it had no value to them then why would these Agents keep copying it? *Midler v. Ford*, 849 F.2d 460 (9th Cir. 1988).

Here, Van Jones carefully imitates Plaintiff's word choice. Plaintiff references the "free" world, which connotes countries with western-style democracies as opposed to those under communist rule. Van Jones attempts to capture the peculiarity of *Shock Exchange* by referencing the land of the "free," which connotes U.S. with independence from Britain – nothing remotely related to mass incarceration. "Not only are the words chosen by a superior mind peculiar to itself, but in ordinary life no two descriptions of the same fact will be in the same words ..." *Jefferys v. Boosey*, 4 H.L.C. 815, at 869, *Baker v. Coates*, No. 24-6839.

Plaintiff asserts incarceration rates exploded from the mid-'90s to the current period. Stevenson asserts incarceration rates exploded from the '70s to the current period, in an attempt to create the appearance of dissimilarity. *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F. 2d 144 (2d Cir. 1956). In his 2015 Essay Coates also attempts to tie mass incarceration to the 1970s. *Baker v. Coates*, No. 24-6839. This is a pattern from the defendants. *13th* and Stevenson's analysis lacks rigor; they cannot explain what mass incarceration is, why it materializes in the '70s or when it stops. We have to take their word for it.

In the 1619 plagiarized works, Stevenson and Nikole Hannah-Jones ("Hannah-Jones") assert mass incarceration was created by slavery. *Baker v. Hannah-Jones*, Dkt. 5. In 13th Stevenson asserts it was created by Nixon's war on drugs. The conflicting statements are evidence of copying. Plaintiff understands Coates, Jelani Cobb ("Cobb"), Khalil Gibran Muhammad ("Muhammad"), and Michelle Alexander ("Alexander") all contributed to *13th* and the 1619 plagiarized works.

Plaintiff compares incarceration rates of Black males of 4,797 per 100,000 residents to white males of 708 per 100,000 residents (2011 data). Stevenson and 13th explain incarceration rates of black males v. white males in percentage terms, and Senator Cory Booker compares black male incarceration to the number of slaves in the 1850s. These are crude attempts to create the

appearance of similarity. *Joshua Meier Co.*, 236 F.2d at 147. In the 2015 Essay Coates also explains the incarceration of black males in percentage terms. *Baker v. Coates*, No. 24-6839. Plaintiff illustrates the disparities in incarceration rates between black men and white men, which former New York Mayor David Dinkins repeats.

Cobb asserts these disparities under Reagan quickly exploded into the era of mass incarceration. This contradicts Stevenson and Alexander's narrative that Nixon created mass incarceration. It also contradicts narrative from Stevenson, Hannah Jones and the 1619 plagiarized works – which Cobb contributed to – that slavery created mass incarceration. Cobb's assertion lacks evidence and/or rigor. Former Tufts professor, Kerri Greenidge, came under fire for unsubstantiated claims made in her recent book:

> But skepticism grew as her prose came under the microscope by historians and scholars, including Myra Glenn, an author and retired American history professor at Elmira College. In a 2024 examination of "The Grimkes," Glenn called it "deeply flawed," and called out that Greenidge "all too often lacks the evidence to substantiate many of her major claims."[4]

Plaintiff asserts that treatment and/or education is a better alternative to stopping drug trafficking than locking up drug dealers. Stevenson repeats this sentiment. Plaintiff asserts the war on drugs has resulted in a frequent number of arrests for low-level drug transactions, which Stevenson and President Obama repeat. Plaintiff asserts Reagan's war on drugs was a war on blacks and amplified incarceration, particularly for blacks. Former Congressman Charles Rangel, Mark Maurer and Angela Davis repeat this sentiment. Alexander admits to a war on drugs, but implies it began with Nixon – an attempt to create the appearance of dissimilarity with *Shock Exchange*. Plaintiff references Reagan's "so-called" war on drugs. Ms. Davis references Reagan's "so-called" war on drugs. Here, Ms. Davis carefully imitates Plaintiff's word choice. *Jefferys v. Boosey*, 4 H.L.C. 815, at 869, *Baker v. Coates*, No. 24-6839.

Plaintiff asserts (i) the majority of black males are jailed in federal prison with longer lengths of stay, ravaging the black family and (ii) the increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. New Gingrich ("Gingrich"), Pat Nolen, Grover Norquist, former Congressman Charles Rangel, and former President Bill Clinton repeat the sentiment. Plaintiff asserts mandatory sentences and a higher length of stay are negatively impacting U.S. prison policy. Bill Clinton, Glenn Martin, Stevenson, David Keene, Mark Maurer and Cobb repeat the sentiment.

In *Shock Exchange* Plaintiff marvels at how Reagan won Plaintiff's home state of Virginia in a landslide in 1980, "We watched as the states rolled in – Reagan was defeating President Jimmy Carter by a landslide … Up next was Virginia, which has always been a Republican state. When the screen showed Reagan had taken Virginia by a huge margin, practically guaranteeing he would be president, Suzie exclaimed, 'Black folks are going to catch hell now!.'"[5] *13th* marvels

---

[4] Chris Nesi, "Historian says its racist to question her – after book about slavery pulled from shelves over inaccuracies," New York Post, July 14, 2026.

[5] *Ralph W. Baker, Jr., Shock Exchange: How Inner-City Kids From Brooklyn Predicted the Great Recession and the Pain Ahead*, Page 75.

at how effective Reagan's so-called "Southern strategy" was effective at helping him win the Southern vote in 1980, carefully imitating *Shock Exchange*. Ibram X. Kendi ("Kendi") also imitated *Shock Exchange* in *Stamped From The Beginning: The Definitive History of Racist Ideas in America* ("Stamped"), "Thanks in part to southern support, Reagan easily won the presidency."[6] Plaintiff sued Kendi for allegedly plagiarizing *Shock Exchange* pursuant to *Stamped* and various "Kendi plagiarized works." *Baker v. Hannah-Jones*, et al., 24-CV-8760.

**1980 Electoral Map - President Of United States**

| | Electoral Votes | | | % of Total | |
|---|---|---|---|---|---|
| | Reagan | Carter | Total | Reagan | Carter |
| DE | 3 | - | 3 | | |
| FL | 17 | - | 17 | | |
| GA | - | 12 | 12 | | |
| MD | - | 10 | 10 | | |
| NC | 13 | - | 13 | | |
| SC | 8 | - | 8 | | |
| VA | 12 | - | 12 | | |
| WV | - | 6 | 6 | | |
| DC | - | 3 | 3 | | |
| AL | 9 | - | 9 | | |
| KY | 9 | - | 9 | | |
| MS | 7 | - | 7 | | |
| TN | 10 | - | 10 | | |
| AR | 6 | - | 6 | | |
| LA | 10 | - | 10 | | |
| OK | 8 | - | 8 | | |
| TX | 26 | - | 26 | | |
| Total South | 138 | 31 | 169 | 82% | 18% |
| Northeast | 118 | 4 | 122 | 97% | 3% |
| Midwest | 135 | 10 | 145 | 93% | 7% |
| West | 98 | 4 | 102 | 96% | 4% |
| Total Electoral Votes | 489 | 49 | 538 | 91% | 9% |

Source: Ralph W. Baker, Jr.
Source: https://www.archives.gov/electoral-college/1980

The above chart show Reagan won in a landslide – capturing 91% (489 of 538) of total electoral votes. Reagan performed worst in the South; he won 82% of electoral votes in the South versus northeast (97%), Midwest (93%) and west (96%). He only lost six states – Georgia, Maryland, West Virginia, Rhode Island, Minnesota and Hawaii – of which three were in the South; he also lost D.C. It is implausible that the main takeaway for Ms. DuVernay, Henry Louis Gates, Stevenson, Cobb and Agents was how Reagan dominated the South. The only way one can

[6] Ibram X. Kendi, *Stamped From The Beginning*, Page 431.

explain the similitude with *Shock Exchange* is through copying. *Steinberg v. Columbia Pictures Industries*, 663 Supp. 706 (S.D.N.Y. 1987).

The *actual* interview with Atwater [referenced to by *13th*] included narrative on Reagan cutting social services, "… the interviewer asked a question, '… Reagan does get to … the racist side of the Wallace voter by doing away with legal services, by cutting down on food stamps?'"[7] This narrative imitates *Shock Exchange*, which honed on Reagan's cuts to social programs, "Boxed in by Carter's claims that his tax cuts to the wealthy and increased military spending would come at the expense of social programs, Reagan promised not to reduce entitlement spending."[8] Ms. DuVernay framed the Atwater interview as tax cuts and criminalization of crack dealers in order to (i) frame it as an extension of Nixon's Southern strategy and (ii) create the appearance of dissimilarity with *Shock Exchange*.

Ms. DuVernay and *13th* purposely misleads the viewer to believe Reagan's threat to lock up crack dealers helped him win the South during his 1980 election. Reagan's war on drugs didn't occur until after he became president. 13th highlights Reagan's address to the nation on his campaign against drug abuse. [Reagan talk, 19:30 mark]; however, that address took place in 1986 during Reagan's second term. *13th* highlights First Lady Nancy Reagan's famous national "Just Say No" to drugs campaign speech, which took place in 1986.[9] Plaintiff understands crack cocaine did not become a national health crisis until the mid-'80s. [Mark Maurer, 22:00 mark]. It's well-known that black politicians and black activists lobbied Reagan to crack down on drugs because (i) they associated crack cocaine and crack use with violence and (ii) they wanted to get violent drug dealers out of black communities. [Grover Norquist, 24:20 mark]. Reagan's Anti-drug Abuse Act of 1986, which established mandatory minimum sentences for crack cocaine, was not signed until his second term. The framing of Reagan winning the South during his 1980 election by promising tax cuts and to lock up crack dealers was cooked up by DuVernay and Agents. This is evidence of copying.

*Shock Exchange* describes Reagan's tax cuts for the wealthy, downsizing of the government and cuts to social programs that hurt Blacks. DuVernay carefully imitates it and tries to create the appearance of dissimilarity by describing it as Reagan's "Southern strategy" and characterizing it as an extension of Nixon's "Southern strategy." Per Shock Exchange, Reagan and President Obama had the same strategy of "trickle-down" economics, "With QE1, QE2, and the Fed's below-market loan programs, Obama has attached the success of his presidency to the 'trickle-down theory.'"[10] 13th castigates Reagan and his economic policies, carefully imitating *Shock Exchange*. However it praises President Obama throughout, despite the fact that President Obama and Reagan had the same economic policies. The only one can explain the similitude is through copying. *Steinberg v. Columbia Pictures Industries*, 663 Supp. 706 (S.D.N.Y. 1987). Hannah-Jones (1619 plagiarized works) and Kendi (*Stamped*) castigate Reagan and incessantly

[7] "Lee Atwater explains the Southern Strategy, YouTube, @HistoryisAwkward, January 5, 2025.
[8] Ralph W. Baker, Jr., Shock Exchange: How Inner-City in Brooklyn Predicted the Great Recession and the Pain Ahead, Page 77.
[9] "CNN: 1986: Nancy Reagan's 'Just say no' campaign," YouTube, CNN, February 28, 2011.
[10] Ralph W. Baker, Jr., Shock Exchange: How Inner-City Kids From Brooklyn Predicted the Great Recession and the Pain Ahead, Page 324.

fawn over President Obama. *Baker v. Hannah-Jones*, Dkt. 5. These works are clearly contrived and designed to promote a staged ideology. The similitude between these alleged plagiarized works and Shock Exchange can only be explained through copying. *Steinberg*, at 713.

*Shock Exchange* explains the stagflation – high inflation and high unemployment – a holdover from the Reagan administration. 13th carefully imitates this narrative. In that 1981 Reagan address referenced by 13th, Reagan also described stagflation facing the country, (i) mortgage rates of 15.4% or 2 ½ times the 1960 rate of 6%, and (ii) Reagan's fight against rising unemployment and inflation.[11] *Shock Exchange* describes Reagan's cuts to entitlement programs, government jobs, and healthcare, which Ms. Davis carefully imitates. *Shock Exchange* describes Reagan's tax cuts to the wealthy and the business class, which John Hagan repeats. Shock Exchange describes Reagan's projected budget deficit in 1982, which triggered budget cuts. 13th displays Reagan's address to the country where he projects savings in 1982 from budget cuts.

DuVernay copied 100% of Plaintiff's creative selections for both the 13th interview and the 13th documentary.

[11] https://www.reaganlibrary.gov/archives/speech/address-nation-economy-february-1981

## Anomalies Of Shock Exchange

| | 13th Interview | Total Minutes | % of Total Minutes | 13th Doc | Total Minutes | % of Total Minutes |
|---|---|---|---|---|---|---|
| Criminal Justice | 36 | 37 | 97% | 88 | 100 | 88% |
| Reconstruction | 1 | 37 | 3% | 2 | 100 | 2% |
| Du Bois | - | 37 | 0% | - | 100 | 0% |
| Black Church | - | 37 | 0% | - | 100 | 0% |
| Redlining | - | 37 | 0% | - | 100 | 0% |
| | | | | | | |
| Housing / Wealth / Land | - | 37 | 0% | - | 100 | 0% |
| Revolt, riots, violence, uprisings, unrest | - | 37 | 0% | 4 | 100 | 4% |
| Reparations | - | 37 | 0% | - | 100 | 0% |
| | | | | | | |
| Glass-Steagall, MBS, CDO | - | 37 | 0% | - | 100 | 0% |
| Panic Financial Crisis | - | 37 | 0% | - | 100 | 0% |
| Plaintiff's Personal Story | - | 37 | 0% | - | 100 | 0% |
| Reagan Policies | - | 37 | 0% | 12 | 100 | 12% |
| Massive Resistance | - | 37 | 0% | - | 100 | 0% |
| John Randolph | - | 37 | 0% | - | 100 | 0% |
| Black Music | - | 37 | 0% | - | 100 | 0% |
| Infrastructure | | | | - | | |
| Gingrich / Republicans | | | | | | |
| Combat Democrats | - | 37 | 0% | - | 100 | 0% |
| Blanche K. Bruce | - | 37 | 0% | - | 100 | 0% |
| Rodney King | - | 37 | 0% | - | 100 | 0% |
| Tobacco | - | 37 | 0% | - | 100 | 0% |
| Dexter Avenue | - | 37 | 0% | - | 100 | 0% |
| Blacks Denied School | - | 37 | 0% | 1 | 100 | 1% |
| Interracial Sex | - | 37 | 0% | - | 100 | 0% |
| Large % Of Blacks | - | 37 | 0% | - | 100 | 0% |
| Tax Dollars For Whites | - | 37 | 0% | - | 100 | 0% |
| Brown v. Board | - | 37 | 0% | - | 100 | 0% |
| Civi Rights | - | 37 | 0% | 1 | 100 | 1% |
| Sum | 37 | 37 | 100% | 100 | 100 | 100% |

Source: Ralph W. Baker, Jr.

# EXHIBIT E

Below are substantial similarities between the *13th: A Conversation With Ms. Oprah Winfrey and Ms. Ava DuVernay* and *Shock Exchange*. The conversation took place between Ms. Winfrey and Ava DuVernay ("Duvernay" or "defendant"). Plaintiff understands Ms. DuVernay began her career as a junior publicist for various movie studios before starting her own public relations firm in 1999 at the age of 27.[1] Ms. DuVernay is not considered a thought lead on public relations. How could she be magically be considered a thought leader on mass incarceration, public policy or economics? It is statistically impossible that she created the 13th documentary independent of *Shock Exchange*.

Below is Plaintiff's description of mass incarceration from *Shock Exchange*.

> Before quantifying the black tax – unemployment and incarceration – I would expect to see a sharp rise in unemployment starting in the late 1970s and early 1980s as the U.S. manufacturing base began to erode. Black men worked their way into middle class status by traveling to northern cities and California where manufacturing jobs were in abundance. The decline in U.S. manufacturing has hurt the economy overall, but African Americans especially. The inverse of this conclusion is that black men, for whatever reason, have been less successful in transitioning from the manufacturing sectors to the service sectors of the economy.
>
> The above chart illustrates the employment-to-population ratio by sex and race, and measures the proportion of the population employed. This may be a better proxy for the true employment picture. The employment-to-population ratio for African-American men in 2010 was 53.1%, as compared to 65.1%, 67.5% and 68.0% for white, Asian and Hispanic men, respectively. Prior to seeing the data I would have expected a sharp decline in the ratio for black males starting in the mid-80s as the country's manufacturing base began to erode. However, the figures were relatively unchanged in 1980 (60.4%) and in 2000 (60.2%), yet fell precipitously by 2010. It reiterates the adage that "when America catches cold, black America catches pneumonia."
>
> There was no noticeable difference in the employment-population ratio amongst women from different racial groups. Overall, the employment-to-population ratio for all women has increased since the early 1970s as more women have entered the workplace. Yet the differential in the ratio between black women and black men is the smallest vis-à-vis other ethnic groups. For instance, in 2010 the differential in the ratio between black men and black women (1.6%) was much less than that of whites (11.1%), Asians (14.5%) and Hispanics (10.4%). The

[1] https://en.wikipedia.org/wiki/Ava_DuVernay

differential may be symptomatic of a U.S. service economy more comfortable with black women in the workplace.

The rate of incarceration also reflects the additional costs of being black in America. One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration. The abnormally high rate for African Americans is a known truth in the black community. After doing some research, I found that the U.S. has the highest incarceration rate of any country in the "free world."

The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. The incarceration rate is a function of admissions, times length of stay. Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. Critics have also blamed the so-called "war on drugs" for the abnormally high incarceration rate of African-American males (4,797 per 100,000 U.S. residents) as compared to that of white males (708 per 100,000 U.S. residents). Even more damning is the fact that a high percentage of white males are incarcerated in local jails with shorter stays, causing less of a disruption for their families. In contrast, the majority of black males are jailed in federal prison with longer stays – a phenomenon that has practically ravaged the black family. Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for low-level drug transactions and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking.

Senior year, Dr. Hendley presented us with a case involving a town with an exploding population of dogs. The town manager had a dilemma – to control the population by either spading male dogs or female dogs. The logical answer would be to spade the male dogs, since they were the "obvious" culprits. However, if the ratio was 10 female dogs per 10 male dogs and he spaded as many as six male dogs, the remaining four could still service 10 female dogs. Instead, the town manager spaded the female dogs and the dog population decreased proportionately. To that point, attempting to "spade" drug dealers does not have the same impact on the drug trade as spading the user through incarceration, treatment, or education. In no way am I attempting to dissect the criminal justice system, but simply presenting data that supports what Grandma always knew – if you are black in America, odds are you are going to the pen.

P.52 - P.54

| **13th Inteview** | ***Shock Exchange*** |
|---|---|
| **(I)** A lot of these pieces of the doc I think people knew … They knew about the drug wars. They knew about unequal sentencing. But there's something about seeing it all strung together in sort of a primer, which is what I wanted to do, a primer for folks who didn't know. And folks that do know different pieces of it, it's something when you see the puzzle all put together and you see the final picture that informs you in a different way. [Ms. DuVernay, 5:00 mark)<br><br>The other thing is the difference in sentencing. So we have to go through a whole piece in the documentary talking about sentencing disparities. You look at the differences between people who engage with crack cocaine as opposed to powder cocaine. It's the same act of "drug use" if you want to call that a crime. But yet folks who could afford a certain powder and folks who could afford the rock got different … [Ms. DuVernay, 10:00 mark] | Majority of black males jailed in federal prison with longer stays – a phenomenon that has ravaged the black family.<br><br>*Shock Exchange* compares incarceration rates of Black males of 4,797 per 100,000 residents to white males of 708 per 100,000 residents (2011 data).<br><br>Reagan's so-called war on drugs turned out to be nothing more than a war on African Americans. The increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world.<br><br>The policy has eradicated entire families and has threatened to eliminate the African American race as we know it. In September 2011, The Wall Street Journal Was so "concerned" that it had a forum where experts advised African American women to seek out white males for marriage partners. P.80 |
| **(II)** "The other thing is the difference in sentencing. So we have to go through a whole piece in the documentary talking about sentencing disparities. You look at the differences between people who engage with crack cocaine as opposed to powder cocaine. It's the **same act of 'drug use' if you want to call that a crime**. But yet folks who could afford a certain powder and folks who could afford the rock got different …" [Ms. DuVernay, 10:00 mark] | Attempting to "spay" drug dealers does not have the same impact on the drug trade as spaying the user through incarceration treatment or education. |
| **(III)** "We absolutely should have treated crack and cocaine as exactly the same thing. I think it was an **enormous burden on the black community**, but it also fundamentally violated a sense of core fairness." [Newt Gingrich, 14:00 mark] | In contrast, the majority of black males are jailed in federal prison with longer stays – a phenomenon that has practically ravaged the black family.<br><br>The increase in incarceration for low-level drug offenders and mandatory sentencing led |

| | |
|---|---|
| | to black men becoming the most incarcerated group in the world. The policy has eradicated entire families and threatened to eliminate the African American race as we know it. P. 80. |

**Synopsis Of How 13th Interview Copies *Shock Exchange* Expression**

Ms. Duvernay – a publicist – describes the drug wars and unequal sentencing vis-à-vis blacks v. whites. She describes primary arguments made in *Shock Exchange* that mass incarceration was caused by government policy to stop drug dealing, and the unequal sentencing that followed. If the Publicist knew mass incarceration was caused by these events then it begs the question, "What was the purpose of adding narratives on slavery, reconstruction, Birth Of A Nation, the Ku Klux Klan, lynchings and Jim Crow to 13th?" The Publicist admits that she wanted to do a "primer" on mass incarceration that covered the war on drugs and unequal sentencing. This conflicts with her earlier statement where the Publicist intimated she and other Agents got together and "accidentally" came up the narratives for 13th: "Well, that's what documentary filmmaking is, a thinking process because the film wants to be what it wants to be. You can't dictate what the story going to be." [Around the 2:30 mark]. The conflicting statements are evidence of copying.

The publicist implies "drug use" may not be a crime. This mirrors *Shock Exchange* which clearly says drugs users should be given treatment or education, which could tamp down the incarceration rate.

**Key Instances Where DuVernay Prevaricates During *13th* Interview**

The Publicist prevaricated throughout the interview and would not give clear, concise answers to questions. On several occasions Ms. Winfrey answered on behalf of the Publicist, which exactly what an Agent would do. Below, the Publicist could not explain her unique expression in *13th*.

## Question: What Did DuVernay Want To Express Through *13th*?

(0:00 mark) Ms. Winfrey: "I recognize that all true art, great expression that impacts people, comes from the center of something. It's a level of expression. So, I'd like to know what was going on with you that you wanted to express through *13th*.

The Publicist: "Oh, goodness. It's such a long time coming for me, being really affected by police interaction."

Ms. Winfrey (appearing skeptical): Hmm.

The Publicist: "Since a little girl growing up in Compton, a heavy police presence there, not feeling safety when I would see police, feeling fear, feeling like they were coming after me or coming after the people in my … [Of Note: Ms. Duvernay pivots to police misconduct, which is not the same as mass incarceration.]

Ms. Winfrey: "So you growing up represented danger, fear." [Of Note: Here, Ms. Winfrey answers on behalf of Ms. DuVernay. When Ms. DuVernay struggled to craft a narrative she thought someone would believe, Ms. Winfrey stepped in to save Ms. DuVernay; this is exactly would an Agent would do. Plaintiff also accused Ms. Winfrey of helping Coates craft a lie pursuant to where the characters in *The Water Dancer* were derived. Baker v. Coates, 1:22-cv-07896-JPO-SLC, Dkt. 126. This is a pattern from Ms. Winfrey, and evidence that *13th* is not Ms. DuVernay's original work.]

[Of Note: Ms. DuVernay expresses fear of the police. Ta-Nehisi Coates also expressed fear of the police throughout *Between the World and Me*, yet he provided no evidence of it. This "fear" appears to be a canned response from these Agents.]

DuVernay: "Which is an interesting way to grow up. Many people think safety, they think relief …"

[Of Note: This speaks to the "Oprahfication" of a subject matter where Ms. DuVernay or other Agents simply have to discuss trauma, fear, slavery, triumph over adversity, et, al., and that acts as a stand-in for any knowledge, expertise or unique insight into the subject matter.[2]]

[2] Priyamvada Gopal, "The Jason Arday Affair and the 'Oprahfication' of Antiracism, Zeteo UK, August 10, 2026.

(2:30 mark) "Ms. Winfrey: "How did you decide to how to structure it? What was the thinking process? 'I'm going to ask this person, this person, this person? I'm going to tell the story this way.?"

Ms. DuVernay: "Well, that's what documentary filmmaking is, a thinking process because the film wants to be what it wants to be. You can't dictate what the story going to be. You can go in with an area of focus or key points you want to explore, but really, it's an investigation. You have to go where the story is going to take you."

[Of note: Ms. DuVernay prevaricates again, and refused to answer the question. Ms. Winfrey did not press the Publicist for an answer – exactly what an Agent would do. The Publicist came up with the same answer pursuant to mass incarceration as *Shock Exchange* because she copied the Plaintiff's plan and arrangement, and copied Plaintiff's expression with an attempt to supercede *Shock Exchange*. The Publicist – like all Agents – wants to compete with Ralph W. Baker, Jr. and destroy his life's work.]

## Question: Why Care About "Those People" Who Are Incarcerated?

(11:00 mark) Ms. Winfrey: "I think one of things 13th does … is it allows people to be able to answer that question for themselves: **'Why should I care about those people who are incarcerated?"**

Ms. DuVernay: "People say they cry when they watch it …

Ms. Winfrey: Also realizing how much you didn't care before. I've talked to a lot of people who never even thought about it! Never thought about it!

Ms. DuVernay: "Because they don't have to think about it. But we're a forward-thinking people, if we're members of the world in a way that we believe in justice and dignity, then you have to."

[Of note: Ms. Winfrey pressed Ms. DuVernay twice, and she refused to answer. When Ms. DuVernay doesn't convey that she cares about "those people." She only cares about plagiarizing *Shock Exchange* and competing with Ralph W. Baker, Jr. Ms. DuVernay made 13th four years after *Shock Exchange* was published. Her comment about "we're forward-thinking people," borders on lying.]

## HOW WOULD YOU ADVISE OUR NEW ADMINISTRATION

(20:00 mark) Ms. Winfrey: "Following all in-depth research and the interviews, you're now an expert on this. So, how would you advise our new administration?"

Ms. DuVernay: "The challenge is that you have to care about the issue in order to make change. Reform … historically, reform has always led to further repression. Because reform is really people reshaping these mechanisms … to their own end … I stand more with prison abolitionists like Angela Davis, who say we have to abolish the prison has we know it today."

Ms. Winfrey: "What would that look like?"

Ms. DuVernay: "… It means that the way that the system works now and historically has worked is broken … You have to actually look at it, layer by layer, dismantle it and build something new.

Ms. Winfrey: "But isn't that reform?"

Ms. DuVernay: "No. That is reconstruction … That's reconstructing it … Whenever people talk about reform, it's the Band-Aid … we'll let people who are non-violent offenders out." Those are just all temporary Band-Aids …"

[Of Note: Ms. DuVernay again refuses to answer the question. At this point, Ms. Winfrey is simply helping a random publicist fence stolen property. To imply Ms. DuVernay is an "expert" on anything borders on lying.

# EXHIBIT F

Below is an excerpt from the NYU 2015 Study.

I this time of increased political polarization, there is one area where we have a genuine chance at bipartisan cooperation: the over-imprisonment of people who did not commit serious crimes. The drop in violence and crime in America has been an extraordinary national achievement. But plainly, our nation has too many people in prison for too long – we have overshot the mark. With just 5 percent of the world's population, we now have 25 percent of its prison population, and an emerging bipartisan consensus now understands the need to do better.

It has been two decades since there was sustained national attention to criminal justice. By 1994, violent crime had tripled in 30 years. Our communities were under assault. We acted to address a genuine national crisis. But much has changed since then. It's time to take a clear-eyed look at what worked and what didn't, and what produced unintended, long-lasting consequences.

So many of these laws worked well, especially those that put more police on the streets. But too may laws were overly broad instead of appropriately tailored. A very small number of people commit a large percentage of serious crimes – and society gains when that relatively small group is behind bars. But some are in prison who shouldn't be, and others are in for too long, and without a plan to educate, train, or reintegrate them into our communities, we all suffer.

The new approach to many roots and just as many advantages: a desire to save taxpayers money; the resolve to promote rehabilitation not recidivism; an obligation to honor religious values; the necessity to alleviate crushing racial imbalances. All of them strengthen this powerful new movement.

Now it's time to focus on solutions and ask the right questions. Can we do a better job identifying the people who present a serious threat to society? If we shorten prison terms, could we take those savings and … restore the prison education programs that practically eliminate recidivism.? How can we reduce the number of prisoners while still keeping crime down?

As the presidential election approaches, national leaders across the political spectrum should weigh in on this challenge – and in this exciting book of essays from the Brennan Center, many of our nation's political leaders step up and offer answers. This, in itself, is deeply encouraging. After decades in which fear of crime was wielded as a political weapon, so many now understand the need to think hard and offer real reforms, which, if implemented, can bring about change in the right way. To address our prison problem, we need real answers, a real strategy, real leadership – and real action.

So many of these laws worked well, especially those that put more police on the streets. But too many laws were overly broad instead of appropriately tailored. A very small number of people commit a large percentage of serious crimes – and society gains when that relatively small group is behind bars. But some are in prison who shouldn't be, others are in too long, and without a plan to educate, train, and reintegrate them into our communities, we all suffer.

The new approach has many roots and just as many advantages: a desire to save taxpayers money; the resolve to promote rehabilitation not recidivism; an obligation to honor religious values; the necessity to alleviate crushing racial imbalances. All of them strengthen this powerful new movement.

Now it's time to focus on solutions and ask the right questions. Can we do a better job identifying the people who present a serious threat to society? If we shorten prison terms, could we take those savings and … restore the prison education programs that practically eliminate recidivism? How can we reduce the number of prisoners while still keeping crime down?

As the presidential election approaches, national leaders across the political spectrum should weigh in on this challenge – and in this exciting book of essays from the Brennan Center, many of our nation's political leaders step up and offer answers … After decades in which fear of crime was wielded as a political weapon, so many now understand the need to think hard and offer reforms, which if implemented, can bring about this change in the right way. To address our prison problem, we need real answers, a real strategy, real leadership – and real action.

Below is Plaintiff's description of mass incarceration from *Shock Exchange*.

Before quantifying the black tax – unemployment and incarceration – I would expect to see a sharp rise in unemployment starting in the late 1970s and early 1980s as the U.S. manufacturing base began to erode. Black men worked their way into middle class status by traveling to northern cities and California where manufacturing jobs were in abundance. The decline in U.S. manufacturing has hurt the economy overall, but African Americans especially. The inverse of this conclusion is that black men, for whatever reason, have been less successful in transitioning from the manufacturing sectors to the service sectors of the economy.

The above chart illustrates the employment-to-population ratio by sex and race, and measures the proportion of the population employed. This may be a better proxy for the true employment picture. The employment-to-population ratio for African-American men in 2010 was 53.1%, as compared to 65.1%, 67.5% and 68.0% for white, Asian and Hispanic men, respectively. Prior to seeing the data I would have expected a sharp decline in the ratio for black males starting in the

mid-80s as the country's manufacturing base began to erode. However, the figures were relatively unchanged in 1980 (60.4%) and in 2000 (60.2%), yet fell precipitously by 2010. It reiterates the adage that "when America catches cold, black America catches pneumonia."

There was no noticeable difference in the employment-population ratio amongst women from different racial groups. Overall, the employment-to-population ratio for all women has increased since the early 1970s as more women have entered the workplace. Yet the differential in the ratio between black women and black men is the smallest vis-à-vis other ethnic groups. For instance, in 2010 the differential in the ratio between black men and black women (1.6%) was much less than that of whites (11.1%), Asians (14.5%) and Hispanics (10.4%). The differential may be symptomatic of a U.S. service economy more comfortable with black women in the workplace.

The rate of incarceration also reflects the additional costs of being black in America. One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration. The abnormally high rate for African Americans is a known truth in the black community. After doing some research, I found that the U.S. has the highest incarceration rate of any country in the "free world."

The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. The incarceration rate is a function of admissions, times length of stay. Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. Critics have also blamed the so-called "war on drugs" for the abnormally high incarceration rate of African-American males (4,797 per 100,000 U.S. residents) as compared to that of white males (708 per 100,000 U.S. residents). Even more damning is the fact that a high percentage of white males are incarcerated in local jails with shorter stays, causing less of a disruption for their families. In contrast, the majority of black males are jailed in federal prison with longer stays – a phenomenon that has practically ravaged the black family. Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for low-level drug transactions and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking.

Senior year, Dr. Hendley presented us with a case involving a town with an exploding population of dogs. The town manager had a dilemma – to control the population by either spading male dogs or female dogs. The logical answer would be to spade the male dogs, since they were the "obvious" culprits. However, if the ratio was 10 female dogs per 10 male dogs and he spaded as many as six male dogs, the remaining four could still service 10 female dogs. Instead, the town manager spaded the female dogs and the dog population decreased proportionately. To that point, attempting to "spade" drug dealers does not have the same impact on the drug trade as spading the user through

incarceration, treatment, or education. In no way am I attempting to dissect the criminal justice system, but simply presenting data that supports what Grandma always knew – if you are black in America, odds are you are going to the pen.

P.52 - P.54

Below is a summary of the two analyses side-by-side.

| NYU 2015 Study | *Shock Exchange* |
|---|---|
| **(I)** With just 5 percent of the world's population, we now have 25 percent of its prison population, and an emerging bipartisan consensus now understands we need to do better. [Bill Clinton]<br><br>The U.S. has 5 percent of the world's population, but 25 of its prison population. [Cory Booker]<br><br>The U.S. has 5 percent of the world's population, but 25 percent of its prison population. [Hillary Rodham Clinton]<br><br>The U.S. has 5 percent of the world's population, but 25 percent of its prison population. [Inimai Chettiar]<br><br>One in 100 Americans is currently behind bars. Our nations prisons include one-third of the planet's incarcerated women. [Introduction]<br><br>We have five times as many prisoners as any other advanced democracy. [Mark A.R. Kleinman, UCLA]<br><br>In 1972, there were 300,000 people in jails and prisons. Today, there are 2.3 million. The U.S. has the highest rate of incarceration in the world. [Bryan Stevenson] | U.S. has higher incarceration rate of any country in the free world.<br><br>*Shock Exchange* included a chart of the U.S. at 743 per 100,000 residents and its closest-to-scale competitors, Rwanda (595), Russia (568), Georgia (547) and U.S. Virgin Isles (549). |
| **(II)** Over the last 40 years the U.S. prison population has grown 500 percent. [Kamala Harris, in her official capacity as AG of California] | U.S. incarceration rate increased 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. |

| | |
|---|---|
| To get back to our historical level of incarceration, we would need to reduce the prisoner headcount by 80 percent. [Mark A.R. Kleinman, UCLA]<br><br>Getting back to a civilized level of incarceration while continuing to push crime rates down is out of reach using current policy tools. [Mark A.R. Kleinman, UCLA]<br><br>Incarceration increased six-fold since the '70s, resulting from policymakers' response to violent crime during the '70s. [Marc Levin]<br><br>The growth in incarceration rates in the United States over the past 40 years is historically unprecedented and internationally unique. [Jeremy Travis, President John Jay College of Criminal Justice]<br><br>In 1984, Japan had a population half the size as ours and was incarcerating 50,000 prisoners, compared to 580,000 in the U.S. Japan's total prison population has now increased to 67,000, while ours has quadrupled to 2.3 million. [James Webb] | |
| **(III)** One-third of black men face the prospect of prison during their lifetimes, with devastating consequences for their families. [Hillary Clinton]<br><br>I supported as senator to reduce the unjust federal disparity between crack and powder cocaine law. [Hillary Clinton]<br><br>Likelihood that African American high school dropouts born between 1945 and 1949 serving at least a year in prison before age 34 was 14.7%. For those born a generation later … the risk of imprisonment is 68%. [Jeremy Travis, John Jay College]<br><br>African Americans who make up 13% of the U.S. population – accounted for 30% of those arrested for drug charges, and 38% of all drug offenders sentenced to prison. [James Webb] | Critics blamed the war on drugs for abnormally high incarceration rates for African Americans (4,797 per 100,000) versus white males (708 per 100,000). |

| | |
|---|---|
| **(IV)** How can we reduce the number of prisoners while keeping crime down? The study later cites 13 states already doing this. [Bill Clinton]<br><br>Locking up ever-larger groups of people does not lead to fewer crimes. [Introduction]<br><br>Encouraged by reforms 15 states (Texas, Georgia, New Jersey, California, Virginia, et al.) to reduce incarceration and crime rates. [Cory Booker]<br><br>In 2012, we expanded the mandatory drug court and treatment program to more counties … Drug addiction is a disease. [Chris Christie]<br><br>Sexual predators, violent offenders, and dangerous criminals need to be locked up, but we must provide treatment options and real rehabilitation to those who struggle with drug abuse and addiction. [Mike Huckabee]<br><br>One in five of those incarcerated suffer from severe mental problems that could be treated elsewhere. [David Keene]<br><br>In 2005 Texas shifted from targeting nonviolent offenders. In 2007 incarceration dropped 12% and crime fell 25%. [Marc Levin]<br><br>Texas Judge John Creuzot suggested many low-risk, nonviolent drug offenders should not be incarcerated. The approached allowed Texas to lower incarceration, and reduce crime. [Texas Governor Rick Perry]<br><br>More than 50% of prison and jail inmates in the U.S. have a diagnosed mental illness, a rate nearly five times greater than that of the general population. [Bryan Stevenson]<br><br>We now know that we can reduce crime and reduce incarceration. States like Texas, New | Nor will it (criminalization) ever reduce drug trafficking … Attempting to "spay" drug dealers docs not have the same impact on the drug trade as spaying the user through incarceration, treatment, or education. |

| | |
|---|---|
| York, Georgia and California have changed their laws to do just that. For the first time in 40 years, crime and incarceration fell nationwide. [Inimai Chettiar] | |
| **(V)** The government proposed Smarter Sentencing Act of 2015 to reduce mandatory minimums for non-violent drug offenders – without any attribution to Ralph W. Baker, Jr. or *Shock Exchange*. [Senator Cory Booker]<br><br>Too often we let violent criminals slip through the cracks while ensnaring non-violent – and sometimes innocent – people behind bars … In 2014 I introduced legislation that created non-monetary alternatives for low-level offenders while they wait for trial. [Chris Christie]<br><br>Co-sponsored the The Smarter Sentencing Act of 2015, which lowers minimum sentences, and gives judges flexibility in determining the appropriate sentences based on the unique facts and evidence of the case. [Senator Ted Cruz]<br><br>In response to the 2011 U.S. Supreme Court *Brown v. Plata* decision, California passed the Criminal Justice Realignment Act of 2011 ("Realignment"), which shifted incarceration and supervision of low-level, non-violent offenders from state prisons to California's 58 counties. [Kamala Harris, in her official capacity as AG of California]<br><br>The National Academy of Sciences published a report in 2014 that assessed the causes of high rates of incarceration. We recommended reforms to mandatory minimum, long sentences, and drug enforcement. [Jeremy Travis, John Jay College]<br><br>Mandatory minimum, "three strikes you're out," and "truth-in-sentencing" regimes set overly-punitive sentences for defendants. [Inimai Chettiar] | Majority of black males jailed in federal prison with longer stays – a phenomenon that has ravaged the black family.<br><br>Increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. The policy has eradicated entire families and has threatened to eliminate the African American race as we know it. In September 2011, The Wall Street Journal Was so "concerned" that it had a forum where experts advised African American women to seek out white males for marriage partners. P.80<br><br>About 50% of the U.S. prison population represents non-violent crimes. |

| | |
|---|---|
| **(VI)** If we shorten prison terms, could we take those savings and, … restore the prison education programs …? [Bill Clinton]<br><br>I helped institutionalize the idea, of the 1994 Crime Bill, to have community policing. [Vice President Joe Biden]<br><br>According to the Pew Center, the average prison stay increased 36% since 1990 … Sentence lengths are often wildly disproportionate to the crimes committed. [Inimai Chettiar] | Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. |
| **(VII)** By 1994, violent crime had tripled in 30 years. [Bill Clinton]<br><br>A small number of people commit a large percentage of serious crimes …[Bill Clinton]<br><br>Can we do a better job of identifying the people who present a serious threat to society? [Bill Clinton]<br><br>[Incarceration] is driven by the drug war … We are not focused on locking up violent, dangerous felons … nearly one-third of federal prisoners have little to no prior criminal history. [Cory Booker]<br><br>Violent crime has plunged in recent decades … prisons … continue to grow irrespective of crime rates. [Cory Booker]<br><br>In the 1970s, when crime and violence were escalating, some liberal judges blamed crime on societal shortcomings … Politicians reacted by demanding harsher and longer sentences, and enacting mandatory minimums and "three strikes you're out" laws. [David Keene]<br><br>The department's philosophy to reduce violent crime has paid off tremendously. [Cathy Lanier, Chief of Police, D.C. Metro Police Dept.] | Instead of reducing the level of violent crime, the war on drugs resulted in frequent number of arrests for low-level drug transactions and non-violent offenders.<br><br>Reagan's so-called war on drugs turned out to be nothing more than a war on African Americans. The increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world.<br><br>The policy has eradicated entire families and has threatened to eliminate the African American race as we know it. In September 2011, The Wall Street Journal Was so "concerned" that it had a forum where experts advised African American women to seek out white males for marriage partners. P.80 |

| | |
|---|---|
| War on drugs is principally responsible for distrust of the police. The criminal justice system traps nonviolent offenders, particular African-American men. [Senator Rand Paul]<br><br>Mass incarceration has been fueled by misguided drug policy and excessive sentencing. [Bryan Stevenson]<br><br>In 1980, we had 41,000 drug offenders in prison; today we have almost 300,000. This is an increase of over 600% and a significant proportion of this population is incarcerated for possession or nonviolent offenses stemming from drug addition and related behavioral issues. [James Webb]<br><br>While heavily focused on non-violent offenders, law enforcement has been distracted from pursuing more serious violent crimes. [James Webb]<br><br>Half of state prisoners are behind bars for nonviolent crimes; half of federal prisoners are locked up for drug crimes … And 6 out of 10 local jail inmates await trial, though research suggests that as many as 80% could be released with little or no threat to public safety. All told, as many as 1.07 million people may be behind bars without a public safety rationale. [Inimai Chettiar] | |
| **(VIII)** Sixty percent of the 600,000 prisoners who reenter society each year face long-term unemployment. By some estimates, mass incarceration is responsible for as much as 20 percent of the United States poverty rate. [Introduction]<br><br>Incarcerating people increases their propensity to commit future crimes. [Introduction]<br><br>[Incarceration] increases barriers to obtaining a job … This is why state and federal prisons have become revolving doors, with two of every three former offenders getting | One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration.<br><br>Before quantifying the **black tax – unemployment and incarceration** … |

| | |
|---|---|
| rearrested within three years of release. [Cory Booker]<br><br>Having a criminal record makes it more difficult to get a job. [Cornel Brooks, NAACP, citing Devah Pager and Bruce Western]<br><br>His [former incarcerated] chances of finding work in a hurry are slim. If he is not working, he has much free time to get into trouble, and no legal way of supporting himself. This formula for failure leaves us stuck with mass incarceration. [Mark A.R. Kleinman, UCLA] | |

Plaintiff's conclusion on mass incarceration from *Shock Exchange* is inspired by a case study from Dr. Bill Hendley's advanced economics class at Hampden-Sydney College in 1989. Plaintiff's expression of mass incarceration is written from an economic perspective. By simply cutting the drug supply – removing drugs off the street or locking up drug dealers – authorities will not reduce the flow of drugs. Regulators must address the demand side. There was nothing like it in the marketplace when Plaintiff published *Shock Exchange*.

Plaintiff triangulates around various metrics – U.S. incarceration rates and their growth over time, U.S. incarceration rate relative to that of the rest of the world, Black male incarceration rate compared to that of white males, and non-violent criminals as a percentage of the U.S. prison population – to determine "mass incarceration" materializes by 2011. Plaintiff's unique expression – the "Baker Mass Incarceration Index" – (i) proves the U.S. incarceration rate is divorced from violent crime and (ii) determines when "mass incarceration" is triggered and when it is not. The 2015 Study practically acknowledges that its progenitors are beginning to understand mass incarceration and the Baker Mass Incarceration Index only after Shock Exchange was published:

> Our nation is beginning to understand certain fundamental truths. Mass incarceration exists. It is not needed to keep crime down.[1]

Plaintiff's unique expression proves the incarceration rate is divorced from violent crime. The index is part science and art, and Ralph W. Baker, Jr. is the best person to interpret it. Ta-Nehisi Coates admitted *Shock Exchange's* expression of mass incarceration and its suggested remedy were unique, and described how he plagiarized it for *The Black Family In The Age Of Mass Incarceration* ("2015 Essay"). *Baker v. Hannah-Jones*, No. 25-300, DktEntry: 100-1, Appendix: GGG. In an April 2015 panel discussion at Duke University, Coates describes how the popular narrative on mass incarceration is that it started in 1970:

[1] "Solutions: American Leaders Speak Out On Criminal Justice, Brennan Center For Justice, April 27, 2015.

> The mass incarceration life story is that in 1970, we went a little crazy and started jailing a bunch of people. We responded to real crime trends. We just kind of went overboard. Suddenly, we looked up and we had more incarcerated people than any nation on Earth. 800,000 more people than are incarcerated in China, a country with nearly a million more people. Don't know what happened. (Around the 39:30 mark).[2]

In a March 2015 discussion at Craig Newmark School of Journalism, Coates was ecstatic about his piece for mass incarceration:

> I'm working on this thing about mass incarceration … The Atlantic likes to put its foot down on certain issues and say 'Okay. We're going to try and do something big about this. We're going to try to make some sort of statement …' You have to, you know do something different. One of the things I'm working on I'm working on this thing about mass incarceration. That's like the creative sort of challenge. 'Everybody's talking about mass incarceration. What do you have to say that's different?
>
> Oh god, I can't tell you what's different. I'm sorry … At that moment when you realize that, 'Ohh this is being talked about in every place in the world and every outlet and here is the thing … Here is the thing that folks are missing …' Here is the thing that everyone is underestimating. And frankly, here is the reason why it probably won't get fixed.[3]

I: *Shock Exchange* asserts the US is the most-incarcerated country in the world, which Bill Clinton, Mrs. Hillary Rodham Clinton, Senator Cory Booker, Bryan Stevenson and several others repeat. The 2015 Study repeats this narrative over 10 times.

II: *Shock Exchange* asserts the growth in the U.S. incarceration rate is untenable, which defendants repeat. Mark A.R. Kleinman implies that we need to reduce the prisoner headcount to "historical levels" or "civilized levels," which are likely at levels implicit in the Baker Mass Incarceration Index.

III: There is a disparity in incarceration rates between black men and whites, which defendants repeat.

IV: *Shock Exchange* asserts treatment – rather than incarceration – would be a better solution to stopping the drug trade and/or crime, which defendants repeat over 10 times.

*Shock Exchange* asserts locking up drug dealers does not stop drug dealing. One could release non-violent criminals and it would not cause violent crime to rise or cause a greater threat to society. Bill Clinton asks how to reduce prisoners while keeping crime down? This carefully imitates the major question *Shock Exchange* answers. The 2015 Study asserts locking up people does not stop crime, carefully imitating *Shock Exchange*. Coates repeated the same narrative in the 2015 Essay – a pattern from these Agents. *Baker v. Coates*, No. 24-6839.

---

2 "Reparation: A Roundtable Discussion with Ta-Nehisi Coates," Scholars and Publics, YouTube, April 13, 2015.

3 "Ta-Nehisi Coates in Conversation with A.O. Scott and Anna Holmes," Craig Newmark Graduate School of Journalism, YouTube, March 20, 2015. (Around the 45:00 to 47:00 mark).

Senator Cory Booker implies this narrative was derived – not from *Shock Exchange* – but from several states that reduced crime rates and incarceration. Of note, is that Senator Booker nor the study gives the racial make-up of those prisoners released. It strains credulity to believe that Senator Booker and NYU visited Texas, Virginia, or Alaska before they realized Kemba Smith should not have been given 24.5 years for having a baby by a drug dealer. The fact pattern suggests they copied Plaintiff's expression and used these states as a false flag.

New Jersey Governor Chris Christie asserts drug use is a disease and users deserve treatment, not incarceration. This carefully imitates *Shock Exchange*.

V: *Shock Exchange* asserts (i) the majority of black males are jailed in federal prison with longer stays, which has ravaged the black family, (ii) mandatory minimum sentences are driving up the length of stay, and (iii) about half of the U.S. prison population is non-violent offenders, implying we are giving non-violent offenders a "length of stay" as if they are violent offenders. Defenders repeat that mandatory minimums are too punitive and need to be reformed, and the need to reduce the number of non-violent offenders in the prison system.

VI: *Shock Exchange* asserts how the growth in the prison population is driven by "length of stay" more so than the number of crimes committed, which defendants repeat.

VII: *Shock Exchange* asserts Reagan's war on drugs has resulted in frequent arrests of non-violent offenders without reducing violent crime. Defendants repeat this as if they had just discovered fire. *Shock Exchange* explains how mass incarceration was triggered by Reagan's war on drugs. Bill Clinton attaches mass incarceration to the rise in crime that began in the 1960s – an attempt to create the appearance of dissimilarity. *Steinberg v. Columbia Pictures Industries*, 663 Supp. 706 (S.D.N.Y. 1987). Here, Bill Clinton implies his 1994 crime bill was meant to tamp down a rise in violent crime. That's not how Plaintiff remembers it. Plaintiff remembers Bill Clinton wanting to appear "tough on crime" – resulting in being tough on blacks – to pacify Newt Gingrich and his republican revolution.

13th also attempts to attach mass incarceration with Nixon and the '60s – a clear pattern from these Agents. Complaint: Exhibit D. *Shock Exchange* is laser focused on how incarceration should be driven by violent crime. Bill Clinton hones in on serious crimes, carefully imitating *Shock Exchange*. Clinton's question about doing a better job of identifying serious threats to society is an insult to Blacks; here Clinton is practically playing in Blacks' faces. Plaintiff recalls this crazy story about Kemba Smith, who had just given birth to a newborn, was given a 24.5 year sentence under mandatory sentencing laws in 1994. Smith was romantically involved with a drug dealer, yet she had never sold a drug.[4] Bill Clinton commuted her sentence, yet it illustrated how mandatory sentences could lead to perverse outcomes. Cory Booker repeats the narrative

[4] "Testimony of Kemba Smith," Federal Sentencing Reporter, VOL. 18, NO. 4, April 2006.

that violent crime has plunged and prisoners have grown irrespective of crime. Coates repeated this narrative in the 2015 Essay. *Baker v. Coates*, No. 24-6839.

VIII: *Shock Exchange* explains the "black tax" – unemployment and incarceration – the cost of being black in America. Defendants describe the link between unemployment and incarceration, and how it disproportionately impacts blacks. The NAACP's Cornel Brooks cites Devah Pager (former Harvard sociology professor) and Bruce Western (Harvard, Columbia). In the 2015 Essay Coates cites Devah Pager and Bruce Western, illustrating a pattern. *Baker v. Coates*, No. 24-6839. In February 2024 Plaintiff previously divulged to the Second Circuit Court of Appeals ("Second Circuit") that Coates and Bruce Western had created an ecosystem from *Shock Exchange*.

# EXHIBIT G

Below is an excerpt from the NYU 2019 Study.

How can we end mass incarceration in America? By now, the debate is over: our nation grossly over-incarcerates its people. The United States has less than five percent of the world's population and nearly one-third of its prisoners. Astonishingly, if the 2.3 million incarcerated Americans were a state, it would be more populous than 16 other states. All told, one in three people in the United States has some type of criminal record. No other industrialized country comes close. This system grew over decades in plain sight, and only a broad and bold national response will end it.

Mass incarceration has crushing consequences: racial, social, and economic. We spend around $270 billion per year on our criminal justice system. In California it costs more than $75,000 per year to house each prisoner – more than it would cost to send them to Harvard. Mass incarceration exacerbates poverty and inequality, serving as an economic ball and chain that holds back millions, making it harder to find a job, access public benefits, and reintegrate into the community.

Most disturbingly, the system profoundly discriminates against people of color at every juncture. African Americans are more likely to be stopped by police, arrested, detained before trial, and given harsher penalties than whites. As a result, they are imprisoned at more than five times the rate of whites. In some states, this disparity is more than ten to one. For too long, we have tolerated this civil rights crisis.

And mass incarceration simply is not necessary to keep our communities safe. Today, crime and murder rates remain near record lows nationwide. Our cities – many which suffered under a wave of violent crime in the early 1990s – are largely safter than they have been in years. No one is entirely sure what cause the steady crime decline of the past two and a half decades. But it is clear that it owes litter to harsh policies and the resulting in incarceration. In fact, 27 states have reduced both imprisonment and crime together from 2006 to 2014. It is increasingly clear that reforms and safety go together.

For all these reasons, the politics of crime and punishment have changed fundamentally, in ways hard to imagine in an earlier era. Today, polls show widespread support for a less punitive approach. Once incendiary moves such as marijuana legalization or an end to the death penalty are finding political success and rising popularity …

At long last, a vibrant public conversation is underway. A 2015 Brenan Center publication, *Solutions : American Leaders Speak Out on Criminal Justice*, offered proposals from a bipartisan array of elected officials and advocates and helped move criminal justice reform to the center of the 2016 election. Since then, the nationwide consensus in favor of a new direction has only hardened … Last year, Congress took a step forward in overwhelmingly passing the bipartisan First Step

> Act. It shortened some of the most extreme federal drug sentences and expanded programming for incarcerated people. The First Step Act … will not fix our deeply broken system. But with both Democrats and Republicans committed to reform, it represents a new baseline …
>
> Over the past few years, the Brennan Center has outlined some key steps toward ending mass incarceration … if the federal government and every state ended imprisonment for lower-level crimes and reduced over long sentences for other crimes, we could safely cut the nation's prison population by 40 percent. Second, if Congress passed a "reverse" of the 1994 Crime Bill to incentivize states through federal grants to decarcerate rather than incarcerate, it could spur nationwide change.[1]

Below is Plaintiff's description of mass incarceration from *Shock Exchange*.

> Before quantifying the black tax – unemployment and incarceration – I would expect to see a sharp rise in unemployment starting in the late 1970s and early 1980s as the U.S. manufacturing base began to erode. Black men worked their way into middle class status by traveling to northern cities and California where manufacturing jobs were in abundance. The decline in U.S. manufacturing has hurt the economy overall, but African Americans especially. The inverse of this conclusion is that black men, for whatever reason, have been less successful in transitioning from the manufacturing sectors to the service sectors of the economy.
>
> The above chart illustrates the employment-to-population ratio by sex and race, and measures the proportion of the population employed. This may be a better proxy for the true employment picture. The employment-to-population ratio for African-American men in 2010 was 53.1%, as compared to 65.1%, 67.5% and 68.0% for white, Asian and Hispanic men, respectively. Prior to seeing the data I would have expected a sharp decline in the ratio for black males starting in the mid-80s as the country's manufacturing base began to erode. However, the figures were relatively unchanged in 1980 (60.4%) and in 2000 (60.2%), yet fell precipitously by 2010. It reiterates the adage that "when America catches cold, black America catches pneumonia."
>
> There was no noticeable difference in the employment-population ratio amongst women from different racial groups. Overall, the employment-to-population ratio for all women has increased since the early 1970s as more women have entered

[1] Ending Mass Incarceration: Ideas From Today's Leaders, Brennan Center For Justice at New York University School of Law, May 16, 2019.

the workplace. Yet the differential in the ratio between black women and black men is the smallest vis-à-vis other ethnic groups. For instance, in 2010 the differential in the ratio between black men and black women (1.6%) was much less than that of whites (11.1%), Asians (14.5%) and Hispanics (10.4%). The differential may be symptomatic of a U.S. service economy more comfortable with black women in the workplace.

The rate of incarceration also reflects the additional costs of being black in America. One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration. The abnormally high rate for African Americans is a known truth in the black community. After doing some research, I found that the U.S. has the highest incarceration rate of any country in the "free world."

The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. The incarceration rate is a function of admissions, times length of stay. Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. Critics have also blamed the so-called "war on drugs" for the abnormally high incarceration rate of African-American males (4,797 per 100,000 U.S. residents) as compared to that of white males (708 per 100,000 U.S. residents). Even more damning is the fact that a high percentage of white males are incarcerated in local jails with shorter stays, causing less of a disruption for their families. In contrast, the majority of black males are jailed in federal prison with longer stays – a phenomenon that has practically ravaged the black family. Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for low-level drug transactions and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking.

Senior year, Dr. Hendley presented us with a case involving a town with an exploding population of dogs. The town manager had a dilemma – to control the population by either spading male dogs or female dogs. The logical answer would be to spade the male dogs, since they were the "obvious" culprits. However, if the ratio was 10 female dogs per 10 male dogs and he spaded as many as six male dogs, the remaining four could still service 10 female dogs. Instead, the town manager spaded the female dogs and the dog population decreased proportionately. To that point, attempting to "spade" drug dealers does not have the same impact on the drug trade as spading the user through incarceration, treatment, or education. In no way am I attempting to dissect the criminal justice system, but simply presenting data that supports what Grandma always knew – if you are black in America, odds are you are going to the pen.

P.52 - P.54

Below is a summary of the two analyses side-by-side.

| **NYU 2019 Study** | ***Shock Exchange*** |
|---|---|
| **(I)** U.S. accounts for less than 5 percent of the world's inhabitants – and about 25 percent of incarcerated inhabitants. [Michael Waldman]<br><br>Despite being home to 5 percent of the world's population, the U.S. houses 25 percent of the world's prison population. [Senator Cory Booker]<br><br>The United States have five percent of the world's population, but its prison system holds nearly 25 percent of the world's prison population. [Jared Kushner, Senior Advisor to President Donald J. Trump]<br><br>They [incarcerated] are part of the world's largest prison population. [Beto O'Rourke] | U.S. has higher incarceration rate of any country in the free world.<br><br>*Shock Exchange* included a chart of the U.S. at 743 per 100,000 residents and its closest-to-scale competitors, Rwanda (595), Russia (568), Georgia (547) and U.S. Virgin Isles (549). |
| **(II)** Between 1980 and 2015, the number of people incarcerated increased from 500,000 to more than 2.2 million. [Derrick Johnson, NAACP]<br><br>Since 1980, our federal prison population has exploded by almost 800 percent, largely a direct result of the War on Drugs – a government policy that mandated longer, more punitive sentences, often for non-violent criminals. [Senator Cory Booker]<br><br>If you look at the 1970s, America is basically where the rest of the industrialized world is in terms of mass incarceration. Fast forward to 2015 … we incarcerate more than 600 people per 100,000 adults. For blacks the rate is five times as high. [Ta-Nehisi Coates]<br><br>There are approximately 2.2 million people in American prisons and jails – a nearly 500 percent increase in 40 years.<br><br>We are just starting to reckon with and undo the legacy of "tough on crime" 1980s and 1990s. Imprisonment rates in the U.S. have increased a dramatic 700 percent since 1970 | U.S. incarceration rate increased 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. |

| | |
|---|---|
| due to draconian sentencing policies. [Senator Bernie Sanders] | |
| **(III)** They [people of color] are imprisoned at more than five times the rate of whites. [Michael Waldman]<br><br>In December 2018, President Trump signed the bipartisan First Step Act into law. [Derrick Johnson, NAACP]<br><br>The new law – the First Step Act – was the most sweeping overhaul of the criminal justice system in a decade and included a provision making retroactive a 2010 law that reduced the egregious discrepancies between sentences for crack cocaine and powder cocaine. [Senator Cory Booker]<br><br>Congress passed the First Step Act , a bipartisan prison and sentencing reform bill. [Inimai Chettiar]<br><br>There is no real difference between drug use or dealing between blacks and whites – blacks are 3.6 times more likely to get arrested for selling drugs. [Senator Cory Booker] Predominantly black and brown communities experience a disproportionate police presence, and the result is a higher-than-average rate of arrest.<br><br>African Americans are nearly four times zs likely as whites to be arrested for drug offenses and six times as likely to be imprisoned. [Inimai Chettiar]<br><br>African Americans make up 40 percent of the incarcerated population – nearly one million people – while constituting only 13 percent of U.S. residents. [Inimai Chettiar]<br><br>Over-policing of some communities contributes to our country's outsized and racially disparate arrested and incarcerated population. [Vanita Gupta] | Critics blamed thc war on drugs for abnormally high incarceration rates for African Americans (4,797 per 100,000) versus white males (708 per 100,000). |

| | |
|---|---|
| The First Step Act is just the beginning. [Holly Harris]<br><br>Prosecutors should shift success measures to reducing unnecessary imprisonment, reducing racial disparities, and lowering recidivism rates. [Senator Kamal Harris]<br><br>More than 60 percent of the incarcerated population are people of color … Black men are six time more likely than white men to be incarcerated. [Sherrilyn Ifill]<br><br>It is naïve to believe that legislation like the First Step Act, which was signed by President Trump in 2018, will solve the problem of mass incarceration. [Sherrilyn Ifill]<br><br>African Americans represent just under four percent of the state's (Iowa) inhabitants but 25 percent of its prison population. [Van Jones]<br><br>African Americans are incarcerated at nearly six times the rate of whites. [Van Jones]<br><br>We took an important first step with the passage of the … First Step Act, bringing important reforms to federal prisons and making needed changes to our sentencing laws. [Senator Amy Klobuchar]<br><br>The administration worked closely with Republicans and Democrats … to pass the First Step Act, which revitalizes our criminal justice system to be tough on crime but also be smart on crime. [Jared Kushner, Senior Advisor to President Donald J. Trump]<br><br>African Americans account for 12 percent of adults in the U.S., but make up 33 percent of the incarcerated population. [Senator Elizabeth Warren] | |
| **(IV)** These laws have wasted precious resources by locking up people for low-level crimes instead of focusing on rehabilitation, | Nor will it (criminalization) ever reduce drug trafficking … Attempting to "spay" drug dealers does not have the same impact on the |

| | |
|---|---|
| and have been overwhelmingly disproportionately applied to black, brown and lower-income Americans. [Senator Cory Booker]<br><br>One out of every four people currently in prison is incarcerated for lower-level crime … alternatives to prison like treatment, community service, or probation would work better to rehabilitate and reduce recidivism. [Inimai Chettiar]<br><br>We currently use prisons as warehouses for people who need help. Nearly 80 percent of those in prison suffer from mental health issues, substance abuse issues, or both. [Inimai Chettiar]<br><br>We have to figure out why we look at certain populations of people, see mental health issues, chemical dependency issues, employment issues, or lack of education, and decide that the endpoint for them should be prison. [Ta-Nehisi Coates]<br><br>40 percent of those incarcerated are Black, even though Black people make up 13 percent of the U.S. population. Black people are five times more likely to be incarcerated at some time in their lives than their white counterparts. [Alicia Garza]<br><br>Research has shown that sentences such as treatment and probation work better than incarceration to rehabilitate and reduce recidivism for non-violent offenders. [Kirsten Gilibrand]<br><br>If someone is suffering from drug addiction and charged with possession for the first time, they should got to a drug treatment program – not prison – for counseling and support. People suffering from mental health should go to mental health courts. [Senator Kristen Gilibrand] | drug trade as spaying the user through incarceration, treatment, or education. |

| | |
|---|---|
| One of the most important lessons I learned as Hennepin County Attorney is that you can't break the cycle of drug abuse and destructive behavior just by locking a person up. [Senator Amy Klobuchar]<br><br>Even by conversative estimates, at least 40 percent of the prison population could be released without compromising public safety. [Beto O'Rourke] | |
| **(V)** Black men are 75 percent more likely than similarly situated white men to be charged with federal offenses that carry harsh mandatory minimum sentences. [Senator Cory Booker]<br><br>If the federal government and every state ended imprisonment for lower-level crimes and reduced overly long sentences for other crimes, we could safely cut the nation's prison population by 40 percent. [Michael Waldman]<br><br>Ending imprisonment for lower-level crimes and reducing overly long sentences for other crimes – would safely cut the nation's prison population by 40 percent. [Inimai Chettiar]<br><br>Of the two million people currently incarcerated, more than 450,000 are in jail awaiting trial. They have never been convicted of a crime … Such a plan [to decarcerate] should include sentencing reform and abolishing mandatory minimums. [Alicia Garza]<br><br>We need to use alternatives to prison for low-level, non-violent criminals …25 percent of prisoners nationwide are incarcerated for lower-level, nonviolent offenses … Instituting alternatives to prison for low-level, non-violent offenses would result in thousands fewer federal prisoners without compromising public safety. [Senator Kirsten Gilibrand] | Majority of black males jailed in federal prison with longer stays – a phenomenon that has ravaged the black family.<br><br>Increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. The policy has eradicated entire families and has threatened to eliminate the African American race as we know it. In September 2011, The Wall Street Journal Was so "concerned" that it had a forum where experts advised African American women to seek out white males for marriage partners. P.80<br><br>About 50% of the U.S. prison population represents non-violent crimes. |

| | |
|---|---|
| Ending the use of prison for lower-level crimes and shortening sentences for others … could reduce the number of people in prison by 40 percent. [Van Jones]<br><br>The prison population is comprised disproportionately of people of color; built on prosecuting some communities for nonviolent drug offenses and not others, even though people of all races use illegal drugs at roughly the same rate. [Beto O'Rourke]<br><br>Research shows that nearly 40 percent of our prison population could safely be released by providing alternatives and treatment for people convicted of lower-level crimes and reducing extreme sentences. [Topeka K. Sam] | |
| **(VI)** If Congress passed a "reverse" of the 1994 Crime Bill to incentive states through federal grants to decarcerate rather than incarcerate, it could spur nationwide change. [Michael Waldman]<br><br>Last year, Congress took a step forward by overwhelmingly passing the bipartisan First Step Act. It shortened some of the most extreme federal drug sentences and expanded programming for incarcerated people. [Michael Waldman]<br><br>The "lock them up and throw away the key" ideology has left people spending far too much of their lives incarcerated for crimes far less serious than their sentences suggest. [Senator Sherrod Brown]<br><br>The 1994 Crime Bill incentivized states to lengthen prison sentences and build prisons … To unwind these incentives, Congress can pass a "reverse" of the 1994 Crime Bill. [Inimai Chettiar]<br><br>We've turned away from the lock-them-up-and-throw-away-the-key policies of the 1980s | Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. |

| | |
|---|---|
| and 1990s, specifically the 1994 Crime Bill. [Holly Harris]<br><br>The 1994 Crime Bill … disproportionately impacted communities for color and accelerated mass incarceration. [Jared Kushner, Senior Advisor to President Donald J. Trump] | |
| **(VII)** Our **so-called** justice system has often functioned as a purveyor of mass injustice by consistently perpetuating racial inequities and corroding the civil liberties of communities of color. [Derrick Johnson, NAACP]<br><br>The War on Drugs – a government policy that mandated longer, more punitive sentences, often for non-violent criminals. [Senator Cory Booker]<br><br>The fraught relationship is partly due to the historical role that law enforcement has played in enforcing and perpetuating injustice: slavery, the Black Codes, lynchings, Jim Crow segregation, and the war on drugs. [Vanita Gupta]<br>I grew up in Worchester, Massachusetts during the advent of the War on Drugs in the 1970s and 1980s. [ Mark Holden]<br><br>We must end a failed war on drugs that has long been a war on people. [Beto O'Rourke]<br><br>Since we began the so-called War on Drugs, imprisonment rates in the U.S. have skyrocketed, exacerbated in part by sentencing laws aimed at locking up men of color. [Senator Bernie Sanders] | Instead of reducing the level of violent crime, the war on drugs resulted in frequent number of arrests for low-level drug transactions and non-violent offenders.<br><br>Reagan's **so-called** war on drugs turned out to be nothing more than a war on African Americans. The increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world.<br><br>The policy has eradicated entire families and has threatened to eliminate the African American race as we know it. In September 2011, The Wall Street Journal Was so "concerned" that it had a forum where experts advised African American women to seek out white males for marriage partners. P.80 |
| **(VIII)** Mass incarceration exacerbates poverty and inequality … making it harder to find a job, access public benefits, and reintegrate into the community. [Michael Waldman]<br><br>Black Americans are more likely to have to endure the 40,000 or so collateral consequences that come with a criminal | One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration.<br><br>Before quantifying the **black tax – unemployment and incarceration** … |

| | |
|---|---|
| record, including barriers to public services, education and employment. [Senator Cory Booker]<br><br>Decades of overincarceration have impoverished communities of color, reinforcing the intergenerational wealth gap and creating a destructive cycle of incarceration and poverty. [Inimai Chettiar]<br><br>Once saddled with a criminal record, these people then face more than 40,000 collateral consequences preventing them from obtaining jobs, housing, education, licenses, loans, employment and voting rights. [Mark Holden]<br><br>Black unemployment has always been high compared to the rest of the country but after taking into account incarceration, the unemployment rate for black men is triple the rate of white men. [Van Jones] | |

I: *Shock Exchange* asserts the US is the most-incarcerated country in the world, which defendants and the 2019 Study repeats.

II: *Shock Exchange* asserts the growth in the U.S. incarceration rate is untenable, which defendants and the 2019 Study repeats at least five times.

III: *Shock Exchange* asserts There is a disparity in incarceration rates between black men and whites, which defendants and the 2019 Study repeat. Plaintiff understands the First Step Act was designed to remove some of the disparities in drug sentencing between the races. Plaintiff understands lawmakers presented this act to President Trump, and it was signed into law in 2018. The fact pattern suggests lawmakers used Plaintiff's expression of mass incarceration to craft the First Step Act and feigned no knowledge of Ralph W. Baker, Jr. or *Shock Exchange*. Defendants referenced the First Step Act ad nauseum.

IV: *Shock Exchange* asserts treatment – rather than incarceration – would be a better solution to stopping the drug trade and/or crime, which defendants repeat.

V: *Shock Exchange* asserts (i) the majority of black males are jailed in federal prison with longer stays, which has ravaged the black family, (ii) mandatory minimum sentences are driving up the length of stay, and (iii) about half of the U.S. prison population is non-violent offenders, implying we are giving non-violent offenders a "length of stay" as if they are violent offenders. Defenders repeat this narrative. Defendants also estimate a large number of non-violent criminals

could be released without any addition threat to the public – a major conclusion of *Shock Exchange*.

VI: *Shock Exchange* asserts how the growth in the prison population is driven by "length of stay" more so than the number of crimes committed. Defendants repeat this narrative and reference the 1994 Crime Bill – which set mandatory minimums and increased length of stay – at least three times.

VII: *Shock Exchange* asserts Reagan's war on drugs has resulted in frequent arrests of non-violent offenders without reducing violent crime. Defendants repeat this narrative.

VIII: *Shock Exchange* explains the "black tax" – unemployment and incarceration – the cost of being black in America. Defendants repeat this narrative at least five times. Van Jones' narrative is practically verbatim from *Shock Exchange*.

# EXHIBIT H

Below is an analysis of the arrangement of words from *Black AF* versus the *Shock Exchange* mass incarceration arrangement. There is a substantial similarity between the top 5 repeated words and the next 4 repeated words from *Shock Exchange*, and certain passages from *Black AF*. The dissections from *Black AF* occur over pages 2-13.

## *Shock Exchange* – Mass Incarceration Arrangement

Before quantifying the black tax – unemployment and incarceration – I would expect to see a sharp rise in unemployment starting in the late 1970s and early 1980s as the U.S. manufacturing base began to erode. Black men worked their way into middle class status by traveling to northern cities and California where manufacturing jobs were in abundance. The decline in U.S. manufacturing has hurt the economy overall, but African Americans especially. The inverse of this conclusion is that black men, for whatever reason, have been less successful in transitioning from the manufacturing sectors to the service sectors of the economy.

The above chart illustrates the employment-to-population ratio by sex and race, and measures the proportion of the population employed. This may be a better proxy for the true employment picture. The employment-to-population ratio for African-American men in 2010 was 53.1%, as compared to 65.1%, 67.5% and 68.0% for white, Asian and Hispanic men, respectively. Prior to seeing the data I would have expected a sharp decline in the ratio for black males starting in the mid-80s as the country's manufacturing base began to erode. However, the figures were relatively unchanged in 1980 (60.4%) and in 2000 (60.2%), yet fell precipitously by 2010. It reiterates the adage that "when America catches cold, black America catches pneumonia."

There was no noticeable difference in the employment-population ratio amongst women from different racial groups. Overall, the employment-to-population ratio for all women has increased since the early 1970s as more women have entered the workplace. Yet the differential in the ratio between black women and black men is the smallest vis-à-vis other ethnic groups. For instance, in 2010 the differential in the ratio between black men and black women (1.6%) was much less than that of whites (11.1%), Asians (14.5%) and Hispanics (10.4%). The differential may be symptomatic of a U.S. service economy more comfortable with black women in the workplace.

The rate of incarceration also reflects the additional costs of being black in America. One could say that unemployment and incarceration rates are linked in that one (high unemployment) leads to crime and ultimately, incarceration. The abnormally high rate for African Americans is a known truth in the black

community. After doing some research, I found that the U.S. has the highest incarceration rate of any country in the "free world."

The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. The incarceration rate is a function of admissions, times length of stay. Simply based on the number of admissions per capita, the U.S. would not be the world's largest jailor. The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. Critics have also blamed the so-called "war on drugs" for the abnormally high incarceration rate of African-American males (4,797 per 100,000 U.S. residents) as compared to that of white males (708 per 100,000 U.S. residents). Even more damning is the fact that a high percentage of white males are incarcerated in local jails with shorter stays, causing less of a disruption for their families. In contrast, the majority of black males are jailed in federal prison with longer stays – a phenomenon that has practically ravaged the black family. Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for low-level drug transactions and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking.

Senior year, Dr. Hendley presented us with a case involving a town with an exploding population of dogs. The town manager had a dilemma – to control the population by either spading male dogs or female dogs. The logical answer would be to spade the male dogs, since they were the "obvious" culprits. However, if the ratio was 10 female dogs per 10 male dogs and he spaded as many as six male dogs, the remaining four could still service 10 female dogs. Instead, the town manager spaded the female dogs and the dog population decreased proportionately. To that point, attempting to "spade" drug dealers does not have the same impact on the drug trade as spading the user through incarceration, treatment, or education. In no way am I attempting to dissect the criminal justice system, but simply presenting data that supports what Grandma always knew – if you are black in America, odds are you are going to the pen.

# BAF - 1

I eventually realized that my middle room education was the inverse of Woodson's miseducated negro. My mother reverse-engineered a curriculum founded on the words and works of great thinkers like Dorothy B. Porter, Arturo Schomburg, Zora Neal Hurston, and John Edward Bruce, all of whom, in one way or another, are manifestations of Du Bois's mission to manufacture a new measuring tape. I am but a bastard child born with the privilege of wandering into an already constructed house that Du Bois built.

The history I discovered in the middle room wasn't just an alternative version of American history; it was the story of an entirely different place, wholly incompatible with the whitewashed mythology enshrined in our collective memory. I have never known that place because that America, in reality, does not exist.

That story of America is a fantastical, overwrought, and fictive tale. It is a fantasy where Christopher Columbus discovered a land that he never set foot in. It is the story of the Pilgrims on the Mayflower building a new nation. It is George Washington's cherry tree and Abraham Lincoln's log cabin. It is the story of slaves who spontaneously teleported themselves here with nothing but strong backs and a brainful of negro spirituals. It is Betsy Ross's sewing kit and Paul Revere's horse and Thomas Jefferson's pen and Ben Franklins's eyeglasses and George Washington's teeth and liberty and justice for all. And it is a history predicated on lies.

History can never be objective or unbiased because, no matter how hard the storytellers may try, the perception of reality prejudices all stories. The academic field of history is dominated by white men handicapped by the inability to see whiteness's impact on America's biography. The best historians try to approximate the truth by unbending the collection of funhouse mirrors through which the past has been viewed, but it isn't simply a counterfeit version of history, it is a fable that erases the reflection of an entire people to ensure that the mythology of our heroes lives happily ever after.

Because of the middle room, I was not burdened with unbending the funhouse mirror of America's past. For me, the writings of Du Bois, Woodson, and the other Black chroniclers of yesteryear were not counternarratives to a blanched whitewashed version of a somewhat true story. For me, the America that existed in the middle room is the real America. In my education, we are the sun and everything in the history of this nation's existence is simply rotating around the Blackness illuminating our universe.

When we are dead, and all the things that ever were have turned to dust, we will not be history; we will be things that once were. A few of us, however, will have lived a life so notable that a white man might deem it worthy of bending his opposable thumb to register our existence into posterity. The best we can hope for is to become a part of white history because American history is white history. Except for this one. This history is Black AF.

The five most-repeated words for BAF1 were history (12), America (10), middle (8), room (8), white (7). The top five words in Plaintiff's narrative on mass incarceration were black (15), U.S. (11), population (9), incarceration (9), and dogs (9).




BAF1 has a total occurrence of 85% (45 ÷ 53).




The total occurrence for the next 87% (33 ÷ 38).

# BAF – 2

And then there were the coats. Coats were the bane of my childhood existence. I always lost them. I left them on church pews, in cars, and especially at school. And because coats are the most expensive part of a kid's wardrobe, I have received more dressing-downs form my mom about coats than anything except my propensity to forget to pull the garbage can to the curb on trash day. If there is a heaven for jackets, it is almost certainly filled with the misplaced winterwear purchased by Dorothy Harriot. I always, always lost my coat.

So, in fifth grade, when I begged my mother to buy me a "goosedown" – a feather-filled ski jacket with removable sleeves that had become the latest fashion, of course she gave me a lecture about how I'd have to suffer frostbite and hypothermia for the next two winters if I lost my puffy coat. The day my mother bought that goosedown from the Army Navy store was the second-happiest day of my sartorial life, exceeded only by the parachute pants and Ghostbusters tee I received for my birthday a few years later.

One day, I was walking home from elementary school, which required me to walk past the hangout spot where all the thugs cut school to smoke cigarettes and look at "nekkid magazines." I was in one of my trademark dazes when the scent of menthol-laced smoke alerted me to the fact that I was being followed. By the time I tried to run, it was too late. This crew surrounded me and demanded I give up the goosedown. I thought of my mother's wrath. I thought of all the long-lost jackets from the past, from the bootleg Members Only to the Sears Toughskin with corduroy sleeves. I thought of my mother's frostbite warning and the days in the middle room solitary confinement in my future.

I refused. They beat it off me. I struggled so hard that, while they got the body of the jacket, they couldn't get the sleeves. But what good are warm arms when you're walking home with the rest of your body fighting off cold? Of course, I kept it a secret. I wasn't embarrassed about the mugging as much as I was afraid of my mother's wrath when she realized that I no longer had the item on which she had spent an entire $56. I knew she wouldn't buy the mugging story. I had to get it back before she found out. So instead of telling her that I had been robbed, I told my two older cousins, Fred and Squeak, along with my best friend, James Bond. They were already in junior high. They probably knew the culprits. A few days later, as I shivered home from school, avoiding the Newport shortcut, they yelled out for me to come over. They had found it!

There, wearing my sleeveless goosedown was my next-door neighbor, Freaky-D. Freaky-D wasn't big, but he was fearless. At thirteen, he was already smoking marijuana and drinking Colt 45. Apparently, he had been casing my goosedown for months. Surrounded by my investigative squad, Freaky-D swore that he had owned the coat for over a year. His friends, whom I recognized as the muggers, backed him up. They corroborated his story, insisting that he had had the coat for over a year. After a few minutes of interrogation, Double-O, Fred, and Squeak bought his story and let him go. As they walked away, Freaky-D let me know it wasn't over. "Imma remember this, Mikey," he yelled. Freaky-D don't steal!"

The next morning I was called into the principal's office. Sitting there was my mother, along with Freaky-D and the vice principal of the Hartsville Union High School. With tears in his eyes,

Freaky-D recounted how I had masterminded the plot to convince my friends to steal his jacket. As illogical and preposterous as it sounded to me, to the jury in the principal's office, Freaky-D's testimony was perfectly plausible.

I vehemently objected to Freaky-D's lie, explaining that there was no evidence for this wholly untrue story. He was the real jacket thief. Unbeknownst to me, Freaky-D had proof, which was why my mother was summoned to the school. Staring a hole into my soul, she reached into my bookbag and pulled out the evidence that confirmed the true history of the goosedown jacket … the sleeves of which matched perfectly.

The top 5 most-repeated words for BAF2 were coat (18), jacket (15), mother (12), lost (10), and story (9). Total occurrence vis-à-vis Shock Exchange is 121% (64 ÷ 53).



Total occurrence for the next four most-repeated words are also 121% (46 ÷ 38).



# BAF – 3

What you are about to read is a story. The names have not been changed to protect the guilty. In most history books, America is colonized by European "settlers." In chronicling this nation's past, historians recognize that the English, Dutch, Spanish and French colonists are human beings with different backstories, cultures and motivations. We know the political incentives, economic concerns, and social mores that explain away the theft, violence, and genocide they committed against the savage silhouettes that we are too unbothered to name. The people and the cultures whose blood water the stolen landscapes are usually dehumanized by simply remaining anonymous. The stolen Africans are not Akan or Nyamwezi; they are the "slaves." The various indigenous nations who were extinguished are never Oceti Sakowin or even Iroquois; they are just "Indians" or, at most, "Native Americans." Yet, somehow, the states and colonies that replace them have borders, legislatures, and distinguishable features.

Black AF History does not upset this timeless tradition of American scholarship. It uses the same scholarly conventions to which we have become accustomed. To make sure the reader isn't disoriented by a new historical standard, this book recognizes that the English, Dutch, Spanish, and French land thieves are just "white people." While it may sometimes seem abrasive, confrontational, and even dismissive, this book recognizes that the only difference between a burglar and a "settler" is who writes the police reports. In fact, the only difference between the Black AF version of history and the way America's story is customarily recounted is that whiteness is not the center of the universe around which everything else revolves.

While this book does not seek to deify whiteness, it also does not obfuscate the flaws of Black heroes. In this history, Martin Luther King Jr. is a human being who is sometimes afraid. Booker T. Washington and W.E. Du Bois are rivals, but their ultimate goal is the same – to get free. In this book, enslaved Africans are not victims, they are warriors from the Ashanti Kingdom and the founding fathers of the Gullah culture and the creators of America's first democracy.

And while this book is not a complete history of Black people in America, it acknowledges that too much has been stolen for that to ever exist. In this book, there is no America. In this book, the country we know as the United States is just a parcel of land that was stolen and repurposed as a settler state using European logic and the laws of white supremacy. This book is a story about a strong-arm robbery. It is about family and friends trying to recover what was stolen. It is the testimony, and the verdict that jury of our peers has never heard.

I can do that in my history. Freaky-D taught me that. Years later, I asked Freaky-D about the jacket. He acknowledged the he knew it was stolen when he bought it from the thieves. According to Freaky-D, the guys strung him along about the sleeves for days, promising that they would eventually be delivered. He claims he didn't know the coat was mine until Fred, Double-O, and Squeak confronted him about it, which is when he came up with the plan to get the sleeves. And because all history is infused with the historian's values, in Freaky-D's version of history, receiving stolen property doesn't make him a thief.

Like Freaky-D, America don't steal. This is the Black AF history of America. This book is the sleeves.

The top 5 most-repeated words for BAF3 were history (14), America (11), Black (10), book (8) and story (8). Total occurrence vis-à-vis Shock Exchange is 96% (51 ÷ 53).




Total occurrence for the next four-most repeated works vis-à-vis Shock Exchange is 97% (37 ÷ 38).



## BAF – 4

I have an uncle named James. For most of my life I had no idea his name was James. To me, he was "Uncle Junior." James Harriot Jr. was alternately a salesman of marijuana, a Black Panther, Vietnam veteran, and a trusted deacon of the church. He knew things. A lot of things. Like how to use a bandsaw, or bait a hook with a worm. He was infinitely more complex than that, but to me at age ten, that was the essence of Uncle Junior.

One sweltering summer day, I was visiting his house, which sat on a pond with actual peacocks running in the yard, playing outside with my cousin. We asked Uncle Junior for some water, and he made us stand on the porch and drink it, ensuring that we were not committing the ultimate sin of Black households – running "in and out that door." When he collected the drinking glasses, I remember looking through the screen door, watching him put a record on the turntable. I can never forget the music that came out.

He said their names were Earth, Wind & Fire. I want to say that Earth, Wind & Fire is the greatest band in history, but there might be white people reading this book, and I wouldn't want to cause any Beatles fans to have a conniption. I honestly don't know what a conniption is, but my uncle Junior said it a lot. All I know is that it is a medical emergency that is nearly as dangerous as a hissy fit, which is the deadliest kind of fit. But this is not the time for that. This is the time for understanding that Earth, Wind & Fire is basically Jesus-less gospel music. I'm willing to bet you aren't aware of just how many Earth, Wind & Fire songs you know, because they are as ubiquitous as church hymns. And to top it off, they had the three elements of all Great Black Music.

1. They wore jumpsuits. All great music acts must wear jumpsuits. It is a mandate passed down from the Godfather of Soul's backing band, the J.B.'s. Since then, if you want to be great, there must be a point in your career where you must dress like a NASCAR crew that fell in a vat of sequins and rhinestones. Many people wonder why Andre 3000 dressed so weird, but I saw Outkast in concert last summer and Dre dressed exclusively in jumpsuits, and I realized: Ya'll won't let him be great.
2. Falsetto. Prince. Eddie Kendricks. Michael Jackson. Phillip Bailey. All great Black singers must have an extra octave that is reserved for the Holy Ghost and heartbreak.
3. A Horn Section. I don't care what kind of music you are playing – the fact is, everything sounds better with a horn section. Everything. Everyone since the beginning of time knows it. Ask Joshua how he brought down the walls of Jericho. Ask a soldier what instrument he wants played at his funeral. Ask Jesus what sound will signal his return.

Uncle Junior loved Earth, Wind &Fire, which of course, meant that I became obsessed with Earth, Wind & Fire. And, according to him, the only proper way to listen to "The Elements" was on vinyl. Of course, he owned compact discs and cassettes, and even had an eight-track tape player. But for my eldest uncle, Earth, Wind & Fire albums should only be played in their purest form, from beginning to end. Luckily, my favorite EWF tune was the second song on the first side of their album That's the Way of the World.

Have you ever heard That's the Way of the World? If you are Black, the answer is yes. If you have ever been to a cookout, the answer is yes. If you have an aunt who owns a leather miniskirt or a leopard-print blouse, the answer is yes. If you have ever smelled incense burning in a room with a ceiling fan, the answer is yes. To this day, every time I hear it, I remember what joy sounds like. What love tastes like. What home feels like. All of a sudden, I'm a kid again, standing on my uncle's porch, listening to my aunts tell stories through the screen door while my uncle Junior explained the way of the world.

The five repeated words for BAF4 were uncle (17), junior (15), music (12), story (11), and family (10). Total occurrence vis-à-vis Shock Exchange is 123% (65 ÷ 53).



Total occurrence for the next four most-repeated words vis-à-vis Shock Exchange is 121% (48 ÷ 38).



**BAF – 5**

Uncle Junior loved Earth, Wind &Fire, which of course, meant that I became obsessed with Earth, Wind & Fire. And, according to him, the only proper way to listen to "The Elements" was on vinyl. Of course, he owned compact discs and cassettes, and even had an eight-track tape player. But for my eldest uncle, Earth, Wind & Fire albums should only be played in their purest form, from beginning to end. Luckily, my favorite EWF tune was the second song on the first side of their album That's the Way of the World.

Have you ever heard That's the Way of the World? If you are Black, the answer is yes. If you have ever been to a cookout, the answer is yes. If you have an aunt who owns a leather miniskirt or a leopard-print blouse, the answer is yes. If you have ever smelled incense burning in a room with a ceiling fan, the answer is yes. To this day, every time I hear it, I remember what joy sounds like. What love tastes like. What home feels like. All of a sudden, I'm a kid again, standing on my uncle's porch, listening to my aunts tell stories through the screen door while my uncle Junior explained the way of the world.

Perhaps the only thing Uncle Junior loved more than the group he called "The Elements" was correcting people's stories. Whenever my family members gathered, the children would usually sit on the floor while the adults entertained each other with stories that stretched back generations. And without a doubt, every time somebody got "creative" with their version of a "vent," Junior was there to make sure the truth was told. When my mother recounted the tale of the time Uncle Junior brought home a skittish black cat and hid it in the bathroom closet so my grandparents wouldn't know about it, and how that cat went on to leap out in the middle of the night and nearly claw her to death, Uncle Junior reminded her that the cat was technically more of a midnight gray, and in reality, it barely scratched her. When my aunt Marvell delighted us with the story of how my grandfather saved an entire family from a blazing house fire, he would interrupt to point out that it was mostly smoke and very few flames. He would eventually take over the story and tell it with less hyperbole, yet still, he would somehow make his version the more interesting one. He was a living, breathing fact-checker; a human footnote with impeccable storytelling technique. It was his passion.

Uncle Junior wasn't necessarily a killjoy, either; he was just someone who was as concerned about the fidelity of the family stories as he was about imparting history of the sound of God's house band. Knowing this, I would sometimes use this particular idiosyncrasy to endear myself to him. If Uncle Junior wasn't at a family gathering, I would call him up afterward and regurgitate the stories back to him while he made his corrections. I trusted his version would be the definitive version and more interesting. But truthfully, I didn't really care about the family epics as much as I just enjoyed hearing him attempt to rectify the misrepresented facts. Not only was it hilarious to me, but it gave me a chance to have one-on-one time with my uncle. This ongoing habit didn't just strengthen my storytelling muscle and inform me about my family, it also taught me not to trust anyone's version of history unless I corroborated it with an independent source, which, ironically enough, is the same method I used to learn the history of America.

The top five repeated words for BAF5 were uncle (13), junior (12), story (11), music (10), and America (9). Total occurrence for BAF5 vis-à-vis Shock Exchange is 104% (55 ÷ 53).




Total occurrence for the next four most-repeated words is 111% (42 ÷ 38).



**BAF – 6**

If all else failed, we could simply "follow the drinking gourd," which of course was the code name for the Big Dipper. I volunteered to show them how to find the Big Dipper in the night sky, because you never knew if the fugitive slave catchers had an APB out on our canary yellow station wagon. While they had no interest in learning about the Underground Railroad-based astronomy, my grandmother did have one question. "Mikey, where did you learn all this stuff from, boy?" she asked. Now I was confused. I couldn't tell if she was impressed or perturbed. She had always told me that there are no stupid questions, but she was coming dangerously close to proving her adage wrong. "Where do you think I learned it?" I replied. "The middle room."

In 1952, James and Marvell Harriot built a house for their eight children in Hartsville, South Carolina, a scant twenty-two miles from the forced labor camp where James S. Bradley enslaved 253 human beings, including Marvell's great-great-grandfather Ervin. The Harriot house had four bedrooms, one bathroom, a dining room, and a living room you enter only if you were entertaining company, had obtained verbal permission, or if somebody who had the Holy Ghost died. But the best room was in the center of the house, a den-style family room that would eventually be called the "middle room." Five generations of the Harriot family would play, pray, laugh, sing, dance, and learn about the world from the middle room's vantage point. Long before I was born, my grandfather lined the entire middle room with sturdy oak shelves, and over the years, to this very day, everyone in the Harriot clan has deposited their books there. It rivals almost any independent bookstore and some libraries, with stacks and stacks of books on topics from science fiction to history. It also contained a state-of-the-art television set, turntable, and hi-fi eight-track tape player that mostly played James Cleveland albums, episodes of Trapper John, M.D., and election results. The burnt umber carpet was where I learned how to play Uno, Spades, and Acey-Deucy (the remedial version of backgammon). The middle room was also a stage for family talent shows, a courtroom, and – most importantly – the homeroom, study hall, and resource center for all four pupils enrolled in the Dorothy Harriot Elementary School for Dorothy Harriot's Children.

When I was a child, my mother chose to homeschool my sisters and me. As an adult, she informed me that my early homeschooled education was an experiment due to her belief that "a Black child cannot fully realize their humanity in the presence of whiteness." Although she drilled us on mathematics, grammar and the Bible, our schooling was primarily self-directed, courtesy of the middle room. I read anything and everything, which led to many awkward incidents, like the strange side-eye I received at church after I read The Autobiography of Malcolm X at nine years old and began each sentence with "if it is Allah's will." When I was twelve, after reading the science-fiction novel The Soul of a Robot, I stumbled across W.E.B. Du Bois's The Souls of Black Folk. That couldn't be much different, right? I was scarcely two pages in when I read this …

Reading this, my brain fired off a dozen questions. Where was this alternative universe that had reduced Blackness to an afterthought? And through whose eyes did Du Bois see himself? I would later discover The Mis-Education of the Negro, in which Carter G. Woodson explains that in the American education system, the entirety of Black people's existence "is studied only as a problem or dismissed as of little consequence." Du Bois eloquently echoed this sentiment,

asking, "Between me and the other world there is ever an unmasked question: unmasked by some through feelings of delicacy; by others through the difficulty of rightly framing it. All, nevertheless, flutter round it. How does it feel to be a problem?"

I eventually realized that my middle room education was the inverse of Woodson's miseducated negro. My mother reverse-engineered a curriculum founded on the words and works of great thinkers like Dorothy B. Porter, Arturo Schomburg, Zora Neal Hurston, and John Edward Bruce, all of whom, in one way or another, are manifestations of Du Bois's mission to manufacture a new measuring tape. I am but a bastard child born with the privilege of wandering into an already constructed house that Du Bois built.

The top five repeated words for BAF6 were middle (12), room (12), history (11), Black (10) and America (9). Total occurrence is 102% (54 ÷ 53).



Total occurrence for the next four most-repeated words is 111% (42 ÷ 38).



# EXHIBIT I

Below is a side-by-side comparison of passages from *Black AF* and *Shock Exchange*.

| ***Black AF*** | ***Shock Exchange*** |
|---|---|
| **(I)** I remember when I discovered America. It happened around 8 p.m. on November 4, 1980 – the night Ronald Reagan was elected president. I was on my knees, crying, sending desperate pleas to my Lord and Savior Jesus when I was interrupted by my grandmother summoning me … When she saw tears streaming down my face, she asked what was wrong. I confessed … I was listening to grown folks talking. I told her that I couldn't understand how she was so calm when our worst fears had been realized … I spilled the beans about how I overheard her tell my mother a few weeks ago, **"If Reagan is elected, he'll send Black people back in the cotton fields."** That sent my mind spinning. I didn't know how to pick cotton … After my grandmother finished explaining the sarcasm … I felt relieved, albeit a bit embarrassed. I still wasn't quite sure if they were trying to make me **feel better about our impending enslavement** … (Pages 2-3) | I watched the 1980 presidential election in the living room with my mother. We watched as the states rolled in – Reagan was defeating Jimmy Carter by a landslide. But there was still hope. Up next was Virginia, which has always been a Republican state. When the screen showed Reagan had taken Virginia by a huge margin and it was clear he was going to be the next president, Suzie exclaimed, **"Black folks are going to catch hell now!"** I slid over out of arms' reach and asked, "Why?" Never looking at her smart-aleck teenaged son, she said cryptically, "Just wait and see." P. 75<br><br>Reagan's so-called war on drugs turned out to be nothing more than a war on African Americans. The increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. The policy has eradicated black families … When Reagan said "big government was bad," what African Americans heard was "Reagan wants to put us out of work."P.80 |
| **(II)** African Americans registered to vote in droves. South Carolina's Black voters quickly outnumbered whites. In 1968 the Black majority elected Francis Lewis Cardozo as the South Carolina secretary of state … Black voters also sent Richard Cain, superintendent of AME missions and pastor of the historic Emmanuel AME Church … to the state senate. In the state house of representatives was Union veteran and hero notorious Robert Small. By 1870, the lieutenant governor of South Carolina was Black. A Black man was on the state's supreme court. And the state house of representatives was *majority Black* | Prior to the Conservative Democrats gaining favor in the late 1880s, Virginia politics was controlled by the Readjuster Party, co-founded by Confederate General Robert William Mahone and Harrison Riddleberger, a lawyer from Woodstock, Virginia. After the Civil War, Virginia was left with debt of approximately $50 million …<br><br>After West Virginia seceded from the state, 'Readjusters' felt the debt should be readjusted downward and West Virginia should pay its fair share of the debt burden. Mahone and Riddleberger formed coalitions |

| | |
|---|---|
| … and as soon as they ascended into office they started exercising Black power … Black power was real … They controlled the political base in the cities and states. There was only one choice for the cowards. They summoned the mob. Pages 199-200<br><br>Across the country … states passed segregation laws and disenfranchised Black people en masse. | with progressive thinking factions and took advantage of blacks' growing political power. William E. Cameron was elected governor from the Readjuster Party in 1882. At the time, three state senators and 11 delegates were black.<br><br>Cameron's administration passed progressive legislations like the abolition of anti-black voting regulations, the establishment of Virginia State University, and increased funding for public schools. Both Republicans and Democrats alike wanted to quell black advancement, which meant destroying the Readjuster Party. By 1883 the Readjusters had lost majority control of the state legislature and the governorship to the Conservative Democrats. By 1902 the state legislature passed laws which eliminated voting rights of blacks, and stated for the first time that the races were to be educated at separate schools. |
| **(III)** Unlike Colvin, Browder, McDonald, Smith, and Reese, Parks planned her protest. She served as secretary for the Montgomery chapter of the NAACP and had participated in civil rights activities for more than a decade … When Professor Robinson heard of Parks's arrest, she was fed up. After her prized student Browder had been arrested for the same thing, Robinson tried to convince her organization, the Women's Political Council, to organize a citywide bus boycott … they printed thirty-five thousand flyers calling for a one-day citywide boycott and passed them out to local churches …<br><br>On December 5, 1955, a group of leaders formed the Montgomery Improvement Association (MIA) and asked Robinson to lead it … Nixon suggested a younger face for the movement, nominating the new pastor of **Dexter Avenue Baptist Church**: the | Prince Edward County had a segregated school system, which was condoned by the government as long as schools were "separate but equal." However, in 1951 450 students at Robert Russa Moton High School walked out to protest what they deemed to be an inferior education at inferior facilities … Barbara Johns was the niece of Vernon Johns, a famous preacher at the Dexter Avenue Baptist Church in Montgomery, Alabama. Johns also hailed from Prince Edward County and was considered one of the top African American preachers of his day. Johns was branded a radical, as he was staunchly opposed to segregation … Sermons like "It's Safe to Murder Negroes in Montgomery," a failed protest against blacks having to set in the back of the bus and an attempt to eat at a "whites only" restaurant caused angst among the members at Dexter Avenue. |

| | |
|---|---|
| Reverend Martin Luther King, Jr. Unlike the women who stood up for their rights, King was reluctant. He wanted a more low-key position. | After four years, Johns and Dexter Avenue parted ways. Afterwards, the church sough a less-established and less-controversial preacher. It settled on **Martin Luther King, Jr.** Though King gained notoriety for his **bus boycotts** and nonviolent marches, he credited Johns … Pages 4-5 |
| **(IV)** NAACP attorney Fred Gray decided to get involved … Gray won the case in U.S. district court, but the city appealed to the Supreme Court. On December 17, 1956, the Supreme Court rejected the city's appeals, affirming the district court's ruling in *Aurelia S. Browder, et al. v. W.A. Gayle, et al.* Segregation was unconstitutional on Montgomery city transportation, and on December 20, 1956, the Montgomery boycott ended. Pages 275-276 | While Johns was in Montgomery during the school walkout, he advised his niece over the telephone. Lawyers from the Virginia Chapter of the NAACP, along with students and the townspeople, filed a legal case to end segregation altogether. In May of 1951 they filed *Davis, et al. v. County Board of Prince Edward County* in the federal district court in Richmond … On appeal, the case was bundled with four other cases that collectively made up the 1954 landmark case of *Brown v. Board of Education of Topeka*, overturning segregated schools in the U.S. |
| **(V)** President Nixon fixed the profit problem by declaring a "war on drugs." In 1970, almost 200,000 Americans were in prison. By 1985 there were almost 482,000. By the end of 2019, there were 1.4 million people locked up in U.S. prisons … P.328 | U.S. incarceration rate increased 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010. |
| **(V)** You're in South Carolina where Black people make up around 28 percent of the population and 58 percent of the states incarcerated people.<br><br>Black Americans were incarcerated at nearly five times the rate of whites. | Critics blamed the war on drugs for abnormally high incarceration rates for African Americans (4,797 per 100,000) versus white males (708 per 100,000). |
| **(VI)** We have always known that arresting drug dealers and drug users doesn't affect the proliferation of drugs. P.378 | Instead of reducing the level of violent crime in America, the war on drugs has resulted in a frequent number of arrests for low-level drug transactions and non-violent offenders; about 50% of the U.S. prison population represents non-violent crimes. Nor will it ever reduce drug trafficking. |

I: *Shock Exchange* describes how he and Suzie (his mother) watched the 1980 election results. After it was clear Ronald Reagan would win, Suzie predicted Blacks were **going catch hell** under Reagan. Harriot repeats this sentiment. Harriot reminisces about the night of the 1980

presidential election. Harriot "claims" he was praying out of fear that Ronald Reagan would get elected because he grandmother had predicted Reagan would **send Blacks back into the cotton fields** (back to slavery).

Suzie predicted doomed for Blacks, **"Just wait and see."** Harriot claimed he had angst over the impending doom Blacks' faced under Reagan, carefully imitating the narrative from *Shock Exchange*. Suzie's prediction came true as Reagan's war on drugs resulted in (i) Blacks being arrested at historic levels, and (ii) Blacks being laid off from "good government jobs."

In 1980 Plaintiff was 13 years old, and becoming political aware. This was the first election Plaintiff ever tried to analyze and determine how it the president would shape the world. Plaintiff understands Harriot was born in 1972, and would have been eight years old. It strains credulity that a third grader would have the same discernment about politics or the world as an eighth grader.

Coincidentally, in the 1619 Book, Kiese Laymon "claims" that in 1984 his sister warned him about Reagan:

> … Rae kept saying that Jesse's speech was going to do for us what Reagan's speech did for white folks at the Neshoba County fair four years ago. Ronald Reagan came to the fair and said some words like 'states rights …' Those words made Rae, Mama and Granny, and our whole church so scared we had to leave … Rae told me that **Ronald Reagan came to Mississippi to offer white folks an all-you-can-eat buffet of Black suffering.**[1]

Plaintiff understands Kiese Laymon was born in 1974. In 1984 he would have been 10 years old and in 1980, when Reagan made his speech in Neshoba county, Laymon would have been six years old. The fact pattern suggests that Harriot, Laymon and other Agents are mimicking *Shock Exchange* and making the rest up as they go along.

II: *Shock Exchange* describes the rise of the Readjuster Party in Virginia during reconstruction. The Readjusters won on the strength of the black vote. Afterwards, Blacks were being elected as state senators and delegates, and passed progressive laws and helped shaped laws. The opposition parties destroyed the Readjuster Party by disenfranchising blacks.

*Black AF* describes the rise of black political power during reconstruction. To quell black advancement, whites disenfranchised blacks and denied them the right to vote.

III: *Shock Exchange* describes how black teenagers in Prince Edward County walked out of the school, boycotting unequal conditions vis-à-vis white schools. In some respects, this could be considered the beginning of the civil rights movement. Teenager Barbara Johns was being advised by Vernon Johns, her uncle and minister at Dexter Avenue Baptist Church in

---

[1] Nikole Hannah-Jones, The 1619 Project: A New Origin Story, Page 413.

Montgomery, Alabama. Vernon Johns led boycotts in Alabama, protesting Blacks having to sit in the back of the bus, among other things. He was considered too radical for the congregation and replaced by Martin Luther King, Jr.

*Black AF* describes how Martin Luther King, Jr. led a boycott in Montgomery, Alabama against Blacks having to sit at the back of the bus.

IV: *Shock Exchange* describes how in 1951 Blacks in Prince Edward County to protest an unequal school system, ultimately leading to the de-segregation of public schools. *Black AF* describes how citizens of Montgomery filed a lawsuit, ultimately leading to the de-segregation of city transportation. *Shock Exchange* illustrates how Blacks' fight for civil rights was two-part movement. This is Plaintiff's unique expression. Harriot and *Black AF* carefully imitate it with an attempt to supersede it. It is not a scene-a-faire to discuss reconstruction and the civil rights movement – any other movement or any other period – simultaneously.

V: *Shock Exchange* describes how mass incarceration has exploded, which Black AF repeats.

VI: *Shock Exchange* describe how simply arresting drug dealers will not stop drug dealing, which Black AF repeats.

# EXHIBIT J

Details Of Contributory Infringement

Any time one copies or uses the work of an author it is referred to as copyright infringement. To prove copyright infringement, the plaintiff must prove (1) ownership of a valid copyright; (2) the defendant has copied the work; and (3) such copying constitutes unlawful appropriation. Defendants' use of Plaintiff's work without his permission is in fact copyright infringement.

A type of secondary liability for copyright infringement in which one party may be held liable for the infringing acts if the party has knowledge of the infringing activity and makes a material contribution in aid of the infringement. Contributory copyright infringement is a way of imposing secondary liability for infringement of a copyright. It is a means by which a person may be held liable for copyright infringement even though he or she did not directly engage in the infringing activity. It is one of the two forms of secondary liability apart from vicarious liability. Contributory infringement is understood to be a form of infringement in which a person is not directly violating a copyright but induces or authorizes another person to directly infringe the copyright. Defendants have infringed upon the rights of the Plaintiff and his works, and profited from this infringement.

When another party uses or distributes your copyrighted work without consent, he or she may be found liable for copyright infringement. There are several types of copyright infringement. (i) Direct infringement occurs when a party uses copyrighted work without consent from the owner of the copyright. (ii) Contributory infringement occurs when a party aids in another party's unauthorized use of the copyrighted work. (iii) Vicarious infringement occurs when a company benefits from a party's infringement, despite having the ability to stop the infringement.

## Proving Copyright Infringement

Plaintiff can prove defendants have wrongfully misappropriated his work. Proving copyright infringement requires you to prove that you are the owner of the copyright and that another party copied the copyrighted work. Parties accused of copyright infringement may claim that their use of the copyrighted work is legal, as it is considered fair use. Under the concept of fair use, a party may use a copyrighted work in limited circumstances (e.g., for educational or comedic purposes). In this case defendants used Plaintiff's literary work without permission. The doctrine of contributory infringement is based on the 1911 case of *Kalem Co. v. Harper Bros.*, 222 U.S. 55 (1911). The Second Circuit Court of Appeals asserted contributory infringement occurs when someone, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another. *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971). Defendants' action of infringement caused and materially contributed to the infringing conduct against the Plaintiff. Due to this infringement, defendant(s) have made millions of dollars based on the work of the Plaintiff. The Plaintiff should be compensated for his literary work.

"Random similarities scattered throughout the works" do not support a finding of substantial similarity. *Montgomery v. Holland*, 408 F. Supp. 3d 353, 363 (S.D.N.Y. 2019). The similarities between *Shock Exchange* and the plagiarized works are not random. *Shock Exchange* is one hundred percent Plaintiff's work based on his time, talent, and literary skill. Defendants exemplify copyright infringement, and they should be held accountable for their actions.

Willful blindness is knowledge, in copyright law. The court held in the Second Circuit that willful blindness is knowledge the *Digital Millennium Copyright Act. Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012). The court held "Were Tiffany to prevail in its

argument that eBay was willfully blind, the 'reason to know' standard of the Inwood test would be inflated into an affirmative duty to take precautions against potential counterfeiters, even when eBay had no specific knowledge of the individual counterfeiters." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 513-15 (S.D.N.Y. 2008), Omega, 984 F.3d at 255 ("Tiffany provided a test for identifying which scenarios could result in liability: '[C]ontributory liability may arise where a defendant is . . . made aware that there was infringement on its site but . . . ignored that fact.'"), with *Tiffany*, 600 F.3d at 107.

Below are details that demonstrate defendants knew or should have known about contributory and third-party infringement because it is central to their business model(s). *ReDigi*, 934 F. Supp. 2d at 659, *Anderson v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 969 (N.D. Cal. 2024). An individual or entity may be held liable as a contributory infringer if that individual or entity, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing activity of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

On September 27, 2023, Jelani Cobb and Coates led a panel discussion. Coates has taught writing at Massachusetts Institute of Technology, New York University, and Howard University, amongst others. Coates confessed that plagiarism, copyright infringement and copying other authors' language, sentence structure and expression of ideas without permission is central to the business models of all colleges.

> Jelani Cobb: Writers read, but writers don't read the way that readers do. (Around the 8:27:20 mark)
>
> Ta-Nehisi Coates: That's right! That's right! (Around the 8:27:32 mark)
>
> Jelani Cobb: The analogy I always use is that an engineer doesn't drive over a bridge the way a commuter does. And engineer's driving over that bridge and going, 'Uhh, I see what you did there. You counterbalanced this with … the low bearing structures are over

> here.' Because they're looking at the language and **the mathematics of that structure** … So **writers are looking at the actual math** of the reading that they do. Like, 'Why does that sentence work? And if I had to **reverse engineer** that sentence …' Sometimes you take one word out and that sentence falls or you add one word in and that sentence falls.
>
> And the part of kind of training as a writer is being able to discern which of those it is … the engineering part of writing … The best hope you have of crafting something that stays with people is mastery of that knowledge. And the way that you do that is by relentless reading and the kind of …'applied reading …' you know, reading the same sentence five times … 10 times until you understand exactly why it sounded the way that it did in your head, and the ability to do that is fundamental.
>
> Coates: When I was writing *Between the World and Me* … I read *[The] Fire Next Time* here at Howard University and was like, totally like blown away. And when I went back to write *Between*, I was like, 'I got to figure out what this dude did.' (Around the 8:28:40 mark)
>
> Jelani Cobb: We talked about that, like when you were working on it.
>
> Ta-Nehisi Coates: What is this guy doing? It's not enough to say 'This is a great book that I want to go write a book that I hope is good. I got to figure out what this guy's … I got to read … Now that [what another author is doing] sounds simple. Now you try to write that and smoothly move, without anybody noticing that you've done it [copied the author's expression] it's extremely, extremely hard. But once you know he's doing that, you can literally try it. (Around the 8:30:25 mark)[1]

"Reverse engineer" connotes examining the composition of another person's language, sentence structure and arrangement of words to duplicate it. In a 2022 panel discussion at Howard, a student asked Coates how he helps students find their own voices. Coates replied that he teaches students how to steal.

> Student: What are some of the ways you challenge your students to think creatively and think critically that allows them to have their own voice in their writing? (Around the 5:30 mark)
>
> Coates: The way I conduct my writing class is there's a pretty healthy amount of reading. What I try to do is train them. **This is true in any writing class.** I try to train them to read like writers and not like readers. I always tell them over and over again this is not book club. By which I mean, I try to challenge them to not say, 'I like when X, Y and Z did A, B, C. I try to get them to say, 'This is what X Y, Z is doing and I could steal that for myself.'**[2]

[1] "International Black Writers Festival 2023 Day 2," Moorland-Spingarn Research Center, YouTube, September 27, 2023. (Around the 8:27:00 to 8:31:00 mark)
[2] "Professor Ta-Nehisi Coates Back to the Mecca P2," YouTube, September 14, 2022.

All of the "College Agents" as defined in the Complaint have benefited from and engaged in contributory infringement. Such College Agents include, but are not limited to, New York University, California State University, Los Angeles, Columbia University, University of California, Santa Cruz, Joh Jay College, Harvard University, University of Pennsylvania, Northwestern University, and Grand View University.

The majority of the College Agents are known as "research institutions" that foster tenured professors who perform research and write articles and books that advance institutional knowledge, and drive College Agents' reputations as experts in a particular field. Research and writings can potentially lead to more research grants and donations. Plaintiff understands that to receive tenure, professors must produce writings and research. Liability may be imposed on a College Agent "who had no knowledge of the infringement, but who had (1) the right and ability to supervise the infringing activity; and (s) a direct financial interested in such activity." *Feder v. Videotrip Corp.*, 697 F. Supp. 1165 (D. Colo. 1988). This pressure could potentially induce certain defendants to plagiarize *Shock Exchange*. Courts have also look to whether defendants investigated or would have reason to investigate infringement. *Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023). Cease-and-desist letters and officer and employee statements could also be seen as evidence that defendants were put on notice pursuant to third-party infringement. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013).

R. BAKER
112 S. Elliott Pl
Brooklyn NY 11217

USM 5W
SDNY

RECEIVED
SEP 21 20__
PRO SE OFFICE

500 Pearl Street
New York NY 10007
Attention PRO SE

USM 5W
SDNY

MARQUE SCOTCH BRAND
SINCE/DEPUIS 1925

26-cv-8385

RECEIVED
2026 SEP 19 PM 7:21
U S DISTRICT COURT SDNY